**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**PREFERRED MANAGEMENT CORPORATION, d/b/a, Preferred Home Health Care, Preferred Medical Care, Inc., Preferred Home Health Care–Vincennes, Inc., d/b/a Preferred Home Health Care–Lafayette, and Preferred Home Health Care–Vincennes, d/b/a Preferred Home Health Care–Vincennes, Defendants.**

No. IP98–1697–C–B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

March 1, 2002.

Jo Ann Farnsworth, Equal Employment Opportunity Com'n, Indianapolis, IN, for plaintiff.

Daniel C. Emerson, Bose, McKinney & Evans, Indianapolis, IN, for defendants.

## ENTRY ON ALL PENDING MOTIONS

BARKER, District Judge.

### I. *Introduction and Outline.*

This is an employment discrimination case involving alleged religious harassment and disparate treatment in violation of Title VII, 42 U.S.C. §§ 2000e et seq., as amended, 42 U.S.C. § 1981a. The case consists of two categories of claims: "pattern or practice" claims and individual disparate treatment claims. Both categories include allegations of hostile work environment and allegations of job discrimination. More specifically, the complaint alleges that the defendants (collectively known here in the singular as "Preferred") engaged in a pattern or practice of unlawful conduct, in that it systematically created or condoned a hostile and abusive work environment based on religion, and systematically engaged in discriminatory employment actions on the basis of religion. It also alleges disparate treatment claims on behalf of seven individual complainants in that Preferred allegedly created or condoned a hostile and abusive work environment based on religion affecting six of the complainants, and unlawfully based specific employment decisions affecting all seven complainants on religious criteria.

The case is before us on defendant's motion for summary judgment as to all claims. We also address here three collateral but significant matters. Two of the collateral issues were raised in Preferred's "Establishment Objections" (which we construe as a motion to strike certain of the EEOC's statements of fact and the evidence upon which they rest) and in the EEOC's Motion for Partial Summary Judgment on Preferred's affirmative defenses. The third preliminary issue was raised by Preferred on summary judgment. It alleges that some of the EEOC's claims do not rest on a timely charge of discrimination so that the EEOC's pattern or practice claim is time barred, as is the failure-to-hire claim on behalf of Teresa Raloff. We address these pending motions and related matters here because they are inextricably intertwined with the merits on summary judgment.

Because this case is complicated, we acknowledge that this Entry is long. Accordingly, we provide the following outline in order to facilitate access to its various parts and analyses.

II. *Statement of Facts*

 A. *Facts Generally Relevant to All Claims.*

 B. *Facts Pertinent to Individual Claims.*

 1. *Theresa Raloff.*

2. *Sondra Sievers*

 a. *Facts Pertaining to Religion.*

 b. *Events Leading to Ms. Sievers' Demotion and Discharge.*

3. *Ellen Blice.*

 a. *Background.*

 b. *Events Leading to Ms. Blice's Termination.*

4. *Suzanne Elder.*

 a. *Background.*

 b. *Ms. Elder Resigns from Employment.*

5. *Sherry Stute.*

6. *Diana DeWester.*

7. *Mary Mulder.*

III. *Analysis*

 A. *Summary Judgment Standard*

 B. *Preliminary Matters*

1. *Preferred's "Establishment Objections."*

2. *Charge Filing Statute of Limitations and Teresa Raloff's Claim*

3. *EEOC's Motion for Partial Summary Judgment*

 C. *Hostile Environment and Constructive Discharge.*

1. *The Law of Hostile Environment.*

2. *Pattern or Practice.*

3. *Individual Harassment Claims.*

 a. *Sondra Sievers*

 b. *Ellen Blice*

 c. *Suzanne Elder*

 d. *Sherry Stute*

 e. *Diana DeWester*

 f. *Mary Mulder*

4. *A Note on Coercion*

5. *Vicarious Liability versus Negligence*

6. *Constructive Discharge*

 D. *Individual Disparate Treatment Claims.*

1. *Legal Analysis*

2. *Sondra Sievers: Demotion, Discharge, Retaliation.*

 a. *Ms. Sievers' Demotion.*

 b. *Ms. Sievers' Discharge*

 c. *Retaliatory Discharge*

3. *Ellen Blice*

 a. *Discriminatory Discipline*

 b. *Discriminatory Discharge*

 i. *The Decision Maker*

 ii. *Ms. Blice's Discharge*

4. *Sherry Stute: Failure to Promote.*

IV. *Conclusion.*

For the reasons explained here, We DENY Preferred's motion for summary judgment except with respect to the EEOC's claim that Ellen Blice was the victim of discriminatory discipline. We construe Preferred's "Establishment Objections" as a motion to strike and DENY that motion. We GRANT the EEOC's motion for partial summary judgment in all particulars, *except* for its request that we find as a matter of law that PMC is a proper defendant and *except* for its request that we find admissible all evidence of Preferred's conduct before June 18, 1995 and after July 26, 1996. To the extent that Preferred's arguments concerning statute of limitations may be viewed as a motion separate from its motion for summary judgment, we DENY that motion and conclude that none of the EEOC's claims is barred by any statute of limitations.

## II. *Statement of Facts*

A. *Facts Generally Relevant to All Claims.*

It is a commonplace of summary judgment jurisprudence that we recite the facts

in a light reasonably most favorable to the plaintiff as the party opposing summary judgment and that we resolve all disputes of fact in the plaintiff's favor. These principles are of more than ordinary importance here, because many of the facts, and even the facts' nuances, are hotly contested. Where, as here, the parties advance different theories of the case, they tend to question whether certain facts are even relevant, much less material.

We remind the parties—and particularly the defendant moving for summary judgment—that, since we do not weigh the evidence, we do not seek a "balanced" recitation of the facts. We recite the facts "uniformly favorable" to the non-moving party. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997). Similarly, notwithstanding Preferred's objections to the EEOC's "selective editing" and other literary devices, the EEOC has no duty on summary judgment to be "fair" or "balanced" or "complete" in its presentation of the facts. Fairness is for trials. Summary judgment tests only whether the plaintiff has presented legally sufficient evidence to go to trial. Accordingly, the EEOC's only obligation on defendant's motion for summary judgment is to present admissible evidence tending to raise genuine issues of material fact.

### 1. *The Company and its Management Personnel.*

The Preferred companies consist of four operating companies,[1] a real estate company,[2] and a management company.[3] Pl. Add. Facts, ¶ 661. All of the Preferred entities are owned equally by Jackie Steuerwald and Greg Steuerwald (husband and wife). Pl. Add. Facts, ¶ 663. All of the Preferred companies use the same personnel manual, financial policies, and employee benefits. Pl. Add. Facts, ¶ 664. With the exception of Preferred Properties, all of the Preferred entities have the same officers and board of directors. Pl. Add. Facts, ¶ 665. Preferred Management Corporation (hereafter "PMC") provides training for all of the operating companies; it also manages the operating companies' payrolls, finances, information systems, and human resources. Pl. Add. Facts, ¶¶ 667, 667. The defendants here are the Preferred entities that are engaged in operating home health care services. We refer to them collectively throughout as "Preferred."

Michael Pyatt was employed by PMC as Director of Human Resources from October 1994 through 1998. He was a member of the executive management team. He had authority to hire for any position within the company and oversight of all decisions to terminate. He was responsible for all training with respect to personnel. He also participated in creating and reviewing company policies. Pl. Add. Facts ¶¶ 678–683.

Denise Schrock is Preferred's Chief Financial Officer. As CFO, her primary responsibility is the company's fiscal condition and its overall management. She also helps make company policy. Pl. Add. Facts, ¶¶ 684–687.

Diane Christian started as a director of training and development in 1991; she later became the company's Northern Area Administrator. As the Northern Area Ad-

---

**1.** The four operating companies are: Preferred Care Unlimited; Preferred Medical Care; Preferred Home Health Care–Vincennes, Inc., d/b/a/ Preferred Home Health Care Vincennes; and Preferred Home Health Care–Vincennes, d/b/a/ Preferred Home Health Care–Lafayette.

**2.** The real estate entity is known as Preferred Properties.

**3.** The management company is Preferred Management Corporation.

ministrator, her job duties included visiting the northern branches and meeting with the branch managers to discuss issues in the office such as client load, patient problems, personnel issues and issues in the health care market. In 1995 or 1996, she became Preferred's Chief Nursing Officer, which made her a member of the executive management team. Pl. Add. Facts ¶¶ 688–690.

Ann Parker was Preferred's Southern Area Administrator from some time in 1990 through November 1995. As Southern Area Administrator, she supervised branch managers in the Vincennes, Jasper and Washington offices. Pl. Add. Facts ¶¶ 692, 693.

Teresa Jennings (later Hedges) was promoted to Southern Area Administrator in December 1995. As the Southern Area Administrator, she had authority to hire and fire employees. Pl. Add. Facts ¶¶ 694, 697.

Gregg Johnston was the Director of Program Development at Preferred and was responsible for marketing. Pl. Add. Facts ¶ 698.

Nellie Foster was initially hired as a consultant for Preferred; in January 1996, became a member of the corporate team as a training and development manager. Ms. Foster's previous work experience included working as a minister of Christian education at the Southwest Church of God.

Sue Klein became the interim branch manager for the Vincennes branch in mid-November 1995. After being interviewed by a panel, Darlene Wright sent a summary of the panel's evaluations to Jackie Steuerwald, who decided to promote Ms. Klein to the branch manager position. Ms. Klein had had no managerial experience prior to being named interim branch manager at Vincennes. As an interim branch manager and as a branch manager, Sue Klein's responsibilities included overseeing the functions of the office and the staff, managing the financial aspects of the branch, hiring employees, and disciplining employees. Pl. Add. Facts ¶ 712, 734–737.

Wanda Wallace became acting branch manager for the Evansville branch in February 1996. Ms. Wallace trained and supervised Sherry Stute. Pl. Add. Facts ¶¶ 738–740.

Since 1990, Darlene Wright has been the personnel director for the southern district of Preferred. Ms. Wright's responsibilities include pre-screening of applications, preliminary interviewing of applicants, making recommendations to supervisors about applicants, making recommendations about corrective actions and discipline, and making recommendations for termination. Pl. Add. Facts ¶¶ 741, 742.

Donna Drew started as a field nurse in 1993. In 1996 or 1997, she was promoted to be RN Supervisor in the Vincennes office. Pl. Add. Facts ¶¶ 743–744.

### 2. *Religion and the Work Place.*

Preferred's guiding hand is Jackie Steuerwald, the company's co-owner and chief executive officer. Def. Facts, ¶ 2. Ms. Steuerwald identifies herself as a practicing Christian who adheres to a literal interpretation of the Bible, which she reads daily. She professes a concept of salvation by the grace of God and that she is "born again." Ms. Steuerwald believes that God directed her to establish PHHC in Vincennes and that Preferred is God's home health care agency. She openly shares these beliefs with her employees. Ms. Steuerwald has prepared a narrative entitled "The Transfiguration of Preferred," a brief history of the company's formation, which discusses her belief that God was involved in Preferred's establishment and is involved in Preferred's direction. Def. Facts, ¶¶ 9–16. Pl. Add. Facts, ¶ 815.

Ms. Steuerwald believes in "The Great Commission," a religious directive to go into the world to share her faith. "The world" includes the work place. Def. Facts, ¶¶ 19–20. Asked whether she believes that religion is appropriate in the workplace, Ms. Steuerwald responded: "I don't believe it can be ... If you're a person of faith, it can't be separated." Steuerwald Dep., I, 69. She added by way of explanation: "Well, in Him I live and breathe and have my being, and I don't leave my faith at the door when I go to work. It's who I am. It permeates my thinking, my decisions." Steuerwald Dep., I, 69.

Ms. Steuerwald anoints new branch offices with olive oil and asks God's blessing on each new office. Def. Facts, ¶ 18. When a new office is anointed, the ceremony is conducted during working hours. Pl. Add. Facts, ¶ 810. Ms. Steuerwald also has anointed two existing facilities, in Terre Haute and Evansville, because of strife and discord in those offices. Ms. Steuerwald testified that she discerned demons in those offices and that by anointing them she believed she was able to rid the offices of the demons. Pl. Add. Facts, ¶ 803, 806, 807. Ms. Steuerwald also has anointed individual employees of Preferred for healing purposes. She believes that anointing has healing power. Pl. Add. Facts, ¶ 811, 812.

Ms. Steuerwald defines Preferred's mission as presenting God and his Son, Jesus Christ, to all of Preferred's employees. Def. Facts, ¶ 23. Preferred's mission statement includes that its primary mission is "to be a Christian dedicated provider of quality health care." Def. Facts, ¶ 30. Preferred employs an "evangelism and discipleship" subcommittee, whose members have prayed for the salvation of employees. Def. Facts, ¶¶ 27, 28.

Beginning in June 1995, Preferred has required its employees, as a condition of employment, to sign a statement that includes the words: "I have examined myself and I agree that I have respected and actively supported Preferred's Mission and Values during this past year of employment and I agree to respect and actively support Preferred's Mission and Values for the coming year." Def. Facts, ¶ 37; Pl. Add. Facts, ¶ 824. Preferred's managers and supervisors are instructed to use the company's values in disciplining employees because values are considered a standard of performance. Def. Facts, ¶ 41. Preferred employees are evaluated according to the Mission and Values Statement. Pl. Add. Facts, ¶ 841. They are also disciplined on the basis of the Mission and Values Statement. Pl. Add. Facts, ¶ 843. Religious references are made on employee evaluations. Pl. Add. Facts, ¶ 842. Employees were terminated for violating the values in the Mission and Values Statement. Pl. Add. Facts, ¶ 844.

Preferred's corporate organizational chart is known as "the wheel." At its center is the name "Jesus," who represents the rock upon which Preferred professes to be built. From this center, all of Preferred's departments radiate as spokes. Def. Facts, ¶¶ 43–44. During comprehensive orientation or a management meeting, Ms. Steuerwald had a wheel on the board with Jesus in the middle and employees' names on the spokes. She told those in attendance that, with Jesus as the foundation of Preferred and the employees there providing the care, Preferred would grow and benefit. During the comprehensive orientation that Sherry Stute attended, Ms. Steuerwald said that it was a vision of hers that the conference room at Preferred would some day be a church and that people could come there and pray. Pl. Add. Facts ¶¶ 1246, 1247.

Preferred gives copies of the company's mission statement, statement of values,

definitions, "the wheel," and the "Transfiguration" to all applicants as they apply for employment. Def. Facts, ¶ 45. Applicants are informed that Preferred is a Christian organization and that prayers are recited at the company; they are asked how they feel about working for a Christian organization. Pl. Add. Facts, ¶ 827. Former branch manager Sondra Sievers testified that Ms. Steuerwald told her and others that a candidate for employment who said that there was no room in the work place for religion did not belong at Preferred. Pl. Add. Facts, ¶ 828; Sievers Decl., ¶ 11. A Mormon who also was a candidate for employment, was not hired. The chaplain who interviewed the candidate told others who had been present at the interview that Mormonism is a "cult." Pl. Add. Facts, ¶ 828; Fennell Dep., 28–30.

Preferred offers religious gatherings, which it refers to as "devotions," to its employees on a weekly basis. The devotions are facilitated by two staff chaplains. Def. Facts, ¶¶ 46–47. Preferred states that there was no corporate-wide policy of mandatory attendance at devotions. Def. Facts ¶ 48. By contrast, Ann Parker testified that, as a manager she was required to be a "role model," which meant, among other things, that she was "expected" to attend and was required to embody and exemplify corporate policy. Ms. Parker also testified that she discussed the manager's responsibilities with Sherry Stute when Preferred was going to open an Evansville facility and one responsibility was to attend devotions. Accordingly, she perceived devotions to be mandatory. Parker Dep., pp. 38–40.

Human Resources Director Michael Pyatt professes to be a follower of Jesus Christ. Mr. Pyatt testified that he is saved or born again and that all of the churches he has attended are fundamentalist. Pl. Add. Facts ¶¶ 756–758. On two occasions, Mr. Pyatt conducted devotions at a branch office. Pl. Add. Facts, ¶ 831. Prayer and "script devotion" on various themes are conducted at the weekly devotions. Pl. Add. Facts ¶ 838. Ms. Steuerwald sometimes commented about employees' attendance at devotions. Pl. Add. Facts ¶¶ 833–835, 914, 1488. Employees are not told that they may leave meetings before prayer is conducted. Pl. Add. Facts, ¶ 840. The handwritten document, "Expectations of Branch Manager," included the following items: (1) actively demonstrate company values, behavior standards of branch manager (attached) and (2) devotions are held weekly at a scheduled time. Pl. Add. Facts ¶ 1474.

Sue Klein became the interim branch manager for the Vincennes branch in mid-November 1995. She was interviewed for the regular branch manager position on December 20, 1995 by a panel consisting of Darlene Wright, Terry Jennings and Chaplain Chuck Harrington. The interview panel asked Ms. Klein: "How has your association with Preferred affected you personally since you were hired?" Ms. Klein responded that her association with Preferred had a tremendous impact professionally and spiritually, that she loves to share her beliefs about Jesus and is able to do that at Preferred. The interview panel asked Ms. Klein: "What significant growth have you experienced in the past year and what brought it about?" Ms. Klein responded that she experienced growth of a spiritual nature and knew that she rested in God's hands and that God is in charge. The interview panel asked Ms. Klein to name three assets that she would bring to the branch manager position. She responded: "Caring, Dependence on the Lord, and Willingness and desire to do the job." The interview panel asked her: "What temperment [sic] traits and/or characteristics do you have that would enable you to be an effective manager?" She

responded that she tries to be gentle in approach, listens to all sides of different situations and "takes all situations to the Lord in prayer." Pl. Add. Facts ¶¶ 712–722.

The interview panel asked Ms. Klein "What role do you feel evangelism plays in the position of branch manager?" She responded: "Spreading the Gospel is dear to my heart. The opportunities are endless with Preferred. Shared an opportunity to share the power of God yesterday with Lori Merchant, Physical Therapist." The interview panel asked Sue Klein, "What motivates you as a person?" She responded: "Faith in the Lord Jesus Christ." Pl. Add. Facts ¶¶ 723–725.

In evaluating their interview with Ms. Klein, panel members indicated whether they would hire her and why, including such comments as: "I appreciate her strong faith in Jesus and because faith is a priority with her. She also has a spirit of cooperation; . . . she has Godly values; . . . Sue's faith is devoted and inspiring." Panel members wrote the following types of comments to the question "Could you identify their values in the interview and what were they?" in Sue Klein's interview: "Honesty, Integrity and a dependence on the Lord for guidance; God is her source of wisdom and strength; Faith, honesty, integrity and caring; Integrity, Trust in God, Fairness, honesty, non-indispensabili-.ty." Pl. Add. Facts ¶ 731, 732.

Darlene Wright compiled the responses of the panel members and wrote the following summary on Sue Klein's interview:

> The committee identified Sue as a person with integrity who exemplifies honesty and fairness. She derives her wisdom and strength from the Grace of God.

* * *

The concerns of the committee were her lack of knowledge regarding regu-lations and the financial aspects of the branch. It was also noted that she fails to see "The Big Picture" in regard to Branch Operations. We feel with Sue's willingness to learn, and intelligence she will succeed as an effective Branch Manager.

Pl. Add. Facts ¶ 733.

After Sue Klein became acting branch manager for the Vincennes branch, she told Ellen Blice that Ms. Blice had ˙to attend devotions because she needed to learn to be more humble. Ms. Blice declined to attend because such devotions were contrary to her religious beliefs. Pl. Add. Facts ¶¶ 1082, 1083. At the February 14, 1996, devotions, Ms. Steuerwald handed Ellen Blice a song sheet for the song beginning "He is a mighty God" and said "You need to sing this." Pl. Add. Facts ¶ 1114. Christine Fennell was reprimanded at one˙ point during her employment at Preferred for missing too many devotions. Pl. Add. Facts ¶ 1446.

As a consultant and as a trainer and developer, Nellie Foster was responsible for teaching the "Leader in the Making" program to corporate and branch managers. Ms. Steuerwald described The Leader in the Making program to employees as a way to "understand Jesus modeled leadership." Ms. Foster spoke about scriptures in her management training and referenced scriptures, the Bible, and religion in the handouts she distributed in training sessions. Corporate and branch managers were required to attend sessions for the Leader in the Making management program. In conjunction with the area administrators, Ms. Foster had authority to decide who met the qualifications for the Leader in the Making program. Ms. Foster also did training sessions in the branches for the branch staff. Pl. Add. Facts ¶¶ 699–708. Preferred's CEO, Jackie Steuerwald, sent a letter to Preferred

staff that reads, in part: "I would ask every employee at Corporate and each Branch to be involved in this training [Leader in the Making programs]. You will be notified by a memo as to which track you will be a part of." Pl. Add. Facts ¶¶ 709, 710.

Preferred also encourages prayer in the workplace outside of devotions. For example, prayers are recited before employee meetings. Pl. Add. Facts ¶ 839. Sondra Sievers testified that Vincennes branch had prayer at weekly devotions and then employees began praying for help with anything and everything. Pl. Add. Facts ¶¶ 910, 912. Ellen Blice testified that a prayer was recited before each meeting that Ms. Steuerwald conducted. Pl. Add. Facts ¶ 1070. At times, branch manager Sue Klein would grab Sherry Stute's arm, as well as the arms of other employees, and ask: "Have you prayed today?" Pl. Add. Facts ¶¶ 1203, 1204. "Leader in the Making" presentations always started out with prayer. Pl. Add. Facts ¶ 1206. Prayer also was conducted each day at comprehensive orientation and branch manager meetings. Pl. Add. Facts ¶¶ 1243, 1251.

As Director of Human Relations, Michael Pyatt did not conduct any training on religious harassment or religious discrimination for Preferred employees, nor did Mr. Pyatt have training on religious harassment. Pl. Add. Facts, ¶ 845, 847. Preferred's manual, used by directors to train branch managers, did not contain any reference to religious harassment. Also see Pl. Add. Facts, ¶ 846. Preferred branch managers, supervisors, and office managers—including Terry Jennings, Ann Parker, Sue Klein, Wanda Wallace, Nellie Foster, Kathy Robinson, Rebecca Selm, Karen Lemons, and Carol Smith—received

no training with respect to religious discrimination or to the handling of potential complaints concerning religious discrimination or harassment. Pl. Add. Facts, ¶¶ 846–856.

B. *Facts Pertinent to Individual Claims.*

The EEOC has brought hostile environment harassment claims on behalf of six employees: Sondra Sievers, Ellen Blice, Suzanne Elder, Sherry Stute, Diana DeWester, and Mary Mulder; and individual disparate treatment claims on behalf of seven employees: Suzanne Elder, Sherry Stute, Diana DeWester, Mary Mulder (all four alleging constructive discharge); Sondra Sievers (alleging demotion and discharge based on religion and/or retaliation); Ellen Blice (alleging discriminatory discipline and discharge); Sherry Stute (alleging failure to promote); and Theresa Raloff (alleging discriminatory failure to hire).[4]

We turn now to the factual background of these claims. In doing so, we note that many of the facts pertaining to the individual claims also have a bearing on the pattern or practice and environmental claims.

1. *Theresa Raloff.*

Theresa Raloff applied for the Director of Nursing ("DON") position in Preferred's Lafayette Branch. She interviewed in February 1995. As part of the interview, Ms. Raloff met with Ms. Steuerwald. Preferred acknowledges that Ms. Steuerwald terminated the interview because of Ms. Raloff's religious beliefs. Def. Facts ¶¶ 655–658. Specifically, Ms. Steuerwald asked Ms. Raloff: "What kind of religion are you anyway?" Ms. Raloff responded: "Unitarian." Ms. Steuerwald replied:

---

4. The listing of these names reflects the passing of Kay Wright, who had been a complainant with respect both to harassment and disparate treatment. The EEOC filed Notice of Intent not to Pursue Relief on Behalf of Kay Wright, accompanied by a death certificate, on October 31, 2000.

"You damned humanists are ruining the world" and told Ms. Raloff that she was going to burn in hell forever. She told Ms. Raloff the interview was terminated because Ms. Raloff was inappropriate for the company. She also told Ms. Raloff that she would pray for Ms. Raloff's soul. Pl. Add. Facts ¶¶ 1621–1623.

### 2. Sondra Sievers

#### a. Facts Pertaining to Religion.

Sondra Sievers served as a branch manager and nursing supervisor in Preferred's Lawrenceville facility for three years, from May 1990 until her promotion to branch manager at the Vincennes facility in 1993. Def. Facts ¶ 58. She was demoted from branch manager on November 14, 1995 and replaced by Sue Klein. Pl. Add. Facts ¶ 989; Def. Facts ¶ 129. She was discharged from employment on March 8, 1996. Def. Facts ¶ 186.

Ms. Sievers has been a practicing Catholic all of her life. Def. Facts, ¶ 50. She considers herself to be a Christian in that she is baptized and believes in Jesus Christ. Def. Facts, ¶ 51. She does not, however, believe in the idea of being saved or born again. Pl. Add. Facts ¶¶ 898. Ms. Steuerwald knew that Ms. Sievers was a Catholic. Def. Facts ¶ 60.

During a luncheon with Ms. Sievers and employees Chuck Harrington and Ann Parker, Jackie Steuerwald asked Ms. Sievers, while giggling, whether it is "really true that you keep the Holy Spirit in a box at the front of your church?" Pl. Add. Facts ¶ 901; Def. Facts ¶ 67. Ms. Sievers was embarrassed by the question and made uncomfortable by it. Pl. Add. Facts ¶ 902. Ms. Sievers signed Preferred's Mission and Values Statement, although she was uncomfortable doing so. She believed she had to sign the document as a condition of employment. Pl. Add. Facts ¶¶ 906, 907.

As a Preferred employee, Ms. Sievers watched religiously-oriented videos at work. She believed she was expected to watch the videos because Ms. Steuerwald talked about religion in every conversation and in every meeting that Ms. Sievers heard or attended. As a Catholic, Ms. Sievers was offended by the content of the videos and also thought it inappropriate for Ms. Steuerwald to imply that Medicare should pay for her to evangelize. Pl. Add. Facts ¶¶ 908, 909; Sievers Dep., 215–220. Ms. Sievers perceived prayer to be a regular aspect of the work place. Pl. Add. Facts, ¶ 910. Ms. Sievers testified that, at the Vincennes branch, prayer was conducted at weekly devotions, and then employees began praying for help with anything and everything. After Sue Klein arrived as interim branch manager, prayers were conducted every morning. Pl. Add. Facts ¶ 912; Sievers Dep., 188–189.

Ms. Sievers' supervisor at the Lawrenceville facility, Ann Parker, told Ms. Sievers that Jackie Steuerwald knew which employees attended devotions and that Ms. Steuerwald expected employees to attend. Pl. Add. Facts ¶¶ 914.[5] She also told Ms. Sievers that Ms. Steuerwald wanted staff meetings opened with prayers. Pl. Add. Facts ¶ 915.

While Ms. Sievers was still working at the Lawrenceville branch, she told Ms. Parker that she was uncomfortable with the way religion was "pushed" at Preferred. Pl. Add. Facts ¶ 916. Ms. Parker recommended that Ms. Sievers read the book, "This Present Darkness," a book about spiritual warfare, which, she said, might help Ms. Sievers understand the beliefs of Jackie Steuerwald, Darlene

---

**5.** Two of Plaintiff's Statement of Additional Facts are Numbered 914. We have restated the content of both but use only the single citation.

Wright and other people with whom Ms. Sievers was working. Pl. Add. Facts ¶¶ 917, 918.

Ms. Sievers received religious memos at work that were distributed in her tray or mailbox. As a branch manager, she also received from Mike Pyatt's newsletters called "Focus on Managing," some of which contained Biblical and religious references. Pl. Add. Facts ¶¶ 919, 920.

At various business meetings which Ms. Sievers attended, religion was a topic of discussion. Jackie Steuerwald conducted presentations and meetings which Ms. Sievers attended in which Ms. Steuerwald talked about her religious beliefs. Pl. Add. Facts ¶¶ 922, 923. Marketing Director, Gregg Johnston, held a branch-manager meeting which Ms. Sievers attended in which he used the Bible, and he gave the attendees a book that related to the Bible. Human Resources Director Pyatt also conducted meetings at which he injected religious topics. So did Johnny Garrison, one of Preferred's chaplains who also conducted devotions. Pl. Add. Facts ¶¶ 924, 925, 926. As a branch manager, Sondra Sievers was expected to attend all branch meetings. Pl. Add. Facts ¶ 927.

Ms. Sievers was uncomfortable attending some meetings. At one meeting, Ms. Steuerwald discussed her visit to Cuba, during which she distributed Bibles to Cubans. Ms. Sievers was uncomfortable because she did not expect to hear about passing out Bibles in a business meeting. Def. Facts, ¶¶ 88–90; Pl. Add. Facts ¶ 928. At the same time, she felt *excluded or marginalized* by not being invited to participate in certain events related to business. She felt slighted that Jackie Steuerwald did not invite her to attend a prayer meeting at Ms. Steuerwald's home. She also felt slighted that she was not invited to attend a religious video showing at the Vincennes office. Ms. Sievers thought these exclusions revealed that Ms. Steuerwald did not believe that she fit in at Preferred. Pl. Add. Facts ¶ 932, 933.

b. *Events Leading to Ms. Sievers' Demotion and Discharge.*

Ms. Sievers' first performance evaluation was at the end of her first six months. Her supervisor at the time, Annette Dodd, identified concerns about her performance, including comments that she at times appeared "too good to learn from her subordinates," and that she did not appear focused at work. Def. Facts ¶ 93. Thereafter, at her annual evaluation, Ms. Sievers' new supervisor, Ann Parker, observed that Ms. Sievers appeared to have undergone a change in her attitude because she was taking a more positive and progressive approach to problems. Def. Facts ¶ 94. Indeed, on her annual evaluation of June 27, 1991, Ms. Sievers received ratings of 7, 8, 9, or 10 in 30 categories. Ratings of "7" or "8" mean "consistently over achieves" and ratings of "9" or "10" mean "outstanding." Pl. Add. Facts ¶¶ 937, 938. On her last review before her promotion to Vincennes, it was noted that Ms. Sievers needed to improve the timeliness of "difficult" personnel evaluations of her subordinates. Def. Facts ¶ 95.

In Ms. Sievers performance evaluation for May 1994, Ann Parker noted that there had been some hard feelings in the Vincennes office relating to Ms. Sievers management style, that Ms. Sievers needed to work on developing a "softer, less controlling 'people side,'" and that she needed to be "more specific" in her communications. Two employees transferred to Lawrenceville ostensibly because of Ms. Sievers approach to managing the Vincennes branch. Def. Facts ¶¶ 96, 97.

On her May 1995 evaluation, Ms. Sievers received a "2.3" out of "3"; "3" was the highest possible rating. Def. Facts

¶ 98. Before writing up the May 1995 evaluation, Ann Parker sent out surveys to people in the office and field staff. Ms. Parker does not remember receiving any negative responses from these surveys regarding Ms. Sievers' work performance. Ms. Parker, who served as Ms. Sievers' supervisor until November 1995, thought Ms. Sievers was doing a good job and was working hard at being a good leader and manager.

Ms. Parker had been instructed in a management meeting to include "trust in the Lord" as part of the employee evaluation process. Accordingly, her May 1995 evaluation of Ms. Sievers included a section addressing Preferred's values, and Ms. Parker wrote the words "in the Lord" next to the value of "trust." Pl. Add. Facts ¶¶ 943, 944, 946; Def. Facts ¶ 99. The "trust in the lord" reference came from Preferred's "behavior tags." For the value "Trust in the Lord and not your own understanding," the related behavior tags are "assured reliance," "constant verbal expression of faith," and "positive response to negative situations." Preferred managers were expected to comply with the behavior tags. Pl. Add. Facts ¶¶ 945–948.

On October 24, 1995, Ms. Steuerwald conducted a "Values Presentation" at Preferred's Vincennes branch. During the meeting, Ms. Steuerwald shared how God had changed her life and asked each of the participants to share how they had come to Jesus Christ. Ms. Sievers was uncomfortable with the question because she never had a "big conversion" and knew that Ms. Steuerwald's perception of how one becomes a Christian was different from hers. In her response to Ms. Steuerwald's query, Ms. Sievers stated that she was very fortunate to have been born into and raised by a Catholic family and that God had always been a part of her life. At the meeting, Sherry Stute also talked about joining a Catholic church and becoming

Catholic. Ms. Sievers was uncomfortable with this meeting. She felt that it involved sharing personal information and she did not believe Ms. Steuerwald's past sins were any of her concern; additionally, she felt that Ms. Steuerwald was putting people on the spot to talk about their personal relationships with God. Def. Facts ¶¶ 112–116; Pl. Add. Facts ¶ 972.

On November 2, 1995, at a breakfast meeting in Vincennes with Chuck Harrington and the branch managers for the southern branches, Ms. Steuerwald stated that if her managers were not where they should be spiritually, they should resign. Ms. Sievers believed that Ms. Steuerwald was looking directly at her when she made this remark. After making the comment that if her managers were not where they should be spiritually, they should resign, Jackie Steuerwald said: "I have done this with my top management people, and your area director, Ann Parker, has resigned." The next day, Ms. Sievers spoke with Ms. Steuerwald for two hours by phone about this statement, because Ms. Sievers interpreted the remark as directed at her. She told Ms. Steuerwald that she, too, had a personal experience of God, to which Ms. Steuerwald responded: "Well, you know, you've never said this to me before." Ms. Sievers was offended by Ms. Steuerwald's response because she thought it was none of her business. Ms. Sievers believed she had to make some profession of faith to Ms. Steuerwald in order to keep her job. Def. Facts ¶¶ 117–119; Pl. Add. Facts ¶¶ 975–978.

In September and October 1995, Preferred's management team developed a survey relating to employee satisfaction. Entitled "Your Opinion Counts," the survey covered a number of areas, including working conditions, training, compensation, and advancement opportunities. It also included the question: "Are the Com-

pany's Values actively promoted and modeled by supervisors and managers?" And the request: "Please make any other comments or suggestions that you believe would help Preferred be more effective and be a better place to work and serve the Lord and our customers," providing space for comments. Def. Facts ¶ 108, 109; Pl. Add. Facts ¶¶ 962, 963.

Human Resources director Mike Pyatt distributed the survey to all of the employees in the Vincennes branch on October 25, 1995. Def. Facts ¶ 111. As he did so, he was asked by an employee what would happen as a result of the survey. Mr. Pyatt responded that "they were looking at all the managers and if they weren't where they thought they should be, there would be changes made." Pl. Add. Facts ¶¶ 965, 966.

Fifty-nine surveys were given out. Thirty-four employees responded. Def. Facts ¶ 123. Some of the responses were negative with respect to Ms. Sievers. Def. Facts ¶ 124. The negative responses included: (1) "We have lost a lot of very good, kind, caring office and field staff because of the branch manager and it sure is a shame;" (2) "Sondra does not respect our opinion. If we voice our opinion she will usually disagree and then she will be angry"; (3) "Sondra has us all very unhappy with her lack of responsibility, caring or understanding"; (4) "Sondra does not like others, is either [sic] revengeful with field staff, clients and families"; and (5) "If a person isn't liked or if a person does a job well, branch manager will do anything to create problems for the person." Def. Facts ¶ 125. These comments appeared on three of the thirty-four surveys returned to Mr. Pyatt. Pl. Resp. to Def. Facts ¶ 125.

After receiving the results of the survey, on November 14, 1995, Ms. Steuerwald and Mr. Pyatt went to Vincennes to inform Ms. Sievers of her demotion. Def. Facts

¶ 127. Ms. Sievers met with Mr. Pyatt who addressed the survey results and told Ms. Sievers that she would be removed from her position, placed in the Leader in the Making program with Nellie Foster, and re-evaluated by December 31, 1995. He also gave Ms. Sievers three documents. The first outlined the "qualifications" of a Leader in the Making as (1) having a teachable spirit, (2) having love for one another, (3) honoring others above self; (4) being approachable; (5) willing to ask others for help and advice; and (6) willing to invest in others. The second, entitled "Confess–Repent–Turn," outlined what Ms. Sievers needed to accomplish by December 31, including (1) restoring broken relationships with Cherie Deem, referral sources, patients and staff; (2) submitting to authority; (3) regaining trust and respect of the staff and community; and (4) consistently walking in a blameless way to be above reproach. The third document was called "Characteristics of Broken People Prepared for Revival." Def. Facts ¶¶ 133–136. After the meeting, Mr. Pyatt told Ms. Sievers to take three days off and pray and think about things. Def. Facts ¶ 138 and Pl. Resp.

Regarding leadership training, Nellie Foster, Preferred's training and development manager and also a minister, had developed the "Leader in the Making" program discussed earlier; the program included twenty-four lessons and Ms. Foster was going to customize a training program for Ms. Sievers' circumstances. Def. Facts ¶¶ 127, 128. The customized training involved meetings between Ms. Sievers and Ms. Foster on December 5 and 6, 1995.

The December 5 meeting was religiously-oriented. Pl. Add. Facts ¶¶ 1018, 1019. At the December 6 meeting, Ms. Foster presented the "Lordship Ladder" to Ms. Sievers. Ms. Foster asked Ms. Sievers where she was on that ladder, to which

Ms. Sievers responded, "Well, I'm certainly not on the sixth step," signifying a life filled with peace. Def. Facts ¶¶ 166, 167. Ms. Foster then asked Ms. Sievers: "What was the last sin you committed?" and "What was the last thing you asked God forgiveness for?" Ms. Sievers responded, "I am a Catholic, and I discuss my sins with my priest," and began crying. Def. Facts ¶¶ 168, 169. Ms. Foster took Ms. Sievers' hand and asked Ms. Sievers: "Is it okay if I pray over you?" Ms. Sievers testified that she was "totally offended" at the suggestion that Ms. Foster pray over her, but acquiesced only because she "was already in such hot water with my job." Def. Facts ¶¶ 170, 171.

At the December 6 meeting, Ms. Foster told Ms. Sievers that if it were she, she would quit. Ms. Sievers told her that she did not intend to quit. Pl. Add. Facts ¶¶ 1023, 1024. Ms. Foster concluded that Ms. Sievers was so devastated by the survey results and so torn by the damaged relationships in the office that it would have been unfair to put Ms. Sievers back in her old position. Def. Facts ¶¶ 174, 175. Accordingly, Ms. Foster told Ms. Steuerwald that Ms. Sievers was not a candidate for leadership training. Def. Facts ¶ 178. Ms. Steuerwald decided not to return Ms. Sievers to the branch manager position. Instead, she offered her a quality assurance position. Def. Facts ¶¶ 179, 180.

On December 7, 1995, Ms. Sievers met with Ms. Foster, Darlene Wright (personnel director for the southern branches), and Sue Klein. During this meeting, Ms. Foster informed Ms. Sievers that she would not be reinstated to the branch manager position, but that the company was offering her a position in quality assurance. She was also informed that Sue Klein would become the new branch manager at Vincennes. The following week, Ms. Sievers' demotion was formalized in a meeting with Ms. Klein, Ms. Wright, and Mr. Pyatt. Ms. Sievers accepted the quality assurance position at a reduced rate of pay. Her performance in the quality assurance position was always satisfactory. Def. Facts ¶¶ 181–184; Pl. Add. Facts ¶¶ 1035, 1039.

On January 31, 1995, Ms. Sievers' attorney, L. Edward Cummings, wrote a letter to Ms. Steuerwald questioning whether religion had played a part in Ms. Sievers' demotion. The letter read in part:

> There was no secret ... that [Sondra Sievers] was a practicing Catholic and was not comfortable with some or even much of the religious materials and indoctrination which was provided to your employees. When you had a discussion with her critical of her performance, the materials provided her were clearly religious telling her to confess and repent. Subsequently, she was placed in a program, Leader in the Making, in which she sincerely attempted to perform to your and your company's expectations so that she could return to her position as manager. As you know, the entire focus of the "Leader in the Making" was religious and her success or lack of success in the program related to how she characterized her relationship with Jesus Christ. She and Ms. Foster had a particular discussion involving something called the Lordship Ladder which was not to Ms. Foster's satisfaction and the following day Ms. Sievers learned that she was no longer going to be returned to her position as branch manager.

Def. Facts ¶ 185; Pl. Add. Facts ¶ 863.

Slightly more than a month later, on March 8, 1996, Ms. Steuerwald terminated Ms. Sievers at a meeting which Mr. Pyatt also attended. Ms. Steuerwald opened the meeting by saying to Ms. Sievers: "I understand that you have some questions about your demotion and that you feel it

has to do with religious discrimination." Pl. Add. Facts ¶ 1052. The parties do not, of course, agree as to the reasons for Ms. Sievers' termination. Preferred argues that the discharge was performance related. The EEOC argues that it was based on Ms. Sievers' failure to conform to Ms. Steuerwald's religious views. We defer our discussion of the underlying facts until the analysis portion of this entry.

### 3. *Ellen Blice.*

#### a. *Background.*

Ellen Blice began working at Preferred's Vincennes facility in April 1994. She was discharged on February 14, 1996. Def. Facts ¶¶ 199, 269; Pl. Add. Facts ¶ 1002.

At the time of her hire, Ms. Blice had been a Registered Nurse for less than a year. She had worked as a student nurse extern in the emergency room at Wellborn Baptist Hospital from December 1992 to May 1993 and from then until October 1993 as a graduate nurse in Wellborn's emergency room performing the duties of a registered nurse. On October 31, 1993, Ms. Blice received her license and became a RN. From October 31, 1993 until mid-April 1994, Ms. Blice worked as a registered nurse at Wellborn. At the time of her hire, Ms. Blice had not had home health care experience. Def. Facts and Pl. Resp. ¶ 205. Ms. Blice received positive six-month and one-year performance evaluations prepared by Ms. Burke. Def. Facts ¶ 206.

As a field nurse, Ms. Blice was responsible for coordinating total client care, which included conducting the initial assessment, determining what other services are appropriate (*e.g.,* home health aids, therapists), and coordinating the client's eventual discharge. To qualify for Medicare, a patient must have a skilled nursing need and must be homebound. Skilled nursing needs include the need for instruction from nurses on how patients were to care for themselves, monitoring the patient's medication needs, and watching for changes in the patient's condition. Def. Facts ¶¶ 210–212.

Ms. Blice was a life-long Catholic. During her interview with Darlene Wright, Ms. Wright, personnel director for the southern branches, informed Ms. Blice that Preferred was a Christian company, but did not discuss religion on a personal level or ask Ms. Blice about her religion. Ms. Blice also interviewed with Barb Burke, who did not mention religion at all. Def. Facts ¶¶ 196, 199–203. Ms. Burke offered Ms. Blice a position and Ms. Blice accepted. Def. Facts ¶ 204.

Although Ms. Blice expressed no offense about Preferred's Christian values and mission statement, she was uncomfortable with management's persistent use of prayer. She asked Sue Klein not to pray before giving her answers to questions of a professional nature. She also complained to another employee that she didn't need Sue Klein's prayers. Pl. Resp. to Def. Facts ¶ 215. During the week preceding her termination on February 14, 1996, Ms. Blice told Sue Klein six times not to pray over her all the time. Pl. Add. Facts ¶ 1076.

Ms. Blice thought that it was inappropriate to have religiously-oriented documents placed in her mailbox and was offended by receiving such documents at work. Pl. Add. Facts ¶¶ 1078, 1079; Def. Facts ¶ 229. Ms. Blice testified that on several occasions she received documents relating to religion, broken or unbroken spirits, Psalms, scriptures, and prayers. Def. Facts and Pl. Resp. ¶ 232. Although Ms. Blice routinely discarded the materials, she told Ms. Klein that she did not want to receive such religious materials in her mailbox. She said: "I don't need this stuff in my mailbox because I already know the

truth." Def. Facts and Pl. Resp. ¶ 231; Pl. Add. Facts ¶ 1080 and Def. Resp. Ms. Blice continued to receive the religious materials. Pl. Add. Facts ¶ 1081.

Additionally, there was a prayer before each of the meetings that Jackie Steuerwald conducted. During a meeting called Home Care 101, Ms. Steuerwald asked a series of questions and gave prizes to the individual who was the first to answer correctly. The correct answers to the questions at the Home Care 101 meeting usually were "Jesus," "God" or "the Bible." Ms. Blice testified that she was uncomfortable at the meeting. She thought it was a waste of time because Ms. Steuerwald spent too much time talking about religion and not enough about home care. Pl. Add. Facts ¶¶ 1068–1072; Def. Facts ¶ 219, 221.

Similarly, Ms. Blice understood that devotions at the Vincennes facility were optional during Sondra Sievers' management, but that, after Sue Klein became acting branch manager, Ms. Klein told her that she had to be at devotions because she needed to learn to be more humble. Ms. Blice did not attend devotions because they were contrary to her religious beliefs. Pl. Add. Facts ¶ 1082, 1083. On the day that she was terminated, Ms. Blice had been told to go to devotions. Pl. Resp. to Def. Facts ¶ 216.

Ms. Blice perceived a change in the atmosphere at work after Sondra Sievers was demoted and Sue Klein was promoted to branch manager in November 1995. Prior to becoming branch manager, Sue Klein was complimentary of Ms. Blice's work. After Ms. Klein and Karen Lemons became managers, the atmosphere in the office became more overtly religious. Pl. Add. Facts ¶¶ 1073, 1074. Before Sue Klein assumed the interim branch manager role, she had occasionally invited Ms. Blice to attend her church. Ms. Blice always declined, but was not offended by the offers, nor did she feel any pressure to accept them. Ms. Blice described her relationship with Ms. Klein before Ms. Klein's promotion as "great." After Ms. Klein assumed the managership, however, Ms. Klein always prayed before and after discussing any problem. When Ms. Blice was part of a group and the group was praying, she "just kinda sat there and let them pray." Def. Facts ¶¶ 222–226; Pl. Add. Facts ¶¶ 1075.

Ms. Klein told Ms. Blice that she needed more prayer in her life. Def. Facts and Pl. Resp. ¶ 234. She also told Ms. Blice that "attending devotions would be good for her to learn to become more humble" and that Ms. Blice had to be at devotions on Tuesday because she needed to learn to be more humble. Def. Facts and Pl. Resp. ¶ 235. Nevertheless, Ms. Blice continued to avoid devotions because they were contrary to her beliefs. Def. Facts ¶ 236; Pl. Add. Facts ¶ 1083.

b. *Events Leading to Ms. Blice's Termination.*

On a Friday afternoon in November 1995, Ms. Blice received an order from Dr. Shelton to remove a patient's catheter and to reinsert it some time over the weekend. Ms. Blice paged Donna Drew, who was the on-call nurse for the weekend. As the on-call nurse, Ms. Drew was supposed to visit patients on an as-needed basis over the weekend. Ms. Drew did not respond to Ms. Blice's page. When Ms. Drew did not respond, Ms. Blice informed Karen Lemons, her supervisor, that she needed to see Ms. Drew. Ms. Lemons indicated that Ms. Drew had left for the day. Ms. Blice informed Ms. Lemons of the change in the patient's condition, and Ms. Lemons said she would inform Ms. Drew of the change.

Ms. Drew received a page at 9:57 a.m. concerning the catheter patient. Ms. Drew spoke with Dr. Shelton, at 10:08. Dr. Shelton told Ms. Drew that he left

specific orders to replace the catheter if the client was unable to void. Ms. Drew talked to Ms. Blice about the situation by 11:27 a.m. She told Ms. Blice that she was with her daughter at a sporting event and could not leave to take care of the patient right then. Ms. Drew did not go to the patient's house to replace the catheter until 1:30 p.m. Sue Klein, the Acting Branch Manager, believes that the optimal response would have been for Donna Drew to replace the catheter immediately. Pl. Add. Facts, ¶¶ 1084–1099; Def. Facts ¶¶ 238–252.

Throughout the morning, the patient did not complain of any discomfort and a home health aid was present in the patient's home. Def. Facts ¶ 253. The patient was not pleased with Ms. Drew when she arrived; during Ms. Blice's next regularly scheduled visit, the patient asked that Ms. Drew not come back. Def. Facts ¶ 257.

The following Monday morning, Sue Klein, Ellen Blice and Karen Lemons met. Ms. Klein and Ms. Lemons instructed Ms. Blice to be certain to make direct contact with the on-call nurse in the future whenever a patient's condition changed. Although Ms. Blice did not accept any responsibility for the catheter incident because she felt she had acted appropriately by informing the nursing supervisor, she apologized and indicated that she would give proper notification in the future.

Toward the end of Ms. Blice's employment, she attended a meeting with Sue Klein, Donna Drew, Karen Lemons, and Terry Jennings. At the end of the meeting, Ms. Blice was encouraged to be more humble, to look to God and things would be better and she wouldn't have as much chaos in her life. On February 8, 1996, Ms. Blice received a formal verbal warning about the catheter incident. Donna Drew did not receive a formal verbal warning, nor was any corrective action form was put in her file regarding her role in the incident. Pl. Add. Facts ¶¶ 1100–1105; Def. Facts ¶¶ 255, 256.

In early February 1996, a surveyor from the State audited some of Preferred's client charts based on a complaint received from the client involved in the catheter incident. As a result of the survey, Preferred received a deficiency for lack of communication in the area of "coordinating client care." The state surveyor had found two charts where the primary nurse had failed to coordinate with the on-call nurse; one chart involved the catheter matter where Ms. Blice was the primary nurse, while the other chart, on which Ms. Drew was the primary nurse, involved a failure to communicate a medication change. In response to the State's deficiency, Preferred was required to prepare a plan of correction. The plan included counseling both primary nurses involved on the appropriate procedure for communicating changes in a client's condition. As the primary nurse involved in the catheter incident, Ms. Blice received a verbal warning for her part in the miscommunication. Def. Facts ¶¶ 262–267.

Ms. Drew said she was not at fault over the incident. She did not receive any formal discipline and was not counseled about the incident until February 16, 1996, two days after Ms. Blice was terminated. Pl. Add. Facts ¶¶ 1104–1105.

Ms. Blice asked to speak with Ms. Steuerwald about the verbal warning. Ms. Steuerwald came to Vincennes on February 14, 1996. At devotions that day, Ms. Steuerwald handed Ms. Blice a song sheet for the song beginning "He is a mighty God" and said "You need to sing this." Ms. Blice did not sing the song. Ms. Steuerwald stared at Ms. Blice for the remainder of the devotions period. Def. Facts ¶¶ 269–272; Pl. Add. Facts ¶¶ 1111–1116.

Following the conclusion of the devotions, Ms. Blice met with Ms. Steuerwald, Sue Klein, and Terry Jennings. Sue Klein opened the meeting with prayer. Ms. Blice explained her disagreement with the verbal warning she had received. She also said that the state auditor had not seen the whole truth regarding the incident. Ms. Klein acknowledged that management had not shown the state auditor all of the information regarding the incident. Def. Facts ¶¶ 273, 274 (and Pl. Resp.), 275 (and Pl. Resp.).

Preferred states that Ms. Steuerwald discovered during this meeting of February 14 that Ms. Blice had discharged a patient prematurely when the patient had been at risk for congestive heart failure. Ms. Steuerwald states that, had she known the facts surrounding the catheter patient earlier, she would have discharged Ms. Blice when she found out. Def. Facts ¶¶ 280–301. Preferred asserts that Ms. Blice was discharged because of Ms. Klein's and Ms. Steuerwald's assessment of her "performance" and "attitude." Def. Facts ¶ 301, n. 4. Ms. Blice was terminated that day.

### 4. *Suzanne Elder*

#### a. *Background.*

Ms. Elder began work at Preferred's Lawrenceville, Illinois facility in February 1993. She interviewed with Darlene Wright and Sondra Sievers. Religion was not discussed during her interviews. During her orientation, Ms. Elder reviewed the "Transfiguration of Preferred," which she thought was "a joke" and that "it was kind of silly" to hand it out. Def. Facts ¶¶ 306, 309–313. She thought handing out the Transfiguration was unnecessary and inappropriate. Pl. Add. Facts ¶ 1127.

Ms. Elder's initial performance evaluation was good. When Ms. Sievers was promoted to the Vincennes facility, Ann Parker offered Ms. Elder the branch manager position at Lawrenceville, but Ms. Elder declined. Def. Facts ¶ 317 and Pl. Resp. She gave several reasons for declining, one of which was, according to Preferred, "having to allow devotions in the office and to attend meetings at the corporate office that would be opened with prayer." Pl. Add. Facts ¶ 1128 and Def. Reply.

In describing the branch manager position, Ann Parker told Ms. Elder that, as a branch manager, she would have to start having devotions in the Lawrenceville office. Pl. Add. Facts ¶ 1129. She also told Ms. Elder that, as a branch manager, when she visited the corporate office there would be devotions and prayer before meetings. Pl. Add. Facts ¶ 1130. Ms. Elder did not want to attend devotions because she thought it was inappropriate. It was no secret in the Lawrenceville office that Sondra Sievers and Suzanne Elder went to the same Catholic church. Pl. Add. Facts ¶¶ 1132, 1133.

Terry Jennings ultimately became the branch manager of the Lawrenceville office in July 1993, at which time devotions at Lawrenceville began. Ms. Jennings prepared Ms. Elder's six-month performance evaluation, which was positive. Def. Facts ¶¶ 318, 319. Pl. Add. Facts ¶ 1131.

After Ms. Jennings took over the branch operations, conflict developed between her and Ms. Elder. Ms. Jennings testified that she perceived Ms. Elder as being rude and disorganized. Ms. Elder thought that Ms. Jennings criticized her for everything from how she sighed, to when she went to lunch, to how she acted on the telephone, to how she interacted with the field nurses. Ms. Elder believes Ms. Jennings treated her in this manner because Ms. Elder is Catholic, although she never heard Ms. Jennings say anything negative about Catholics. Def. Facts ¶¶ 322–326.

Ms. Elder testified that Darlene Wright was called in "to mediate the problems [between Ms. Elder and Ms. Jennings] and make me change." Ms. Wright told Ms. Elder at these meetings to read the Bible and once attempted to conduct a laying of hands on her. Def. Facts and Pl. Resp. ¶ 328. Ms. Wright prayed at the start of each meeting. Def. Facts and Pl. Resp. ¶¶ 329. Ms. Wright discussed with Ms. Elder how to approach Ms. Jennings with a more open communication style and to be aware of how her body language was perceived. Ms. Wright also gave Ms. Elder some books to read on personality profiles and told Ms. Elder to read the Bible. Ms. Wright counseled her to show a constant verbal expression of her faith. Def. Facts and Pl. Resp. ¶¶ 330–332.

Sometime after this meeting, Ms. Wright met with Ms. Elder and Ms. Jennings in an effort to resolve the conflict between them. Def. Facts ¶ 333. Ms. Elder testified that "supposedly the conflict was all on my fault, on my side, that I was the reason for the conflict and I was the one who had to change." Pl. Resp. to Def. Facts ¶ 333. Ms. Jennings presented Ms. Elder with a list of goals to meet by February 17, 1994. The goals included: (1) improving communications; (2) meeting with Ms. Jennings daily to discuss agendas; (3) following office protocols established by the branch manager; (4) limiting telephone calls to the corporate office to a designated time during the day; (5) focusing on time management; (6) communicating events to the appropriate staff person; and (7) displaying courtesy to other staff members. Ms. Elder thought these goals were unnecessary and were based on isolated incidents rather than patterns of behavior. Some of the goals she considered completely groundless. Def. Facts ¶ 335–337.

Ms. Elder met several times with Ms. Wright one-on-one. Ms. Wright started each with prayer. During one of these meetings, Ms. Wright asked Ms. Elder if she had a Bible and said that Ms. Elder should read the Bible because it would help her become a better person. Pl. Add. Facts ¶¶ 1144–1145. When Ms. Wright told Ms. Elder that she needed to show constant verbal expression of her faith, Ms. Elder felt that it was none of Ms. Wright's business how she presented herself in her religious beliefs. At one of these meetings Ms. Wright said that laying on of hands would make Ms. Elder feel better. Ms. Elder was upset by the suggestion to do laying on of hands because it is contrary to her beliefs. Pl. Add. Facts ¶¶ 1146–1147.

Ms. Elder transferred from Lawrenceville to Vincennes prior to February 14, 1994. Def. Facts ¶ 338. In Vincennes, Ms. Elder was primarily a field nurse, but performed quality assurance work as well. She did not experience harassment or religious discrimination in Vincennes while Sondra Sievers was her branch manager. Def. Facts ¶¶ 339, 340.

On July 22, 1994, Ms. Elder became Preferred's liaison to the Lodge of the Wabash, which is an assisted living community located in Vincennes. In this role, Ms. Elder was responsible for working with the management at the Lodge and overseeing Preferred's nurses and aides who would make visits to Preferred clients housed at the Lodge. The Lodge was a major referral source for Preferred. Def. Facts ¶¶ 341, 342, 343.

While at Vincennes, Ms. Elder attended mandatory quality assurance (QA) nurses meetings that would be opened with prayer. Def. Facts ¶¶ 344; Pl. Add. Facts ¶ 1132. During the prayer, Ms. Elder would "zone out [and] do paperwork." Def. Facts ¶ 345. She did not complain about prayer at meetings because she believed she had had enough harassment in

the Lawrenceville office and did not want to bring any more scrutiny on herself. Pl. Add. Facts ¶ 1155. Ms. Elder also attended a mandatory values presentation conducted by Jackie Steuerwald; she also signed the Values Statement. Def. Facts ¶ 346; Pl. Add. Facts ¶¶ 1156, 1158. Ms. Elder objected to the value that required "subordination of self-interest to company interest," because her nursing training had taught her that her interests may not always be the same as the company's; she might be directed to carry out an improper order. Def. Facts ¶ 347. She also objected to the part of the Mission and Values Statement in which there were specific references to places in the Bible and that these Biblical definitions were the company's characterization of what the value meant. Pl. Add. Facts ¶ 1157. Ms. Elder testified that she signed the Mission and Values Statement because she wanted to keep her job. Pl. Add. Facts ¶ 1158. Ms. Elder attended an introduction to home care meeting at the corporate office at which passages of scripture were read. Def. Facts ¶ 348. In addition, she attended a Home Care 101 seminar at which Biblical Scripture was quoted throughout the seminar. A client care coordinator at the Home Care 101 seminar told the audience that everyone in the company had a faith in Christ. Pl. Add. Facts ¶¶ 1159, 1160. Ms. Elder testified that she thought the references to scripture were "unnecessary in a business atmosphere." Def. Facts ¶ 349.

While she was working in the Vincennes office, Ms. Elder heard during a nurses meeting that they should work hard because Jesus worked hard. Pl. Add. Facts ¶¶ 1161. At Vincennes, Ms. Elder did not attend devotions and was not disciplined for not attending. She was asked, however, why she wasn't attending. Def. Facts ¶ 350; Pl. Add. Facts ¶ 1162. Ms. Elder received unwanted religious materials in her mailbox; she threw the materials away. Def. Facts ¶ 351; Pl. Add. Facts ¶ 1163.

When Sue Klein was working in QA, she often brought up religion to Ms. Elder. She told Ms. Elder that Ms. Elder's religion does not believe that one can pray for people after they die. She told Ms. Elder that Mary (the Mother of Jesus) is just a person in the Bible. And she talked about being saved. Ms. Elder told Ms. Klein that she did not want to hear about that. Pl. Add. Facts ¶¶ 1164–1168.

During the time she worked in the Vincennes office, Ms. Elder was given a copy of the document, "Characteristics of Broken People Prepared for Revival." Various items on the bulletin board in the Vincennes office had religious references on them. Pl. Add. Facts, ¶¶ 1171, 1172.

b. *Ms. Elder Resigns from Employment.*

In October 1995, around the time at which Preferred conducted its "Your Opinion Counts" survey in the Vincennes office, Ms. Elder applied for a position as the director of home health at Crawford Memorial Hospital in Illinois. After Ellen Blice and Sondra Sievers had been fired in February and March 1996, Ms. Elder perceived a general unrest in the office, because people were concerned for their jobs. On March 8, 1996, Ms. Elder received her performance evaluation from Karen Lemons, who was her supervisor at that time. On this evaluation, Ms. Lemons noted that Ms. Elder had a "good working relationship" with Lodge of the Wabash. Ms. Elder received a "3.3" rating; "5" was the highest possible. She was also scheduled for a pay raise effective April 3, 1996. Def. Facts ¶¶ 352, 354–357, 360.

Ms. Elder resigned her employment with Preferred on March 18, 1996. Before she resigned, she accepted the position at Crawford Memorial Hospital, which paid

more than her position at Preferred. Prior to Ms. Elder's resignation but after Ms. Blice's discharge, Sue Thiakodimitris ("Sue T.") spoke with the Lodge's director of nursing and administrator to see if there were any concerns with PHHC or its staff, and in particular Ms. Blice. Def. Facts ¶¶ 361. Ms. Elder resigned because she did not feel welcome in the office and because Preferred employee Sue Thiakodimitris had gone to the Lodge to inquire about herself and Ellen Blice and she believed that Ms. Thiakodimitris was trying to dig up dirt on her. Def. Facts ¶¶ 361–364.

Ms. Elder believes that Preferred wanted to fire her because her religious views did not compare favorably with those of Sue Klein, who was the new branch manager at Vincennes. Def. Facts ¶ 366. Julie Guy, from the Lodge of the Wabash, took Ms. Elder into a bathroom inside one of the rooms on the Lodge's premises, closed the door and told Ms. Elder that: "They [Preferred] were looking for dirt on Ellen and on you." Ms. Guy asked Ms. Elder if Suzanne was next to be fired. Pl. Add. Facts, ¶¶ 1173, 1174.[6]

### 5. *Sherry Stute.*

Sherry Stute applied for a Nursing Supervisor position at Preferred in July 1995. Shortly before, she had converted to Catholicism. Ms. Stute was attracted by Preferred's logo, which she recognized as a Christian symbol. Ms. Stute spent much time in prayer before submitting her application and resume. The position for which Ms. Stute applied involved assisting in opening a satellite office in Evansville which would become an independent branch once it became sufficiently stable and financially sound. Def. Facts ¶¶ 370, 372–375.

Ms. Stute initially interviewed with Darlene Wright. She told Ms. Wright that she was active in her church and wanted to become more so, that she hoped to read the Bible all the way through within the next year, that one of her strengths was her faith in God, and that she thought God had brought her to Preferred for the interview. Ms. Wright explained the history of Preferred to Ms. Stute, informed her that it was a Christian organization, and shared with her some of her own strong commitment to religion. Def. Facts ¶¶ 376–378. She also told Ms. Stute that she and Jackie Steuerwald had prayed in a closet together at some point because they didn't know how the other people in the office would receive the praying. Pl. Add. Facts ¶¶ 1183–1185.

After meeting with Ms. Wright, Ms. Stute met with Sondra Sievers, then branch manager of the Vincennes office, and Cherie Deem, who was the nursing supervisor for the Vincennes branch. Ms. Stute also interviewed with Chaplain Chuck Harrington. Darlene Wright phoned Ms. Stute and offered her the position of Nursing Supervisor and Ms. Stute accepted. This job represented Ms. Stute's first experience with Medicare, Medicaid, home health care, and all of the associated administrative functions, such as regulatory compliance and paperwork. Def. Facts ¶ 380–382; Pl. Add. Facts ¶ 1188.

Sondra Sievers served as Ms. Stute's supervisor until Ms. Sievers was removed

---

**6.** Preferred objects to the introduction of these statements because they were made by Ms. Elder and are, therefore, hearsay. They are admissible, however, not for the purpose of proving the statements are true—that Preferred was trying to dig up dirt on Ms. Elder—but to explain Ms. Elder's state of mind: that is, why she quit her employment. Fed. R.Evid. 803(3). *See E.E.O.C. v. University of Chicago Hospitals,* 276 F.3d 326, 332 (7th Cir.2002).

as branch manager in November 1995. When Terry Jennings succeeded Ann Parker as the area administrator in December 1995, Ms. Jennings served as Ms. Stute's supervisor. Meanwhile, Sue Klein was serving as interim branch manager and prepared Ms. Stute's three month evaluation. On it, Ms. Klein noted that Ms. Stute needed to "increase her knowledge of home care and this company" and learn the Choice program. Ms. Stute acknowledged that she needed to expand her understanding of Medicare, Medicaid and the accompanying regulations. Ms. Stute identified as her own developmental goals: (1) increase her knowledge; (2) increase the patient base for Evansville; (3) work toward establishing Evansville as an independent branch; and (4) continue to grow in her faith. Def. Facts ¶¶ 383–387. Before Ms. Stute wrote these goals on the November 7, 1995, evaluation, Ms. Klein told her that her goals needed to be reflective of Sue Klein's suggestions for improvement.

Any time Ms. Stute interacted with Ms. Klein, Ms. Klein always made some reference to God and faith. She asked Ms. Stute whether she wanted to be her prayer partner. Ms. Stute was uncomfortable when Ms. Klein asked her whether she prayed and read the Bible regarding a drop in the Preferred's Evansville clientele. When Sondra Sievers had to go to the hospital because of her blood pressure, Ms. Klein said to Ms. Stute: "if Sondra had been right with God she wouldn't be having physical problems." In response, Ms. Stute asked her whether that meant that all of Preferred's patients were not right with God. Ms. Klein replied: "Well, that's why we are there in their lives, so that we can bring them to the Lord before they die." Pl. Add. Facts ¶¶ 1196–1201; Def. Facts ¶ 391, 392.

During a meeting that Ms. Stute attended, Jackie Steuerwald announced that Nellie Foster was being hired as an independent contractor to assist in their spiritual growth. Ms. Foster conducted seminars and in-service presentations. "Leader in the Making" presentations, which came under Ms. Foster's auspices, always began with prayer. Ms. Stute attended Ms. Foster's presentation on "Big People see the Big Picture," a religious presentation. Although Ms. Stute did not find the content offensive, she found it offensive that such presentations were mandatory in the work place. One of the categories on the self-assessment forms used during the in-service presentations was on studying the Bible. Pl. Add. Facts ¶¶ 1205, 1206, 1208–1212; Def. Facts ¶ 390.

Ms. Stute received her orientation in August 1995. That day she had lunch with Jackie Steuerwald and Sondra Sievers, during which Ms. Steuerwald stated that Preferred was operated based on the fundamentals of her religious beliefs. Although Ms. Stute expressed no conflict with Preferred's mission statement and values, she testified that she thought it "unreasonable to expect us to base our day-to-day activities on the Bible verses that [Preferred management] chose for us." Ms. Stute signed the values statement because she felt if she did not do so she would be terminated. Def. Facts ¶¶ 393–395, (and Pl. Resp.), 396–397.

Ms. Stute attended a values presentation presented by Jackie Steuerwald on October 24, 1995. During this presentation, Ms. Steuerwald spoke of Preferred's history, showed a video tape, shared her own religious testimony and asked those in attendance to share how they became Christians. When it was her turn to speak, Ms. Stute told the group that she had "joined the Catholic Church just prior to coming to Preferred and that [she] was still trying to learn and develop [her] faith." After various individuals expressed their faith,

Ms. Steuerwald would say "Amen" or "Praise God." When Ms. Stute said that she had converted to Catholicism, Ms. Steuerwald had a "devastated" look on her face, her eyes got large, and she looked as if she had been knocked over. After this meeting, Ms. Stute believed that Ms. Steuerwald's demeanor toward her changed, which she attributed to having said she was Catholic. Ms. Steuerwald did not interact with her as much; when she did, the interaction lacked the "warm fuzzies" from before. Instead of a "smile" toward her, Ms. Stute perceived in Ms. Steuerwald's eyes a "blank stare." Def. Facts ¶¶ 397–400, 402, 403; Pl. Add. Facts ¶¶ 1256, 1257.

During Ms. Stute's three-day orientation, Ms. Steuerwald stated that all Preferred employees are working and dedicated, resembling Christ. During the orientation or a management meeting, Ms. Steuerwald presented the company's organizational "wheel" with Jesus at the center and employees' names on the spokes radiating outward from it. Ms. Steuerwald told those in attendance how Jesus was the foundation of Preferred and that with the employees providing the care, Preferred would grow and benefit. During the comprehensive orientation that Sherry Stute attended, Ms. Steuerwald said that it was a vision of hers that the conference room at Preferred would some day be a church and that people could come there and pray. Pl. Add. Facts ¶¶ 1244–1246.

On one occasion when Ms. Stute decided not to attend devotions, Ms. Jennings told her she really ought to appreciate the devotions more because Chaplain Chuck Harrington did a lot of work preparing for them. Ms. Stute took this to mean that she was expected to go to devotions. Ms. Jennings told Ms. Stute that it was mandatory for her and her staff to attend an in-service program on fasting that Chaplain Chuck Harrington was presenting. Pl.

Add. Facts ¶ 1247 (and Def. Resp.), 1248, 1249.

On February 21, 1996, Preferred hired Wanda Wallace to be the acting branch manager of the Evansville branch. Ms. Wallace had been the area administrator over PMCI, the southern non-Medicare Preferred company, before she had retired in the Fall of 1993. Among her duties, Ms. Wallace was to train Ms. Stute to become the branch manager. Ms. Stute was informed that Ms. Wallace would be training her for that job, although she was also told that she "probably would like working under Wanda so much that [she] would want to stay on as the RN supervisor and . . . do the supervisory visits and the home health aide supervision and let Wanda do management." Preferred asserts that Ms. Stute was not qualified for the branch manager's position, because she did not have any previous home health experience, and one year of experience was desirable for the position. Def. Facts ¶¶ 404 (and Pl. Resp.), 405. The EEOC points out that Darlene Wright knew that Ms. Stute had no prior home health care when she recommended her for the job. And so did branch manager Sondra Sievers and nursing supervisor Cherie Deem. When Ms. Stute interviewed with Ms. Wright, she told Ms. Wright about her financial experience; Ms. Wright said that "sounds perfect for what the job we want done in Evansville, because we want someone who is working with finances and understands the bottom line." Pl. Ad. Facts 1181, 1188, 1191. Ms. Wallace understood her assignment as training Ms. Stute in Medicare and Medicaid regulations, branch operations, coordinating patient care, quality assurance matters, staffing and issues concerning the professional advisory committee. Def. Facts ¶ 407.

Terry Jennings told Ms. Stute that Ms. Wallace was going to train her and that

she would be working under Wanda's supervision. She also told Ms. Stute that when the time came, both she and Ms. Wallace could apply for the branch manager position. Def. Facts ¶ 408 and Pl. Resp. Ms. Stute was disappointed when Ms. Wallace was brought in as her trainer, because Ms. Stute thought she would automatically become the branch manager over Evansville once it became an independent branch. Def. Facts ¶ 409. Ms. Stute had been told when she was hired that Preferred was hiring her as RN Supervisor to get the Evansville office operational, but that once it became financially stable enough, the RN supervisor would move into the branch manager position and a new RN Supervisor would be hired. Pl. Add. Facts ¶ 1221. Ms. Stute was never given the opportunity to apply for the branch manager position at Evansville. Pl. Add. Facts ¶ 1223.

Terry Jennings told Ms. Stute that Wanda Wallace and Jackie Steuerwald were very close. She told Ms. Stute that Ms. Steuerwald hired Wanda Wallace—it was her company and she could hire whom she wanted; the Bible says, "obey and support your superiors." That was what Ms. Jennings was doing and so should Ms. Stute. Pl. Add. Facts ¶ ¶ 1227, 1228.

In April 1996, Ms. Jennings put together a self-improvement plan for Ms. Stute which included daily Bible readings, daily prayer and a checklist indicating how well Ms. Stute was meeting the company's values criteria. Wanda Wallace monitored the plan by making an appropriate notation each time Ms. Stute met a goal. Every meeting between Ms. Wallace and Ms. Stute started with prayer. After April 1996, Ms. Wallace often asked Ms. Stute whether she had read her daily scripture. Regardless of Ms. Stute's answer, Ms. Wallace went to the phone. She would come back after her phone call and say: "Well, Terry says that you need to be

doing this, because if you want to move forward ... " After Pl. Add. Facts ¶¶ 1272–1277. Ms. Wallace also brought in a Bible, laid it on Ms. Stute's desk, and told her that they would be studying this Bible. Ms. Stute responded by saying that she already had a Bible. Def. Facts ¶¶ 411–417 (and Pl. Resp.), 418.

On more than one occasion, Ms. Wallace referred to Ms. Stute as a "wounded spirit" and stated that the Bible says wounded spirits need healing and nurturing. Indeed, Ms. Wallace told Jackie Steuerwald that she thought Ms. Stute was a wounded spirit. She told Ms. Stute that Ms. Steuerwald agreed with that assessment. Def. Facts ¶ 425 (and Pl. Resp.); Pl. Add. Facts ¶¶ 1293, 1295. One of the topics of the improvement plan developed by Ms. Jennings was how to heal a wounded spirit. Pl. Add. Facts ¶ 1298. Ms. Wallace told Ms. Stute that she needed to study the Bible and pray more to overcome being a wounded spirit. She also asked Ms. Stute if she had confessed her sins. Ms. Stute was insulted by Ms. Wallace classifying her as a wounded spirit. Pl. Add. Facts ¶ 1300.

One day when Ms. Stute had a headache, Ms. Wallace and an Evansville secretary said they would pray for her headache to go away. Ms. Stute acquiesced, whereupon Ms. Wallace and the secretary unexpectedly put their hands on her and prayed for healing. The touching made Ms. Stute feel very uncomfortable and she told Ms. Wallace that she didn't like people putting their hands on her. Def. Facts ¶ 425 (and Pl. Resp.), 426–430 (and Pl. Resp.). Ms. Wallace responded that she was a firm believer in laying on of hands. Pl. Add. Facts ¶ 1288. Later, Terry Jennings talked to Ms. Stute about the hands on incident and told her that she should have been thankful that Ms. Wallace and the secretary came in to heal her. Pl.

Add. Facts ¶ 1289. Ms. Stute reiterated that she did not like people putting their hands on her. Ms. Jennings responded by becoming angry and telling Ms. Stute that she had caused Ms. Jennings many headaches since she had been there; she appreciated when people around her cared about her; and Sherry Stute should be lucky that they cared. Pl. Add. Facts ¶ 1291.

Ms. Wallace also told Ms. Stute that Ms. Stute was a proud person. Pl. Add. Facts ¶ 1233. When intakes for Evansville dropped, Ms. Wallace told Ms. Stute that they should pray for more new patients. Pl. Add. Facts ¶ 1234. Ms. Wallace brought religious tapes into the office and asked Ms. Stute to listen to them. Pl. Add. Facts ¶ 1236.

After she became area administrator, Ms. Jennings told Ms. Stute that being a Christian company, Preferred didn't do anything without including a prayer. She told Ms. Stute that she should go to church with Wanda Wallace. She told Ms. Stute that Jackie Steuerwald was looking at her managers spiritually. Pl. Add. Facts ¶¶ 1260–1264. Ms. Stute had not, as directed, signed up to become a prayer partner. Ms. Jennings came into Ms. Stute's office with the prayer partner form and said "you can't even sign a piece of paper." Several times during the last few weeks of Ms. Stute's employment, Ms. Jennings told her that she was causing Ms. Jennings undue stress and that dealing with Sherry just took all of her energy. One day when Sherry Stute was talking to Terry Jennings on the phone, Terry Jennings told Sherry Stute that Sherry Stute had upset her so, she [Terry] just thought about running in a ditch and killing herself, that having to deal with Sherry Stute was the most stressful thing she had ever done. Pl. Add. Facts ¶¶ 1268–1271.

After the Values Presentation, Ms. Jennings asked Ms. Stute if Catholics prayed before meals, to which Ms. Stute said yes. In another conversation, Ms. Jennings told Ms. Stute that "Catholics don't believe in the Holy Spirit." Def. Facts ¶ 433, 434 (and Pl. Resp.), 436 (and Pl. Resp.).

Some time after the Values Presentation, Terry Jennings told Ms. Stute that Catholics were not considered Christians, adding that Ms. Steuerwald had told her that Catholics didn't believe in the Holy Spirit. Ms. Stute asked in response: "So when a Catholic makes the sign of the cross, what do you think that is?" Ms. Jennings responded that she thought Catholics were making fun of God. During the same conversation, Ms. Jennings said that Catholics have idols other than God. Ms. Jennings also said that Jackie Steuerwald told her that Catholics keep God in a box in the front of the church. She also told Ms. Stute that Jackie had told her that Catholics were pagans. Pl. Add. Facts ¶¶ 1305–1312. During another conversation, Ms. Jennings told Ms. Stute that she ought to change her religion. Pl. Add. Facts ¶ 1313.

During a managers meeting at the corporate office, those in attendance were told that Bibles were available for them to purchase; they were told Ms. Steuerwald felt that everybody in the company needed a Bible so she encouraged the branch managers or supervisors to purchase them for their staff. Someone referred to the Bibles as being the corporate word. Pl. Add. Facts ¶¶ 1317, 1318.

Preferred asserts that, as Ms. Stute's supervisor, Ms. Jennings was not always pleased with Ms. Stute's work. Def. Facts ¶¶ 443. Ms. Stute testified, unrebutted, that she was not criticized at Preferred until after she announced at the Values Presentation in October 1995 that she was a Catholic. After that, Ms. Jennings told Ms. Stute to come in, go to her office, keep her mouth shut, and if she had any deal-

ings with anybody in the office, whether with the secretary, the nurses, the home health aides, she was to go to Wanda Wallace and that Ms. Wallace would deal with everybody. Pl. Resp. To Def. Facts ¶ 443; Pl. Add. Facts ¶ 1265, 1320.

During the last three weeks of her employment, Ms. Jennings told Ms. Stute that she would not have hired Ms. Stute had she been given the original choice. On May 8, 1996, Ms. Jennings met with Ms. Stute to address Ms. Stute's handling of some advertising matters, her failure to adhere to certain office procedures, some notes from a patient chart that had come up missing, the manner in which an 800 number was set up without authorization from the corporate office, and Ms. Stute's organizational skills. The next day, Ms. Stute submitted her resignation letter to Ms. Jennings. Def. Facts ¶¶ 444–448.

### 6. *Diana DeWester*

Diana DeWester began work for Preferred in 1991. Although she was hired as Director of Nursing in the Danville branch, she never worked as a Director of Nursing. Instead, she assisted with the Lafayette office for her first four to six weeks as an employee, and then became the branch manager and nursing supervisor for the newly opened Indianapolis office. Def. Facts ¶¶ 459, 463, 464,

Ms. DeWester grew up Presbyterian, but converted to Catholicism in 1956 when she was 18 years old. She considers herself to be a Christian. She perceived Ms. Steuerwald's religious views as "far-right fundamentalist" and relying on a literal interpretation of the Bible. Ms. DeWester believes that the teachings of the Catholic Church are consistent with a literal interpretation of the Bible. Def. Facts ¶¶ 455, 456. 457, 458 (and Pl. Resp.),

Approximately six weeks into Ms. DeWester's employment, Diane Christian, Preferred's Northern Area Administrator, told her that Ms. Steuerwald did not think Ms. DeWester would fit in at Preferred because of Ms. DeWester's "nonbeliefs." Def. Facts ¶ 465. Ms. Christian told Ms. DeWester to be very, very careful, a statement that Ms. DeWester took as a warning. Pl. Add. Facts ¶¶ 1342, 1343. Shortly after this conversation, Ms. DeWester said at a luncheon Ms. Steuerwald attended that Christians did not have a corner on the "God market," and that just as there is "more than one way to get to Beech Grove, there is more than one way to get to God." Def. Facts ¶¶ 465, 466. Ms. Steuerwald appeared to be very angry after Ms. DeWester made this comment. Pl. Add. Facts ¶ 1344. Ms. Steuerwald observed that Ms. DeWester's comment "was new age thinking and it was not allowed at Preferred Home Health Care." Def. Facts ¶ 468; Pl. Add. Facts ¶ 1345.

Ms. DeWester was the first office employee hired for the Indianapolis office. Becky Selm, who had attended a Catholic church before Jackie Steuerwald pointed her in another spiritual direction, was hired as office manager. Def. Facts ¶¶ 470, 471; Pl. Add. Facts ¶ 1498.

Some employees complained of Ms. DeWester's leadership of the office. Ms. DeWester believed that because of her attitude toward the religious issues at Preferred, some employees didn't like her. Def. Facts ¶ 473 and Pl. Resp. Ms. DeWester believed that her approach to devotions created some tension in the office. Devotions were held every Thursday morning. Ms. DeWester did not want everybody to go at the same time; instead, she proposed that half the staff would attend one week and half the next. Several employees objected to her proposal, believing that the office should be closed during devotion time. Def. Facts ¶¶ 474 and Pl. Resp., 476. Ms. Steuerwald and Ms. Christian directed Ms. DeWester to go to devotions

to show support for Preferred's values. Def. Facts ¶ 475; Pl. Add. Facts ¶ 1361.

Ms. DeWester does not believe that human beings receive religious visions from God or that evil spirits can be present in the work place. Pl. Add. Facts ¶¶ 1339, 1340. Her problem with Ms. Steuerwald was that she demanded that Ms. DeWester abide by her religious beliefs and that she direct her subordinates to abide by them as well. Pl. Add. Facts ¶ 1347. Ms. Christian told Ms. DeWester that, as far as religious views were concerned, it was Jackie Steuerwald's way or the highway. Pl. Add. Facts ¶ 1348. Ms. DeWester was expected to present religious memos and posters in meetings. She did not support hanging religious posters in the workplace and she complained to Ms. Christian about the religious bulletins and posters in the work place. Pl. Add. Facts ¶¶ 1356–1358.

On two occasions, Ms. Steuerwald prayed over the phone regarding Ms. DeWester's brother, who was having surgery, and once for wisdom for an upcoming business meeting. Def. Facts ¶ 478 and Pl. Resp. Ms. DeWester was uncomfortable with Ms. Steuerwald praying over the phone. Pl. Add. Facts ¶ 1367.

On more than one occasion, Ms. Steuerwald told Ms. DeWester that she was "walking in the flesh." Ms. DeWester took exception to the Values Definitions attached to Preferred's Values Statement, because she did not think the Bible verses belonged in the workplace. Def. Facts ¶¶ 482, 485, 486.

Ms. DeWester was directed to support Ms. Steuerwald's religious beliefs on several occasions. She was directed to go to devotions. She was encouraged to fast. She was instructed, when she hired employees, to make sure that they were Christians. In a letter dated August 18, 1995, Ms. Steuerwald told Ms. DeWester to be present at an in-service values presentation to make the introduction and to show her support. Ms. DeWester felt that her employment was threatened when she did not attend a religious function during work hours, even though she acknowledged that she was not disciplined for not attending. Pl. Add. Facts ¶¶ 1359–1363, 1364 (and Def. Reply).

At two meetings Ms. DeWester attended, Darlene Wright and Jackie Steuerwald talked about speaking in tongues. Towards the end of Ms. DeWester's employment, Ms. Steuerwald discussed, in Ms. DeWester's presence, a vision she had of the Antichrist. "Walking in the flesh" was a common statement at Preferred. Ms. DeWester heard repeated discussions about the spirit and spirituality. Pl. Add. Facts ¶¶ 1365, 1366, 1371. On more than one occasion, Ms. DeWester heard Ms. Steuerwald say in a meeting that she was looking at her managers and thought that some of them were not where they should be spiritually. On one such occasion, Ms. Steuerwald gave Ms. DeWester books on religious topics. She then followed up by asking Ms. DeWester about the books. Pl. Add. Facts ¶¶ 1377–1381.

Ms. DeWester tried to appear busy in her office in order to avoid seeing the Holy Spirit videos presented at the Indianapolis branch. Occasionally, Pastor Johnny Garrison would come to her office to ask her if she was attending the Holy Spirit videos. Pl. Add. Facts ¶¶ 1386, 1387. As a branch manager, Ms. DeWester was directed to tell applicants during the interview that Preferred is a Christian organization and to direct all applicants to talk with Pastor Johnny Garrison after she interviewed them. Pl. Add. Facts ¶¶ 1405–1406.

Ms. DeWester attended a branch manager meeting on June 21, 1995, at which Jackie Steuerwald discussed the Values Statement with the branch managers. Ms. Steuerwald told the attendees that each employee would be asked to sign a state-

ment at the beginning of the year agreeing to uphold Preferred's values—among them, "Trust in God." Ms. Steuerwald added that employees also would be asked to sign a statement at the end of the year agreeing that they had supported the values during that year. The values, Ms. Steuerwald said, were to be used in disciplinary actions. Ms. Steuerwald told the attendees that the values are the heart of Preferred and are not negotiable. Ms. DeWester. was told to prepare a list of employees who refused to sign the Values Statement and send that list to Ms. Steuerwald. Ms. DeWester was also told to prepare a list of all employees who would like to discuss the values personally with Ms. Steuerwald and send that list to the corporate office. Ms. DeWester was offended by having Bible verses in the Values Statement, notwithstanding their consistency with her own religious beliefs. In a meeting that Ms. DeWester attended, Ms. Steuerwald explained that Jesus was the center of all of Preferred's operations and that all of the employees were spokes on the wheel. All employees were required to attend a Values Presentation. Ms. DeWester signed the Values Statement because she wanted to keep her job. Pl. Add. Facts ¶¶ 1388–1401.

Ms. DeWester reacted negatively to Ms. Steuerwald's writing called the "Transfiguration of Preferred" because, she opined, she did not believe that "God's real anxious to make Jackie Steuerwald a rich woman." Def. Facts ¶ 489 and Pl. Resp. Ms. DeWester testified that, every time she had an extended conversation with Jackie Steuerwald (except for the last), Ms. Steuerwald would ask: "Have you been saved?" or "Have you found Jesus?" or words to that effect. On each occasion, Ms. DeWester would respond: "Jackie, I am a Christian." Def. Facts ¶ 490 and Pl. Resp.

Ms. DeWester once said in a meeting which Ms. Steuerwald attended that Pre-

ferred was a business, not a church. Diane Christian phoned Ms. DeWester the next day and told her that she was in serious trouble with Ms. Steuerwald over the remark and that Ms. DeWester had to understand that Ms. Steuerwald considered Preferred to be a mission. Ms. DeWester testified that one did not disagree with Ms. Steuerwald about religion for fear of losing one's job, although she acknowledged that she knows of no person who was ever fired because of a dispute with Ms. Steuerwald over religious beliefs. Def. Facts ¶ 496; Pl. Add. Facts ¶ 1409; Def. Facts ¶ 498.

After an interview with an applicant, Ms. Steuerwald came to a branch manager meeting and announced that she may have her first lawsuit. She said that the applicant was from the Southwest and that the applicant was Unitarian and wouldn't fit in. Pl. Add. Facts ¶¶ 1410, 1411.

On October 7, 1992, Diana Christian reviewed Ms. DeWester's work performance. In the "development" box on the evaluation form, Ms. Christian noted: "sometimes can be reactionary"; "can be abrupt when under pressure"; "but also needs to work on handling frustration." Def. Facts ¶¶ 499, 500 (and Pl. Resp.). On that evaluation, on a scale of I to IV, with IV being the highest, Ms. DeWester received a "III" in leadership, a "III" in planning and organizing, a "III" in decision making, a "III" in delegation and control, a "III" in achieving results, a "II" in cost control, a "III" in organizational knowledge, a "IV" in training/development, between "II" and "III" in organizational cooperativeness, a "IV" in initiative, a "III" in resourcefulness/creativity, a "IV" in integrity/honesty, a "III" in communications, a "III" in interpersonal relations, and a "II" in corporate philosophy. Pl. Add. Facts ¶ 1414.

Her overall rating on the October 22 evaluation was a "III." Pl. Add. Facts

¶ 1415. In addition, in the handwritten section listing "Areas of Concern," the following comments are written: "None"; "I think she was under a lot of stress up until a QA nurse was hired"; and "I think she was afraid she was not doing a good job due to the work load. She has always done a great job, even though there was lots to do." Pl. Add. Facts ¶ 1417.

Her next evaluation was on September 22, 1993. Ms. Christian wrote that Ms. DeWester needed to increase her communication with her staff, be more approachable, and to work on ways to deal with anger. Def. Facts ¶ 501, 502. On a scale of I to IV, with IV being the highest, she received a "III" in leadership, a "III" in planning and organization, a "III" in decision making, a "III" in delegation and control, a "III" in achieving results, between a "I" and a "II" in cost control, a "IV" in organizational knowledge, a "III" in training/development, a "III" in organizational cooperativeness, a "IV" in initiative, a "III" in resourcefulness/creativity, a "IV" in integrity/honesty, a "III" in communications, a "II" in interpersonal relations, a "III" in corporate philosophy. Her overall rating was a "III." Pl. Add. Facts ¶ 1418, 1419. In one of her comments in the narrative section Ms. Christian wrote of Ms. DeWester: "Overall, she is a wonderful employee & is a great asset to the agency." Pl. Add. Facts ¶ 1420.

On Ms. DeWester's evaluation of May 19, 1994, Ms. Christian identified Ms. DeWester as a strong leader, but noted that her staff had changed its perception of her since the preceding September. Her staff had raised concerns about Ms. DeWester's honesty, integrity, fairness, respect for authority and ability to work with cohesiveness, among other things. Def. Facts ¶¶ 503, 504, 505.[7] Notwithstanding these comments, on a scale of 1 to 3, with "1" meaning "job performance does not meet requirements", "2" meaning "job performance meets requirements" and "3" meaning "job performance exceeds requirements," the only score that Ms. DeWester received below a "2" on this evaluation was in the area of "implements company policy and procedure within an acceptable time frame." Under the comments for that criterion, Ms. Christian wrote: "implements procedures, however, seems to be non-supportive at times." Pl. Add. Facts ¶ 1421, 1422. When discussing the comment in the May 19 evaluation, Ms. Christian told Ms. DeWester that she had to support Preferred's religious philosophy. Pl. Add. Facts ¶ 1423. Prior to receiving the May 19, 1994 evaluation, numerous Indianapolis employees told Ms. DeWester that she should be more supportive of Preferred's religious philosophy and its Chaplain. Pl. Add. Facts ¶ 1424.

After the May 19 evaluation, Ms. Christian established a set of 60 day goals as follows: (1) "do not let any unclean thing come out of your mouth"; (2) do nothing out of favoritism; (3) be a good role model; (4) "openly support Chaplain and Preferred's philosophy"; and (5) develop positive relationships with office and field staff. Def. Facts ¶ 506 and Pl. Resp., 507 and Pl. Resp. Ms. Christian also admonished Ms. DeWester that if significant improvement was not made in these areas, especially in the areas of interpersonal relationships, Ms. DeWester could face additional disciplinary action up to and including discharge. Def. Facts ¶ 508. Ms. DeWester believed that the employees she had diffi-

---

7. The EEOC objected to the introduction of the employee comments as hearsay. They are not admissible for the truth of their assertions. But to the extent that Preferred relied on the comments to form an opinion as to Ms. DeWester's work performance, they are admissible. Fed.R.Evid. 803(3). They also may be admissible as a business record, subject to additional proof. Fed.R.Evid. 803(6).

culties with were those who supported Ms. Steuerwald's religious beliefs. Pl. Add. Facts ¶ 1427. Diane Christian's instruction for goal number three was to support Preferred's religious philosophy. Pl. Add. Facts ¶ 1425. The instruction for goal number four was to go to devotions. Pl. Ad. Facts ¶ 1426.

In September 1994, Ms. Christian advised Ms. DeWester that she had shown marked improvement in the areas relating to her goals, and noted that she had been working hard at improving her relationships within the office. Def. Facts ¶ 509. Ms. Christian observed, for example, that "[d]uring the last few months, I have noted her strong support for the Chaplain." Pl. Add. Facts ¶ 1428.

On May 10, 1995, Ms. DeWester received her last performance evaluation. Ms. Christian noted that Ms. DeWester needed to continue working on controlling her emotions. Def. Facts ¶ 510–511. On this evaluation, on a scale of 1 to 3, "1" signified "job performance does not meet requirements," "2" meant "job performance meets requirements," and "3" meant "job performance exceeds requirements." The only score that Ms. DeWester received below a "2" was for: "adheres to established branch budget and advises appropriate supervisor of variations." Pl. Add. Facts ¶ 1429. In the narrative section of this evaluation, Ms. Christian wrote: "Diana is an excellent client advocate. She is a resource to other branches on IV's. She is innovative & creative. On her branch audit in April, her office was well organized, up to date, excellent charting & well run with only very minor suggestions. It has been a challenging, growing & stretching year for the Indpls. office & I feel that Diana has grown as well." Pl. Add. Facts ¶ 1430.

On February 19, 1996, Ms. Christian spoke with Ms. DeWester on the telephone to set up a meeting between the two of them and Nellie Foster to discuss Ms. DeWester's performance and areas of potential improvement. Ms. Christian informed Ms. DeWester about Ms. Foster's "Leader in the Making" program and that Ms. Foster had been brought on board to elevate the performance of Preferred's managers. The three met on February 28, 1996. During the meeting, Ms. Christian and Ms. Foster discussed with Ms. DeWester some personality issues that were affecting the operations and morale of the Indianapolis branch. Ms. Christian addressed the perceptions that Ms. DeWester could be "bossy," controlling and intimidating. By the end of the meeting, however, Ms. Christian believed some progress had been made and she and Ms. Foster, along with Ms. DeWester, developed a personal improvement plan. Def. Facts ¶ 513–514, 516–519.

Ms. DeWester's personal improvement plan called for Ms. DeWester to do the following: (1) pick two weaknesses to target over the next few months; (2) document two instances where she made progress in overcoming those weaknesses within a given period of time frame; (3) complete some exercises concerning relational skills within a given time period; and (4) implement values in areas of "atmosphere, attitude, behavior, conduct, [and] discipline" within a the time period. Def. Facts ¶ 520.

Ms. DeWester attended two or three of Ms. Foster's training sessions and found them to be religiously-oriented. Pl. Add. Facts ¶ 1433. On March 1, 1996, Ms. DeWester called Ms. Christian to inform her of her resignation. Ms. DeWester stated that she was not willing to make the changes discussed in the meeting held two days earlier and could no longer put up with the religion at Preferred. Def. Facts ¶¶ 523, 524. Ms. DeWester said that, after years of religiously-oriented materials and

comments, attending Ms. Foster's training sessions was the last straw. The day after Ms. DeWester turned in her resignation letter, Diane Christian told her: "Jackie has decided she wants you to leave now." Pl. Add. Facts ¶¶ 1432, 1434.

### 7. Mary Mulder

Mary Mulder has attended Catholic churches with her husband and children, but has never joined any church or become Catholic herself. She considers herself a Christian, which she understands to mean that she is to be kind to people and honest with them. Def. Facts ¶¶ 590, 591. She believes that being "saved" means that you believe in God and are kind to other people, you try to live an honest life and take care of your family. Pl. Add. Facts ¶ 1481. She perceives her beliefs about being "saved" are different from those of Jackie Steuerwald, Mike Pyatt, and Becky Selm. She thinks that, for them, in order to be saved one had to preach the gospel to other people and verbally express one's feelings about religion. Ms. Steuerwald told Ms. Mulder that to become "saved," Mary Mulder needed to learn how to preach the word of God to other people, to openly talk about it and to give away her sinner ways of life. Pl. Add. Facts ¶ 1482-1484.

Ms. Mulder applied at Preferred's Indianapolis branch in October 1995 for a staffing coordinator position, which involved organizing the schedules for all of the home health aides in the branch. She interviewed with Becky Selm, who would be her direct supervisor and who told Ms. Mulder during the interview that she "used to be a wild person that wasn't directed by spiritual guidance and that Jackie Steuerwald had helped direct her in the right direction, and that her husband still wasn't walking in the right path but that that was something that [she] had to work out, but [she] felt like a better person." Def. Facts ¶ 592, 595; Pl. Add. Facts ¶ 1486.

Ms. Mulder received her only performance evaluation on January 8, 1996. It was prepared by Ms. Selm, to whom she reported directly, and it was a good review. Def. Facts ¶ 597; Pl. Add. Facts ¶ 1489.

Before her first day of work, Ms. Mulder met Johnny Garrison, the chaplain, who told her that Preferred offered a devotional time, and that she was welcome to attend. Ms. Mulder always understood that the devotions were optional and she went as often as she could, because she enjoyed them. Ms. Mulder did not consider anything that occurred at the devotions to be offensive. Def. Facts ¶ 598-600. At times, when Ms. Mulder did not attend devotions, Becky Selm would ask "Why didn't you go into devotions today?" She also observed: "Well, Jackie likes for everybody to attend." Pl. Add. Facts ¶¶ 1487-1488.

During her orientation, Ms. Mulder reviewed the Transfiguration of Preferred. Ms. Mulder's reaction to it was that, if Ms. Steuerwald wanted to believe that, so be it. Def. Facts ¶¶ 601, 602.

On one occasion, Ms. Mulder attended a meeting presented by Mike Pyatt where he discussed the need for the people in the branch to work together and told those in attendance that because they "weren't reaching out to each other and being like Godly children should be," that was why their work was not flowing; he also said that, if they centered their lives around Jesus, everything would flow. Def. Facts ¶ 604 and Pl. Resp. Mr. Pyatt told the attendees: "If you're not walking in the right path of God, you need to look for a new job, this is not the place for you." Def. facts ¶ 605 and Pl. Resp. Becky Selm told employees that Ms. Pyatt was coming on a particular day at a particular time and that they were expected to be there. Pl. Add. Facts ¶ 1491. Mary Mulder was

shocked and offended by Mr. Pyatt's comments and actions during the meeting in which he put up the organizational wheel chart with "Jesus" in the center. Pl. Add. Facts ¶ 1492.

On one occasion Ms. Steuerwald brought a video, "The Holy Spirit," to the Indianapolis branch and employees were expected to attend. Pl. Add. Facts ¶ 1493. Ms. Selm told Ms. Mulder that she did not need to see the tape because she was Catholic and would not understand it. Def. Facts ¶ 606. Ms. Mulder was not eager to see the movie, but she was shocked by Ms. Selm's comment. At the time of the showing, Ms. Steuerwald talked about how she found the Holy Spirit and she wanted her "people" to experience it as well because it would change their lives as it had hers. Ms. Mulder understood the phrase "her people" to mean the Preferred's employees. Pl. Add. Facts ¶ 1495, 1496, 1497. Ms. Mulder went to the showing of the tape anyway. Def. Facts ¶ 607.

In November 1995, Ms. Selm told Ms. Mulder that she should not tell Jackie Steuerwald that she was involved with the Catholic church because, according to Ms. Selm, Ms. Steuerwald did not like Catholics. Ms. Selm observed that she herself used to be involved with the Catholic Church, but that after she met Jackie, Jackie was able to bring religion into her life the way it should be. She said she was no longer involved with the Catholic Church, and she was heavily involved with another church Def. Facts ¶ 609; Pl. Add. Facts ¶ 1498. Ms. Steuerwald denied having said that she does not like Catholics and denied having any bias against Catholics. Def. Facts ¶¶ 610, 612.

Ms. Steuerwald also told Ms. Mulder that she was very open about her religion because she wanted others to have the glory of God in their lives too. Ms. Mulder responded by stating that she was very private about her religion, that she liked to pray in private and did not like preaching to other people. Ms. Steuerwald responded that, because she was not charismatic about religion, she could not be walking in the right path of God. She told Ms. Mulder that she could not be a saved Christian. Def. Facts ¶¶ 613, 614; Pl. Add. Facts ¶¶ 1510, 1511.

In Ms. Mulder's presence, Becky Selm said, "Oh, you know those Catholics, they're just heathens." Ms. Selm told Ms. Mulder that Diana DeWester always fought corporate on religious issues, and they did not like that. Ms. Selm often told Ms. Mulder what a good Christian she was because she participated in church all the time, believed in Jesus Christ, and believed in the Bible. Ms. Selm would ask Ms. Mulder daily for her list of problems, and when Ms. Mulder would show them to her, Ms. Selm would say "Let's pray about them." Ms. Selm suggested that Ms. Mulder pray over her paperwork. After Ms. Selm and another employee took Ms. Mulder's paperwork into another room and prayed over it, Ms. Selm told Ms. Mulder that the only reason the work got done was because they had prayed over it. When Ms. Mulder asked Ms. Selm not to pray over her work, Ms. Selm told her that was a common practice for them and that they would continue to do it. Pl. Add. Facts ¶ 1517–1523; Def. Facts ¶¶ 616–618.

In January 1996, Ms. Mulder was attending comprehensive orientation at the corporate office when Mike Pyatt asked her how she was enjoying working for Preferred. Ms. Mulder stated that she enjoyed the work but was uncomfortable with all of the religious aspects, such as praying over paper work. Mr. Pyatt responded, "You're the hardest kind to break." Def. Facts ¶ 619–621.

At the comprehensive orientation attended by Ms. Mulder, each speaker ex-

plained her role in the company and also shared some personal information about her spiritual journey. Although Ms. Mulder found none of the individual presentations offensive, by the end of the day when every speaker had talked about a religious experience, Ms. Mulder thought that it was a strange thing: by her own beliefs, a religious experience may only come once in your life or may never come at all, yet all of the speakers had one or more religious experiences. Def. Facts ¶ 623, 624 and Pl. Resp. After listening to the speakers' recitations, Ms. Mulder started to feel excluded; she thought that, if she didn't believe the way they did, then she would be considered different or an outcast. She started to think that she shouldn't voice her opinion on what she felt. Pl. Add. Facts ¶ 1530, 1531.

Ms. Mulder also attended some of the presentations made by Nellie Foster, which she found offensive not because the content was contrary to her religious beliefs but because she did not feel it was necessary in the workplace. She was uncomfortable about having someone stand in front of her telling her that religion was necessary in the work place. She also took offense on one occasion when she saw the Lordship Ladder posted for one day in the women's restroom. Def. Facts ¶ 625 and Pl. Resp., 626.

Once, one of Ms. Mulder's co-workers made a reference to the Masonic temple being a cult after Ms. Mulder mentioned that her father belonged to the Masons. Def. Facts ¶ 627. Whereupon employees Jennifer Underwood, Marilyn Pitzulo and Deanna Roberts said: "Didn't you know that the Masonic Temple is a cult?" They then began snickering and laughing and whispering in each other's ears. One of them said that the Masonic Temple was a religious cult. Ms. Mulder was humiliated by this experience. She did not complain about the comments concerning the Masonic Temple because of the steady barrage of religion, and it would not make any difference what she said; unless she conformed to the group's religious views, she wouldn't be part of the group. Pl. Add. Facts ¶¶ 1534–1540.

After employee Rebecca Lambert left Preferred, Becky Selm came into Mary Mulder's office and said: "I think we need to pray in this office to get rid of the evil demons." After Diana DeWester left, Becky Selm told Mary Mulder that she and Jackie Steuerwald had prayed over Diana DeWester's office to get rid of the evil demons in her office when she left. Pl. Add. Facts ¶¶ 1541, 1542. At some point in her employment, Ms. Mulder began to get sick to her stomach at the sight of religious memos. She became increasingly uncomfortable seeing items with Bible verses on them in the reception area. Pl. Add. Facts ¶¶ 1544, 1545.

Jackie Steuerwald had meetings at least once a month at the Indianapolis branch during Ms. Mulder's employment there. When Ms. Steuerwald talked about religion, she would say: "If you can't speak up and talk about God and talk his preachings and to walk his walk, you are not a good Christian and you need to get your life on the right path." At one of the meetings, Ms. Steuerwald passed out the writing entitled "Characteristics of Broken People Prepared for Revival." After doing so, Ms. Steuerwald suggested: "You might want to read down it and see which side of the page that you fall on and work toward getting to the proper side." Jackie Steuerwald told the group that the proper side was the side of "broken people." Pl. Add. Facts ¶¶ 1546–1550.

Ms. Mulder was frustrated at what she saw as inefficiencies or inter-disciplinary problems in the workplace that affected how she was able to perform her job. Whenever she attempted to raise these

concerns, however, the response focused on religion rather than a practical solution to the problem. Def. Facts ¶ 629, 630. The religious response increased the frustrations. Pl. Add. Facts ¶ 1552. Ms. Mulder perceived the morale in the Indianapolis office to be low. She believed that many employees were upset and scared that they were going to lose their jobs if they didn't agree with everything the corporate office presented on religion. Pl. Add. facts ¶ 1553.

After Diana DeWester resigned and Preferred was in search of her successor in May 1996, Ms. Steuerwald held a meeting in the Indianapolis office with Ms. Mulder, Angie Weiskittel, Amy Butler, Cathy Robinson and Carol Fuzzell to address the reasons why some of the departments were not running smoothly. Ms. Steuerwald opened the meeting by reading from her Bible and said that the office was not running smoothly because the employees were not on the path of God and were all sinners. She told the group: "You realize that you're all sinners, that you all play a part in this, of being a sinner. Each and every one of you is a sinner." Def. Facts ¶ 633, 635. Ms. Steuerwald asked Angie Weiskittel: "Do you believe that you're a sinner?" She replied: "Well, I guess I am." Pl. Add. Facts ¶¶ 1556, 1557. Ms. Steuerwald looked at Amy Butler and asked: "Do you believe that you're a sinner?" Ms. Butler hung her head and started to cry and said: "Yes, I'm a sinner." Pl. Add. Facts ¶¶ 1558, 1559. Ms. Steuerwald concluded: "That's right. Because each and every one of you is a

sinner." Pl. Add. Facts ¶ 1560. She added: "Until you people release your vanity and quit becoming vain people, you're always going to come up with these problems." Pl. Add. Facts ¶ 1561.[8]

Kathy Robinson asked Ms. Steuerwald "What do you mean by being vain?" Ms. Steuerwald replied: "When you cause problems, when you think that you're the only important person in this office, that everybody else is wrong, that means that you're a vain person." Ms. Robinson queried: "How can you tell us this is a vain act when we're just trying to make our jobs run more smoothly?" Ms. Steuerwald got up from her seat, put her hands on the table, leaned forward to about six inches from Ms. Robinson's face and said: "You are a vain sinner." Pl. Add Facts ¶¶ 1562–1566. Ms. Steuerwald told Ms. Robinson to repeat after her: "I will pray to God and ask him to keep me from thinking in vain ways." Ms. Robinson repeated the statement. Ms. Robinson and others present began crying. Pl. Add. Facts ¶ 1568–1570. Ms. Mulder was crying because it upset her to see her fellow workers so upset and because she felt that Ms. Steuerwald had "reduced her to slime," that Ms. Mulder was a horrible person because she wasn't practicing Ms. Steuerwald's beliefs. Pl. Add. Facts ¶ 1571.

At one point during the May 1996 meeting, Ms. Steuerwald mentioned something about the Holy Spirit. Mary Mulder responded: "You act as though, when you talk about the Holy Spirit that this is something totally new in your life. If you

---

**8.** Preferred disputes these statements of fact. It claims: "Other people at the meeting, including those whom Ms. Mulder claims were asked to repeat 'I am a sinner,' testified that no such thing occurred." Deposition of Kathy Robinson ("Robinson Dep.") at 163–65; Selm Dep. at 80–81. At the cited testimony, both Ms. Robinson and Ms. Selm testified that they *did not remember* hearing these things, but not that "no such thing occurred." Def. Facts ¶ 636, n. 5. Ms. Mulder, by contrast, testified that she *did* remember and that the events happened. We ordinarily credit positive testimony over lack of memory. In addition, Preferred's objection misses the point. We resolve disputed issues of fact, such as this one, in favor of the party opposing summary judgment.

believed in God, what did you believe in if you didn't believe in the Holy Spirit?" Ms. Steuerwald responded that she had learned not to be a sinner and not to be a vain person and that her new way of life taught her about the Holy Spirit. Ms. Steuerwald then continued for a lengthy period of time giving the attendees of the May 1996 meeting examples of how they were sinners. She said that, instead of trying to deal with each other in a religious fashion, looking toward God for answers, they were going to supervisors and they weren't dealing with their problems when there really was no problem; she told them it was just a fact that they were just being bad to each other, being sinners, and being vain people. When Ms. Steuerwald said things like "You're all sinners," she would look at each person in attendance. Some of the "you're all sinners" comments were directed at Mary Mulder. Pl. Add. Facts ¶¶ 1573–1580.

During the May meeting, Ms. Steuerwald asked Ms. Mulder whether she prayed over her work. Ms. Mulder responded that she was not raised to pray for material gain and that she thought it was selfish to do so. Ms. Steuerwald replied: "Your kind are the hardest to break." Def., Facts ¶¶ 640, 641.

During the May 1996 meeting, Becky Selm started to argue with another employee. During the argument, Ms. Selm burst into tears and said: "I'm a sinner, I'm a sinner, oh, God, please forgive me, I'm a sinner." Ms. Steuerwald commented that: "Becky is the only one in this room who is on the right path to being a good Christian." The May 1996 meeting ran until the end of the day. At the close of the meeting, Ms. Steuerwald said: "I see it's the end of the day. It's time for us to get ready to leave. You know, there are people that are going to be passing us in the hallway. I would like for them to think that we're all in accordance with

each other. I think it's time that we should sing a song together." Ms. Mulder *reluctantly joined in the singing of* "Jesus Loves Me." She thought: as a person who believes in God, it was hard not to join in on some of the things that went on at Preferred. Ms. Mulder thought she was in such a weakened state at that moment that she needed some strength herself and it felt like such a horrible thing to say, gee, God, I'm going to insult you now and not sing this simple little child's song. Ms. Mulder did not consider singing the song a choice. Pl. Add. Facts ¶¶ 1581–1588.

On May 22, 1996, Ms. Steuerwald sent a memo to Kathy Robinson, Carol Fuzzell, Becky Selm, Amy Butler, Angie Weiskittel and Mary Mulder entitled "Your New Walk." Ms. Steuerwald intended the memo to teach the recipients that "carnal weapons are reasoning and spiritual weapons would be prayer. And so I was trying to teach them instead of reasoning some of the things they were and coming up with wrong conclusions, it would be better to pray about those things." Def. Facts ¶ 645 and Pl. Resp. The memo entitled "Your New Walk" read, in part:

I thank my God every time I remember you. In all my prayers for all of you, I always pray with joy because of your partnership with me in living out the gospel.

In my daily prayer journal this week, I had these 2 lessons and felt I should share them with you. *The Divine Reasonings of Faith* and the explanation of it will encourage you in your walk of laying down your carnal weapons. The admonition is to "Seek ye first the kingdom of God, and His righteousness, all these things shall be added unto you." Matthew 6:33

Please feel free to share with me your trials and victories. I'm believing for you and in you!

Pl. Add. Facts ¶ 1595. Mary Mulder interpreted the phrase "laying down your carnal weapons" to mean that the attendees should stop being vain and start becoming more Godly, and not go against Ms. Steuerwald's wishes; that everyone was supposed to walk in this religious path that Ms. Steuerwald wanted them to go into. Pl. Add. Facts ¶ 1597.

After receiving the memo, Ms. Mulder left a meeting in frustration when someone in attendance remarked that they needed to pray about some matter. Ms. Mulder stated as she left that she was tired of hearing about "praying about it." Def. Facts ¶¶ 646, 647.

Two weeks before Ms. Mulder quit, Kristi Fenter, the acting branch manager, referred to those in attendance at a staff meeting as sinners because they had continued to argue over paperwork and other office matters. At that point, Ms. Mulder began crying, could not stop and had to leave the room. Def. Facts ¶ 648, 649.

Ms. Mulder found herself growing depressed. She would go home in tears at night because of the events at work. Def. Facts ¶ 651; Pl. Add. Facts ¶ 1602. Ms. Mulder resigned on June 30, 1996, because she could no longer tolerate the campaign of religious activities at Preferred. Pl. Add. Facts ¶ 1603, Def. Facts ¶ 650. In her resignation letter to Ms. Steuerwald, Ms. Mulder stated that the burden she could no longer bear was not the stress of the job but Ms. Steuerwald's religious convictions. Def. Facts ¶ 652.

### III. *Analysis.*

#### A. *Summary Judgment Standard.*

The parties here have established a record of dubious distinction. Pursuant to Local Rule 56.1 they have submitted factual statements consisting of 1,624 separately numbered items. Most consist of two or three paragraphs including statements of fact, rebuttals, and sur-replies. The statements of fact fill 372 pages. They are replete with legal arguments, objections, and arguments concerning the admissibility of statements and the evidence underlying them, and verbal pot-shots at one another. We expect better from able counsel such as those on both sides of this action.

■ Even though this case is more complicated than most employment discrimination cases, it is useful to remind parties who make such voluminous submissions that summary judgment was not designed to be a "paper trial." Instead, on a motion for summary judgment, "[t]he court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994); *Winter v. Minnesota Mutual Life Insurance Company,* 199 F.3d 399, 408 (7th Cir.1999). *Also see Harbison v. The Prestige Group,* 2001 WL 395786 at *1 (S.D.Ind.2001); *Moore v. Hosier,* 43 F.Supp.2d 978, 987–988 (N.D.Ind.1998). We also note that, while the *grant* of a motion for summary judgment effectively ends a lawsuit on the merits, the *denial* of a summary judgment motion is "strictly a pretrial order that decides only one thing—that the case should go to trial"; denial of the motion "does not settle or even tentatively decide anything about the merits of the claim." *Switzerland Cheese Ass'n, Inc. v. E. Horne's Market, Inc.,* 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966). *See Watson v. Amedco Steel, Inc.,* 29 F.3d 274, 277 (7th Cir.1994).

Thus, "summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial." *Crawford–El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 1598, 140 L.Ed.2d 759 (1998); *Higgs v. Carver,* 2000 WL 1902190 at *2 (S.D.Ind.2000). It is not, however, a substitute for a trial, notwithstanding the "drift"

in that direction that then Chief Judge Posner noted. *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997). In considering a motion for summary judgment, we draw all inferences in a light reasonably most favorable to the non-movant. Where a jury trial has been requested, it is neither our job, nor is it within our competency, to resolve swearing contests. Nor do we have authority on summary judgment to choose among disputed issues of fact. *Weeks v. Samsung Heavy Industries Company, Limited*, 126 F.3d 926, 933; *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir.1997). In determining a motion for summary judgment, we bear in mind that a genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir.1998). "Material facts are those which might affect the outcome of the suit" under the prevailing substantive law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598–99 (7th Cir.2000); *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. *See* Local Rule 56.1(h) ("For purposes of summary judgment, a material fact is a potentially outcome determinative fact.") An issue is "genuine" if a reasonable trier of fact could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

On summary judgment, the initial burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party shows the absence of a genuine issue for trial, the burden shifts to the non-movant, which must "go beyond the pleadings," to present evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 106 S.Ct. 2548. If the party opposing summary judgment fails to present evidence that would reasonably permit the finder of fact to find in its favor on a material question, then the court must enter summary judgment against the non-movant. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249–52, 106 S.Ct. 2505.

**B. *Preliminary Matters.***

Before turning to the substantive claims underlying this case, we address three preliminary matters. These issues were raised by two motions collateral to Defendants' Motion for Summary Judgment: Preferred's "Establishment Objections"; and EEOC's Motion for Partial Summary Judgment which seeks dismissal of Preferred's affirmative defenses. The third preliminary issue was raised by Preferred on summary judgment. It alleges that some of the EEOC's claims do not rest on a timely charge of discrimination. Accordingly, Preferred argues, the EEOC's pattern or practice claim is time barred and so is the failure-to-hire claim it brought on Teresa Raloff's behalf.

These preliminary matters involve important issues of law whose resolution have an impact on the substantive claims. We address these preliminary issues here instead of in a separate entry in order to avoid the unnecessary multiplication of entries involving issues that are inextricably related to one another.

**1. *Preferred's "Establishment Objections."***

Preferred filed a document entitled "Establishment Objections," which we construe as a motion to strike certain factual assertions by the EEOC as well as the evidence that the EEOC has offered in support of those factual assertions. At the

heart of Preferred's argument is the contention that the EEOC, an agency of the federal government, exceeded its constitutional authority by focusing on Jackie Steuerwald's religious beliefs to such an extent that it has unlawfully intruded into her free exercise of religion, in violation of the First Amendment and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, et seq. (RFRA).[9] Preferred seeks, in effect, to strike the offending statements and the evidence in support of those statements from the EEOC's opposition to summary judgment. We are not persuaded that such action is warranted. Clearly, the effect of granting Preferred's motion would be to find as a matter of law that the EEOC's pattern or practice claims are not viable. Resolution of this issue bears implications for both the merits of the case and for the resolution of certain evidentiary issues.

We begin with the obvious. Title VII prohibits an employer from discriminating against employees on the basis of religion. 42 U.S.C. § 2000e–2(a)(1). The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief. . . ." 42 U.S.C. § 2000e(j). *See Anderson v. U.S.F. Logistics*, 274 F.3d 470, 475 (7th Cir.2001). Title VII prohibits employers from taking adverse employment actions against employees on the basis of religious criteria; this includes prohibiting employers from harassing employees on the basis of religion.[10] *Novitsky v. American Consulting Engineers, LLC*, 196 F.3d 699, 701 (7th Cir.1999); *Venters v. City of Delphi*, 123 F.3d 956, 971–972 (7th Cir.1997). Additionally, just as it empowers the EEOC to investigate and conciliate race and sex discrimination (among others), Title VII also authorizes the EEOC to investigate and conciliate complaints of religious discrimination, and it empowers the EEOC to sue on its own behalf as well as on behalf of complaining parties. 42 U.S.C. § 2000e–5(b).

This case involves, perhaps to an unprecedented degree, the clash of two sets of religious rights: the rights of the plaintiffs, pursuant to Title VII, to be free from a religiously-hostile work environment and from employment decisions based on religious criteria or preferences; and the rights of Preferred personnel, including Jackie Steuerwald, pursuant to the First Amendment and the RFRA, to be free from government interference in the free exercise of their religion in operating their business. It is important to bear in mind that this case does *not* involve a "balancing" of the plaintiffs' religious rights and Preferred's religious rights as if their re-

---

**9.** 42 U.S.C. § 2000bb–1 provides:

(a) In general

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

 (1) is in furtherance of a compelling governmental interest; and

 (2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial relief

A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.

**10.** Title VII also includes a "reasonable accommodation" provision with respect to religion. While the case law arising under that provision has proven useful here, the "reasonable accommodation" provision itself is not specifically at issue. Analysis of disparate treatment is different from reasonable accommodation analysis. *Venters*, 123 F.3d at 972.

spective rights were asserted against each other. Instead, the issues here involve two different legal relationships: Title VII positions the plaintiffs against Preferred; the First Amendment and the RFRA pit Preferred against the federal government (in its persona as the EEOC).

Thus, in the underlying complaint—involving the relationship between Preferred and its employees—the EEOC alleges that Preferred violated Title VII by fostering or condoning a hostile work environment and by making employment decisions on the basis of religion, thus violating the employees' right to work in an environment free from decisions based on religious requirements. By its Establishment Objections—which involves the relationship between Preferred and the federal government—Preferred has asserted that some of the EEOC's factual assertions, and the evidence underlying those assertions, are the product of the EEOC's overly-aggressive and intrusive inquiry into Ms. Steuerwald's religious beliefs and the religious beliefs of other employees and former employees of Preferred, in violation of the First Amendment and the RFRA. In an argument akin to a fruit-of-the-forbidden-tree argument, Preferred asks us to remedy the EEOC's alleged impermissible intrusion by striking its pattern or practice claims—which arise from the alleged intrusion—and thus to limit the EEOC's complaint to its disparate treatment allegations.

■ We decline Preferred's invitation to strike the allegedly offending statements and evidence because we find that the EEOC did not exceed its constitutional authority in its investigation into Pre-

ferred's alleged religious discrimination. Although Preferred entitles its pleading "Establishment Objections," its arguments arise at the intersection of the First Amendment's "establishment" and "free exercise" clauses.[11] Preferred's essential point is that the EEOC has unlawfully intruded into Jackie Steuerwald's religious beliefs and practices in order to make its Title VII case against Preferred. Thus, whether we analyze its motion through the structure provided by *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) and its progeny—as Preferred suggests in its Establishment memorandum—or through the regime provided by the RFRA and *Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)—on which Preferred relies more heavily in its motion for summary judgment—we arrive at the same conclusion.

■ What has become known as "the *Lemon* test" consists of three factors: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." 403 U.S. at 612–13, 91 S.Ct. at 2111. *See I.C.L.U. v. O'Bannon*, 259 F.3d 766, 770 (7th Cir.2001); *Books v. City of Elkhart*, 235 F.3d 292, 301 (7th Cir.2000).

Preferred concedes that the first two *Lemon* criteria are satisfied here. It questions only the third factor: "excessive entanglement." It argues that: "[T]he EEOC has immersed itself into [sic] the religious beliefs of Preferred's owner and

---

**11.** The Seventh Circuit noted in *Venters*, 123 F.3d at 969, that, while the free exercise and establishment clauses "constitute distinct protections, they also embody 'correlative and coextensive ideas, representing only different facets of the single great and fundamental freedom [of religion].' *Everson v. Board of Educ. of Ewing Tp.*, 330 U.S. 1, 40, 67 S.Ct. 504, 523, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting). Consequently, '[a]ny attempt to formulate a bright-line distinction is bound to founder.' "

its current and former employees. In doing so, it has enmeshed itself in an administrative entanglement of religion." Def. Memo., p. 3. In other words, the EEOC's involvement with Preferred has resulted in government's excessive entanglement in religion. We disagree.

Our points of departure are *Lemon* and *Agostini v. Felton*, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), in which the Supreme Court modified *Lemon's* "excessive entanglement" inquiry so as to merge "excessive entanglement" analysis with "advance or inhibit" analysis. *Mitchell v. Helms*, 530 U.S. 793, 807, 120 S.Ct. 2530, 2540, 147 L.Ed.2d 660 (2000) (acknowledging that *Agostini* modified *Lemon* test); [12] *DeStefano v. Emergency Housing Group, Inc.*, 247 F.3d 397, 405 (2d Cir. 2001). In other words, if it cannot be shown that the government's action has the "effect" of either "advancing" or "inhibiting" religion, then it will be exceedingly difficult to show that the government is excessively "entangled" in religion. In analyzing the "excessive entanglement" prong, "it is simplest to recognize why entanglement is significant and treat it ... as an aspect of the inquiry into a statute's effect." 521 U.S. at 233, 117 S.Ct. at 2015.

The Second Circuit has set forth a succinct analysis of the factors as follows:

> [W]hen presented with Establishment Clause challenges, we are required to ask " 'whether the government acted with the purpose of advancing or inhibiting religion' and 'whether the aid has the effect of advancing or inhibiting religion.' " We employ "three primary criteria" to answer the latter question: whether the action or program "result[s] in governmental indoctrination; define[s] its recipients by reference to religion; or create[s] an excessive entanglement." These same factors can in most situations be evaluated to answer what is often thought to be a separate question, whether a practice amounts to an unconstitutional government "endorsement" of religion.

*DeStefano*, 247 F.3d at 406 (internal citations omitted). *See Agostini*, 521 U.S. at 222–223, 117 S.Ct. at 2010; *Nottelson v. Smith Steel Workers D.A.L.U. 19806, AFL–CIO*, 643 F.2d 445, 453–454 (7th Cir. 1981) (upholding constitutionality of Title VII religious accommodation provision against establishment challenge). *cert. denied*, 454 U.S. 1046, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981).

Preferred has presented no evidence to support its contentions that the EEOC has acted with *the purpose* of advancing or inhibiting religion or that the EEOC's conduct has had *the effect* of advancing or inhibiting religion. Instead, it argues that the EEOC took 2½ years to conduct its investigation, took twenty-four depositions (and obtained leave to take a dozen more), and inquired deeply into the witnesses' religious beliefs. The latter inquiries, Preferred asserts, were compelled under the EEOC's subpoena power and were conducted on EEOC premises. These facts lead Preferred to conclude that the federal government has become a constant, unlawful intrusion into Ms. Steuerwald's and others' religious beliefs and practices and that there is no end in sight.[13]

---

12. Although the Supreme Court has struggled for more than a century to generate a consistent understanding of the establishment clause, it has found itself compelled to acknowledge that it can only "dimly perceive the boundaries of permissible government activity in this sensitive area." *Mitchell v. Helms*, 530 U.S. 793, 120 S.Ct. 2530, 2540, 147 L.Ed.2d 660 (2000) (plurality opinion) (quoting *Tilton v. Richardson*, 403 U.S. 672, 678, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (plurality opinion)).

13. In its initial brief, Preferred referred to itself as an organization that "can be charac-

Even assuming that Preferred has stated the investigative record correctly, we see no evidence of any long-term government entanglement in Preferred's affairs. The EEOC has conducted one investigation and combined its causes of action into one lawsuit. Nor do we have any reason to believe that the EEOC (or any other government agency) will have continued oversight over Preferred or its employees. Nor has the EEOC expressed any qualitative judgment with respect to the substance of their religious views. We see no indication that Ms. Steuerwald's personal religious beliefs or conduct have changed as a result of the EEOC's investigation and no indication that any religion other than hers (or, for that matter, no religion at all) has been materially advanced by the EEOC's actions.

We further note that the EEOC's authority to investigate, conciliate, and institute legal proceedings have been upheld in the context of other powerful First Amendment interests, most notably that of free speech. In *University of Pennsylvania v. EEOC*, 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), the Supreme Court upheld the EEOC's power to subpoena confidential peer review records notwithstanding the university's interests in preserving academic freedom and in encouraging members of its tenure and promotion committee to engage in unconstrained speech. Even though the Court has recognized academic freedom as a "special concern of the First Amendment", *Keyishian v. Board of Regents of University of New York*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967), it

would not limit the EEOC's authority to conduct discovery on an issue on which it bore the burden of proof—discrimination—beyond a showing of relevance. 493 U.S. at 194, 110 S.Ct. at 584–585.

We also note that it is a commonplace of Title VII law that a plaintiff may state a viable cause of action for harassment under Title VII by pointing to employers' speech that is racially or gender biased. This means that some employer speech, even speech that would ordinarily be protected under the First Amendment, is subject to restriction imposed by federal statute.

Some courts have raised the question of whether the government may lawfully limit political speech of a racially or sexually derogatory nature. The Fifth Circuit raised the issue in *DeAngelis v. El Paso Municipal Police Officers Association*, 51 F.3d 591, 596–597 (5th Cir.1995), a sex harassment case involving a *public* employer. Although the Fifth Circuit did not resolve the issue, it posed it as follows:

> Where pure expression is involved, Title VII steers into the territory of the First Amendment. It is no use to deny or minimize this problem because, when Title VII is applied to sexual harassment claims founded solely on verbal insults, pictorial or literary matter, the statute imposes content-based, viewpoint-discriminatory restrictions on speech.

*Also see Saxe v. State College Area School District*, 240 F.3d 200, 205–207 (3d Cir. 2001) (Title IX case involving harassment). Most courts have simply assumed, without deciding any First Amendment issue, that

terized as a religious institution." Def. Memo in Support of Establishment Objections, p. 4. It thus appeared that Preferred was seeking to exempt itself from Title VII, 42 U.S.C. § 2000e 1(a), which contains the following exemption: "This subchapter shall not apply to .... a religious corporation, association, educational institution, or society with respect

to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution...." In its reply brief, Preferred clarified its position by stating it is *not* arguing that it is exempt from a Title VII lawsuit.

the use of racial epithets or sexually demeaning language may constitute work place harassment. *E.g., Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668 (7th Cir.1993) (Perhaps no single act can more quickly "alter the conditions of employment and create an abusive ·working environment," than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates. [Internal citation omitted]). The courts have thus silently endorsed Title VII's limitations on speech that would be protected in environments other than the work place.

Two courts that have addressed the matter squarely go further. They have found that racially and sexually derogatory speech that constitutes workplace harassment is not "protected speech" under the First Amendment. In other words, remedies may be imposed on employers that permit such expression because it is not protected. *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486 (M.D.Fla. 1991); *Baty v. Willamette Industries, Inc.,* 1997 WL 292123 (D.Kan.1997). Several powerful reasons for this finding are applicable in this case: first, the regulation of discriminatory speech in the workplace may be interpreted as a "time, place, and manner regulation of speech," and thus as a regulation which does not offend constitutional principles; second, those subjected to unwelcome speech in the work place are "captive audiences," who enjoy some protection against otherwise protected speech; third, "a court may require a pri-

vate employer to curtail the free expression in the workplace of some employees in order to remedy the demonstrated harm inflicted on other employees without violating the First Amendment"; and, finally, "as long as it has been determined that a harm has been and continues to be inflicted on identifiable individuals and the context of the speech is the heart of the cause of action, the First Amendment has not been violated." [14] *Baty,* at *7.

We view these First Amendment speech cases as instructive by analogy. They illuminate the well-settled principle that speech which may be unassailable in the streets—even if provocative or repugnant—is not necessarily protected in the workplace. Such speech is often as heartfelt and sincere as Ms. Steuerwald's religious speech. But no court to our knowledge has yet held that the EEOC's intrusion into the political speech of private employers is an unlawful intrusion into the employer's First Amendment rights. Instead, where the intrusion is limited to workplace speech that tends to isolate, classify, or restrict employees or otherwise rises to the level of interfering with the terms and conditions of their employment, such intrusions have been accepted as lawful, albeit silently so.

In sum, Preferred has presented no evidence from which we might reasonably infer that the EEOC's action results in governmental indoctrination, or defines the recipients of its conduct by reference to religion, or creates an excessive entangle-

---

**14.** Even in the context of *public* employment—where the employer is, by definition, "the government"—speech is not absolutely protected. *E.g., Weicherding v. Riegel,* 160 F.3d 1139 (7th Cir.1998) (summary judgment affirmed against prison guard terminated for engaging in Ku Klux Klan and white supremacist speech and activities because activity, while otherwise protected, was insufficient to overcome public employer's interest in a safe

and efficient work place); *Hardy v. Jefferson Community College,* 260 F.3d 671 (6th Cir. 2001) (professor's in-class use of terms "nigger" and "bitch," even in context of academic analysis of hate speech, while protected by First Amendment, was insufficient to overcome public employer's interest in efficiency in the work place, so that professor had no action for retaliation when his contract was not renewed).

**810**

ment in religion. In other words, there is *no evidence to support the conclusion that the EEOC's actions in this matter have created a government preference for religion over no religion (or vice versa) or for one religion over another.*

■ Free exercise analysis under the RFRA is substantially identical. In *United States v. Indianapolis Baptist Temple,* 224 F.3d 627, 629 (7th Cir.2000), the Seventh Circuit acknowledged the individual's "absolute" freedom "to believe and profess whatever religious doctrines one desires" and the broad, though not absolute freedom "to practice (through the performance or non-performance of certain actions) one's religion." However, the Court continued: "neutral laws of general application that burden religious practices do not run afoul of the Free Exercise Clause." The same is true under the RFRA: "Under RFRA, laws that substantially burden the free exercise of religion cannot be enforced unless the burden furthers a compelling government interest and is the least restrictive means of furthering that interest." *Id.* at 630.

■ Here, there is no evidence that EEOC's conduct in investigating Preferred's alleged discrimination or in bringing this lawsuit constitutes a "substantial burden" on Jackie Steuerwald's religious beliefs or practices. Let us be even clearer: even assuming that the effect of the EEOC's investigation and this lawsuit was to force Preferred to conform to Title VII's prohibitions against making employment decisions on the basis of religious criteria, we would find that the investigation and lawsuit did not "substantially burden" Ms. Steuerwald's religious beliefs or practices. Nor do we find a conflict between Title VII and the RFRA. Accordingly, we do not find that Congress's authorization of the EEOC to investigate instances of religious discrimination and harassment clashes with its legislative

purpose to preserve and protect the free exercise of religion unless we find that the EEOC somehow overstepped its bounds in conducting its investigation. As we observed earlier, there is no evidence that it did.

■ But even if the EEOC *had* substantially burdened Jackie Steuerwald's religious beliefs or practices in prosecuting this matter, its conduct still comports with the RFRA's mandates. There is a "compelling government interest" in creating such a burden: the eradication of employment discrimination based on the criteria identified in Title VII, including religion. *University of Pennsylvania v. EEOC,* 493 U.S. 182, 202, 110 S.Ct. 577, 589, 107 L.Ed.2d 571 (1990); *Young v. Northern Illinois Conference of United Methodist Church,* 21 F.3d 184, 185 (7th Cir.), *cert denied,* 513 U.S. 929, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994). As Justice O'Connor stated in her oft-cited concurring opinion in *Estate of Thornton v. Caldor, Inc.,* 472 U.S. 703, 711–712, 105 S.Ct. 2914, 2919, 86 L.Ed.2d 557 (1985):

> "In my view, a statute outlawing employment discrimination based on race, color, religion, sex, or national origin has the valid secular purpose of assuring employment opportunity to all groups in our pluralistic society. Since Title VII calls for reasonable rather than absolute accommodation and extends that requirement to all religious beliefs and practices rather than protecting only the Sabbath observance, I believe an objective observer would perceive it as an anti-discrimination law rather than an endorsement of religion or a particular religious practice."

As previously noted, Preferred is a private sector, for-profit company and not a religious institution subject to Title VII's exemption. Accordingly, we need not address any potential clash between Title

VII and the First Amendment involving the question of whether the government has intervened in an employment matter that arises within the unique province of a religious institution's theological or ecclesiastical mandate. *See, EEOC v. Roman Catholic Diocese of Raleigh, North Carolina,* 213 F.3d 795, 800–801 (4th Cir. 2000); *Bollard v. California Province of the Society of Jesus,* 196 F.3d 940, 945 (9th Cir.1999); *EEOC v. The Catholic University of America,* 83 F.3d 455, 460–461 (D.C.Cir.1996).

Here, in addition to finding that the EEOC's intrusion into Preferred's religious practices is pursuant to a compelling government interest, we also find that the intrusion is the least restrictive means that Congress could have used to effectuate its purpose.

First, Title VII provides a uniform approach to eradicating employment discrimination in its various manifestations. Its religion provisions include two kinds of employee protection: it requires employers to make a "reasonable accommodation" for employees' religious beliefs and practices; and it prohibits discrimination on the basis of religious criteria. It provides for a systematic approach to EEOC investigation and conciliation. And it provides a uniform method for filing complaints and lawsuits both on behalf of the public in general and on behalf of individuals. If the EEOC were to tiptoe around particular religious beliefs and practices by making exceptions for one or more particular religions or religious practices—e.g. Saturday observance *versus* Sunday observance, or dietary restrictions, and the like—it would tax the system beyond endurance. *See, United States of America v. Indianapolis Baptist Temple,* 224 F.3d 627, 630 (7th Cir.2000). Ironically, such an individualized approach would also make the EEOC *more* susceptible to claims of bias. In contrast, by approaching all cases according to the same procedures, EEOC maintains neutrality and makes any departure from neutrality easier to identify.

Second, the EEOC is the federal agency charged with investigating complaints of discrimination on the basis of religion, seeking to conciliate controversies between employers and employees, and, where appropriate filing suit against employers on behalf of individual complainants and to vindicate the public interest. 42 U.S.C. § 2000e–5. As the Supreme Court has observed: "When the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts also to vindicate *the public interest* in preventing employment discrimination." *General Tel. Co. of the Northwest, Inc. v. Equal Employment Opportunity Commission,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (emphasis added); *Occidental Life Ins. Co. v. EEOC,* 432 U.S. 355, 368, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977) ("[U]nder the procedural structure created by the 1972 amendments, the EEOC does not function simply as a vehicle for conducting litigation on behalf of private parties; it is a federal administrative agency charged with the responsibility of investigating claims of employment discrimination and settling disputes, if possible, in an informal, noncoercive fashion"). Also see *E.E.O.C. v. Waffle House, Inc.,* 534 U.S. 279, 122 S.Ct. 754, 760–761, 151 L.Ed.2d 755 (2002).

In addition to our finding that the government has used the least restrictive means to accomplish a lawful end, we also note two practical issues that militate in favor of permitting the EEOC's statements and the evidence it offers in support of them. First, Title VII requires the EEOC as the plaintiff here to prove that Preferred created or condoned a hostile environment and discriminated against its employees on the basis of religion. It can vindicate this duty only by gathering evi-

dence that will support its burden of persuasion. Since Title VII disparate treatment cases such as this one inherently involve the motives and intent of one or more decision makers in taking certain employment actions, the decision maker(s)'s beliefs are admissible evidence of such motives. Indeed, without evidence of such motives, the case is likely to be dismissed on summary judgment. *E.g., St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Vakharia v. Swedish Covenant Hospital,* 190 F.3d 799, 807 (7th Cir.1999); *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir.1998).

A piece of evidence is relevant if its introduction makes some fact at issue in the case more or less likely. Fed.R.Evid. 401. It follows that a decision maker's religious beliefs and statements—particularly those expressed in the work place and about employment—are relevant to a lawsuit alleging discrimination on the basis of religion. Indeed, they may constitute direct evidence of discrimination in a Title VII case. *Vakharia,* 190 F.3d at 806, n. 7; *Cowan v. Glenbrook Security Services, Inc.,* 123 F.3d 438, 443 (7th Cir.1997). Preferred has offered no evidence to suggest that the EEOC's inquiries into Ms. Steuerwald's religious beliefs and/or practices are anything other than an inquiry into the employer's discriminatory intent incident to its burden of proof in this Title VII action.

Similarly, contrary to Preferred's allegations and objections, it does not appear that the EEOC has focused on Ms. Steuerwald's faith or personal beliefs to show that they are *intrinsically* discriminatory.[15] The EEOC has focused on Ms. Steuerwald's beliefs, as well as those of other management personnel, only to the extent that they may have affected management's employment decisions and the employees' work environment. In other words, EEOC has presented Ms. Steuerwald's beliefs and practices in the most obviously pertinent way: as evidence to support an inference that Preferred management used religious criteria to make employment decisions. EEOC argues, in effect, that where, as here, management is profoundly committed to a set of beliefs and to implementing those beliefs in the work place, then a jury may reasonably take management at its word by inferring that management actually based its employment decisions on those beliefs. The Supreme Court has held that: "The Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations ... simply because those beliefs and associations are protected by the First Amendment." *Dawson v. Delaware,* 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992), *quoted in Saxe v. State College Area School District,* 240 F.3d 200, 207 (3d Cir.2001) ("we see no constitutional problem with using an employer's offensive speech as evidence of motive or intent in a case involving an allegedly discriminatory employment action.").

Second, and tellingly, we note that Preferred itself introduced Ms. Steuerwald's religious beliefs and practices in *support* of its motion for summary judgment. It did so on numerous occasions throughout its statements of fact; for example, in the

---

**15.** One of Preferred's recurrent objections to the EEOC's statement of additional material facts is: "Preferred objects to Additional Fact No. ____ because, to the extent the EEOC is suggesting that this is evidence of unlawful discrimination, the government's fixation on [name of Preferred manager]'s religious beliefs and practices constitutes an excessive entanglement of religion and violates [name of manager]'s rights under the Free Exercise and Establishment Clauses of the Constitution." For a few examples among many, see Def. Resp. to Pl. Add. Facts ¶¶ 756–764.

subsection of its Statements of Fact entitled "Jackie Steuerwald's Faith." See, e.g., Def. Facts, ¶¶ 9–22, 24–26, 32, 34, 37–38, 43–47. Preferred also offered extensive accounts of the religious preferences of the complainants and of their supervisors in its factual recitations pertaining to each. As the party moving for summary judgment, Preferred filed its statements of fact and brief first. In doing so, it opened the issue of Ms. Steuerwald's and others' religious beliefs and practices. Preferred cannot offer such evidence in *support* of its position and then object to the EEOC's use of the same or similar evidence *against* it.[16] *United States v. Chaimson,* 760 F.2d 798, 810 (7th Cir.1985) ("when a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject.").

In sum, we reject Preferred's challenge to EEOC's evidence and statements of fact based on that evidence. We find that EEOC did not violate the First Amendment or the RFRA in conducting its investigation or in prosecuting this lawsuit. Accordingly, to the extent that Preferred's Establishment Objections is a motion to strike, we DENY its motion.

### 2. *Charge Filing Statute of Limitations and Teresa Raloff's Claim*

The EEOC alleges that Preferred refused to hire Theresa Raloff because of religion. It is uncontested that Jackie Steuerwald interviewed Ms. Raloff for a position in February 1995. Raloff Dep., 33–34. During that interview, Ms. Steuerwald asked Ms. Raloff what religion she subscribed to. Ms. Raloff responded: "Unitarian." Ms. Steuerwald replied: "You damned humanists are ruining the world." She also told Ms. Raloff that she would "burn in hell," whereupon Ms. Steuerwald told Ms. Raloff that Ms. Raloff was not appropriate for employment with the company and terminated the interview. Ms. Raloff did not get the job. Pl. Add. Facts, ¶ 1623; Raloff Dep., 42–43. If Ms. Raloff's claim is not otherwise barred, these facts are sufficient to raise a reasonable inference that religious criteria played a role in Ms. Steuerwald's refusal to hire Ms. Raloff.

Preferred argues, however, that, even if we assume Ms. Raloff's factual recitation to be true, Ms. Raloff's claim is time barred. It argues that, since the Seventh Circuit's decision in *EEOC v. Harvey Walner & Associates,* 91 F.3d 963 (7th Cir. 1996), the ordinary 300 day charge filing statute of limitations which applies to individual plaintiffs also applies to cases in which the EEOC is the named plaintiff, unless the EEOC has a valid pattern or practice claim. Preferred argues that, since Theresa Raloff never filed an EEOC charge, her cause of action is valid only if it legitimately piggy-backs on the EEOC's pattern or practice claims. It follows, Preferred argues, that because Ms. Raloff never filed a charge, because Ms. Raloff alleges conduct that occurred in February 1995 (more than 300 days before the complaint was filed), and because this Court

---

**16.** To cite one example among many, we note the following. Preferred stated in Fact Statement No. 378: "Also during the interview, Ms. Wright asked whether Ms. Stute was a Christian, and shared with Ms. Stute the history of PHHC and some of her own religious background." EEOC stated in its Additional Facts, No. 1164, about the same interview: "During the interview, Darlene Wright discussed in great detail her religious history, that she was a Christian, and how she loved and served the Lord." Preferred objected to the EEOC's statement: "[T]o to the extent the EEOC is suggesting that this remark constitutes evidence of religious discrimination, Preferred objects, because the remark represents constitutionally protected expression."

has found that EEOC's pattern or practice claim is unsupported by sufficient evidence, then the EEOC's complaint on behalf of Ms. Raloff is time barred. Def. Brief, pp. 5, 16–17.

EEOC argues to the contrary that, as the agency charged with enforcing the civil rights statute in the public interest, it is exempted from various procedural bars, including, under certain circumstances, the 300–day charge-filing requirement. Pl. Brief, p. 25. It also argues that, as long as it bases its complaint on *some* timely-filed charge of discrimination that is reasonably like or related to the action recited in the complaint, it may include in the complaint a claim for which the individual did not file a charge.

 We agree with the EEOC that the *Harvey Walner* case does not stand for the blanket proposition that the EEOC must have a valid pattern or practice claim in order to include a cause of action for which no timely charge was filed. For reasons clearly addressed by the district court in *EEOC v. Mitsubishi Motor Manufacturing of America*, 990 F.Supp. 1059, 1084–1085 (C.D.Ill.1998), where the EEOC *does* have a viable pattern or practice case it is clear that no "timely" charge (that is, a charge filed within 300 days after the alleged discriminatory act) is needed as the basis for its subsequent lawsuit. But, even where EEOC *does not* have a viable pattern or practice claim, it still may proceed on the basis of at least one timely charge that is like or reasonably related to the complaint allegation. *Harvey Walner*, 91 F.3d at 969. The problems that the EEOC encountered in *Harvey Walner* arose because it had none of the three bases upon which it could proceed: a Com-

missioner's charge, or an allegation of a pattern or practice of discrimination, or *any* timely charge of discrimination. In other words, it had none of the three pillars upon which to base its standing to proceed.

 For reasons spelled out in greater detail in sub-part D–4 below, we find that the EEOC *does* have valid pattern or practice claims. But even absent a valid pattern or practice claim, there were four timely charges on which Ms. Raloff's claim could legitimately be piggy-backed. Sondra Sievers filed a charge on April 2, 1996, alleging that she had been demoted on the basis of religion and later discharged on the basis of religion or in retaliation for having complained about religious discrimination. Diana DeWester filed a charge on June 24, 1996 alleging that she was harassed and constructively discharged on the basis of religion. Ellen Blice filed a charge on July 6, 1996 alleging that she was harassed and discharged on the basis of religion. And Mary Mulder filed a charge on July 26, 1996 alleging that she had been harassed and constructively discharged based on religion.[17]

In addition, Diana DeWester's handwritten statement to the EEOC specifically referred to a comment that Ms. Steuerwald made at a branch managers' meeting. Ms. Steuerwald referred to a candidate for a job who had declared that she was a Unitarian and that Ms. Steuerwald told the candidate she would not fit in. Ms. DeWester's notes led the EEOC to further investigation, which uncovered Ms. Raloff's failure-to-hire allegation as well as allegations by Sherry Stute and Suzanne Elder. Smith Aff. ¶ 13; Aff Ex. I. On April 28,

17. Ms. Sievers filed with the EEOC. Ms. DeWester, Ms. Blice, and Ms. Mulder initially filed with the Indiana Civil Rights Commission, but their filings were treated as joint filings with the EEOC. The four charges are attached as Exhibits A, C–1, C–2, E, and G to the Webster Smith Affidavit submitted by EEOC in support of its Motion for Partial Summary Judgment.

1998, nearly two years before filing the complaint in this matter, the EEOC notified Preferred that it had arrived at a determination that Preferred had discriminated on the basis of religion and specifically mentioned the failure to hire and failure to promote among its findings.[18] Indeed, Diana DeWester testified that after the interview with the avowed Unitarian, Jackie Steuerwald stated at a branch managers' meeting that she may have her first lawsuit, involving a Unitarian from the Southwest who wouldn't fit in. Pl. Add. Facts ¶¶ 1410, 1411. We conclude from these facts that Preferred had sufficient notice of the EEOC's potential lawsuit on behalf of Ms. Raloff and that Ms. Raloff's claim is viable if it is sufficiently like or related to the charges actually filed.

Preferred argues that Ms. Raloff's failure-to-hire allegation is *not* sufficiently like or related to the four charges filed. Again, we disagree. All four EEOC charges alleged that Preferred engaged in disparate treatment job discrimination in which individuals were singled out for adverse treatment based on their religious beliefs (or lack thereof). Additionally, the "like or related to" standard is designed largely for the purpose of providing notice (or, conversely, preventing surprise) to the potential defendant and, as we earlier noted, Preferred cannot reasonably claim that it had insufficient notice of Ms. Raloff's claim to defend against it. *Kristufek v. Hussmann Foodservice Co.*, 985 F.2d 364, 368–369 (7th Cir.1993).

Additionally, it is well settled that the EEOC may include in a complaint allegations that are uncovered during the course of an investigation. *O'Rourke v. Conti-nental Casualty Co.*, 983 F.2d 94, 97 (7th Cir.1993) ("issues implied by a charge and communicated to the employer in the course of investigation can enlarge the set of claims open to litigation"), *citing Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.*, 538 F.2d 164, 167 (7th Cir.1976) (en banc). Here, the EEOC not only notified Preferred that its investigation had uncovered an allegation that was like or reasonably related to those of the filed charges, it provided notice that specifically mentioned an instance of failure to hire.

In view of the fact that Preferred has challenged Ms. Raloff's discriminatory failure to hire claim only with respect to its timeliness, and in view of the evidence offered by EEOC—including Preferred's admission that "Ms. Steuerwald terminated the interview because of Ms. Raloff's religious beliefs" Def. Facts ¶ 658—this Court cannot hold as a matter of law that Ms. Steuerwald was not unlawfully motivated by religious criteria in her decision not to hire Ms. Raloff. Accordingly, Preferred's motion for summary judgment on timeliness grounds as to the claim that Preferred refused to hire Ms. Raloff on the basis of her religion is DENIED.

### 3. EEOC's Motion for Partial Summary Judgment.

The EEOC has moved for summary judgment on nine of Preferred's affirmative defenses. Specifically it asks us to find as a matter of law that: (a) it complied with conditions precedent before filing its lawsuit; (b) its lawsuit states a viable cause of action; (c) Preferred Management Corporation is a proper defen-

---

18. The EEOC's April 28 Notices states in part: "Evidence obtained during the investigation also demonstrates that Respondent engaged in a pattern or practice of discrimination against a class of individuals by subjecting them to harassment, disciplinary action, demotion, different terms and conditions of em-ployment and discharge, *and by failing to hire or promote individuals based on their religious beliefs* or the perception by company officials that they somehow did not meet the company's religious standards." Smith Aff. ¶ 17, Aff. Ex. O, P, Q, R (emphasis added).

dant; (d) the complaint's class allegations are properly pleaded because they are like or reasonably related to the charges of discrimination; (e) the Commission complied with the conciliation requirements of 42 U.S.C. § 2000e–5 and exhausted all administrative remedies; (f) this class action is validly brought, but is not governed by Fed.R.Civ.P. 23; (g) the EEOC satisfied the statute of limitations; (h) the EEOC did not waive any claims nor should it be estopped from asserting any of them; and (i) this lawsuit is not barred by the First Amendment prohibition against an establishment of religion.[19]

In response to the EEOC's motion, Preferred asserts that it does not contest items (e), (f) and (g). Accordingly, we GRANT the EEOC's motion for partial summary judgment with respect to those items.

Our discussions in sub-parts B–1 and B–2 above resolve the issues raised in items (a), (b), (d), (h), and portions of (i) in favor of the EEOC as a matter of law. There we found, more specifically, that: the EEOC's complaint allegations were like or reasonably related to the administrative charges filed antecedent to it; the EEOC exhausted all pertinent administrative requirements; the lawsuit (including the failure-to-hire claim on behalf of Teresa Raloff) is not time barred in whole or in part by any statute of limitations; and that Preferred's First Amendment arguments do not bar the lawsuit either in its entirety or in that part which alleges a pattern or practice of harassment or disparate treatment. There, and in sub-part D–4 below, we also found that the EEOC has alleged facts sufficient to establish a pattern or practice claim of hostile environment as well as individual disparate treatment. Accordingly, we GRANT EEOC's motion

for partial summary judgment as to items (a), (b), (d), (h), and a portion of (i).

We are thus left with two issues on the EEOC's motion for partial summary judgment: (c) whether Preferred Management Corporation is a proper defendant; and that portion of (i) which, according to Preferred's interpretation, asks us to grant a motion in limine masquerading as a motion for partial summary judgment with respect to the statute of limitations: specifically, EEOC asks us to deem admissible the EEOC's introduction of evidence concerning certain acts that occurred prior to June 18, 1995 or after July 26, 1996. We take these up in reverse order.

*Relevant Background Evidence.* In opposing the EEOC's motion with respect to the introduction of evidence concerning events before June 18, 1995 and after July 26, 1996, Preferred provides no specific examples of objectionable evidence. We are unaware of any instance in which the EEOC has introduced inadmissible evidence on summary judgment concerning events during the two identified periods. The EEOC is correct in stating that evidence concerning events that occurred more than three-hundred days before the filing of a charge is ordinarily admissible as relevant background evidence. *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (time-barred conduct "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue."); *Shanoff v. Illinois Department of Human Services,* 258 F.3d 696, 705 (7th Cir.2001); *Parkins v. Civil Constructors of Illinois, Inc.,* 163 F.3d 1027, 1036 n. 2 (7th Cir.1998).

By the same token, we will not make a blanket determination that any and all

---

**19.** In the interest of clarity, we note that our lettering (a)-(i) corresponds to the EEOC's

motion for partial summary judgment (b)-(j).

such evidence will be admissible at trial. Evidentiary decisions are properly made in a motion in limine or at the time of their introduction at trial and we will reserve such decisions until they arise at those more appropriate times. Accordingly, to the extent that the EEOC's motion may be interpreted to ask for a blanket ruling that evidence concerning acts before June 18, 1995 and after July 26, 1996 is admissible, we DENY that portion of its motion.

■ *Preferred Management Corporation.* The parties correctly observe that the Seventh Circuit's decision in *Papa v. Katy Industries,* 166 F.3d 937, 940 (7th Cir.) *cert. denied,* 528 U.S. 1019, 120 S.Ct. 526, 145 L.Ed.2d 408 (1999) governs the question of whether Preferred Management Corporation is a proper defendant here. In *Papa,* the Seventh Circuit abandoned the "integrated enterprise" test to determine whether corporations that are nominally separate and distinct business entities are in reality so completely integrated with one another that liability for the misdeeds of an affiliate may be visited upon the parent. In *Papa,* the court determined that, in order to hold a parent liable for the act of its affiliate, the moving party must show that the parent took some action so as to forfeit its separate and independent status. *Id.* at 941.

■ Three sorts of actions qualify to establish liability in the parent: (1) actions that would traditionally permit a court to pierce the corporate veil; (2) action "for the express purpose of avoiding liability under the discrimination laws"; or (3) where "the parent corporation might have directed the discriminatory act, practice, or policy of which the employee of its subsidiary was complaining." *Id.* at 940–941. The last of these three possible exceptions to corporate independence appears to apply most clearly here. Its *sine qua non* is: whether "the parent, or any other affiliate of [Preferred], or the enterprise as a whole formulated or administered the specific personnel policies, or directed, commanded, or undertook the specific personnel actions, of which the plaintiffs are complaining."

■ The undisputed facts here militate in favor of PMC's liability and, therefore, its viability as a defendant. As we noted at the outset of this entry, the Preferred companies consist of four operating companies, a real estate company, and PMC, the management company. All of the Preferred entities are owned equally by Jackie and Greg Steuerwald. All of the Preferred companies use the same personnel manual, financial policies, and employee benefits. With the exception of Preferred Properties, all of the Preferred entities have the same officers and board of directors. PMC provides training for all of the operating companies; it also manages the operating companies' payrolls, finances, information systems, and human resources.

Ms. Steuerwald is president and CEO of the entities and Michael Pyatt was PMC's Director of Human Resources. Preferred also boasts that: "Preferred is merely the instrument through and by which Ms. Steuerwald expresses her religious beliefs...." Def. Brief in Support of S.J., p. 11, n. 2. If the Seventh Circuit continued to subscribe to the "integrated enterprise" test, we could readily find as a matter of law that PMC is the alter ego of the other entities and is liable for any acts of discrimination proved against any of them. In view of *Papa,* however, there remains a genuine issue of material fact as to whether PMC can be said to have "formulated or administered the specific personnel policies, or directed, commanded, or undertook the specific personnel actions, of which the plaintiffs are complaining." Accordingly, the issue of whether PMC is a proper defendant remains open to further proof,

either pre-trial or at trial. Further identification of the "executive team's" relationship to PMC and the other entities might help to resolve this open matter of fact.

Accordingly, on the record before us, we DENY the EEOC's motion for summary judgment with respect to whether PMC is a proper defendant.

### C. *Hostile Environment and Constructive Discharge.*

The EEOC alleges that Preferred created, encouraged, condoned, or tolerated a hostile work environment that affected the terms and conditions of employment of Sondra Sievers, Ellen Blice, Suzanne Elder, Sherry Stute, Diana DeWester, and Mary Mulder It also alleges that Preferred engaged in a pattern or practice of hostile environment harassment—that is, that Ms. Steuerwald and other management personnel *routinely* made their own religious values and preferences the guiding principals of daily work life, preached a particular brand of religion as work place orthodoxy, proselytized employees to join in their religious preferences, and conditioned the work environment on a particular set of religious precepts. Related to these claims of harassment are the EEOC's claims of constructive discharge on behalf of Suzanne Elder, Sherry Stute, Diana DeWester, and Mary Mulder.

Preferred asks us to decide *as a matter of law* that it did not create, encourage, condone, or tolerate a hostile work environment based on religion. It asks us to find that jurors could not reasonably infer from the evidence that Ms. Steuerwald and her management personnel made their particular religious beliefs and practices part of the routine atmosphere of work life at Preferred and that the atmosphere could not have been intimidating, abusive, or hostile to a reasonable employee. It also asks us to find that for employees Elder, Stute, DeWester, and Mulder to

have resigned their employment was unreasonable as a matter of law. We cannot accept any of Preferred's invitations. We do not say that a jury *must* find that the work environment was hostile and abusive for those who did not toe the religious line drawn by Ms. Steuerwald and her management personnel or that it *must* find that the named employees acted reasonably in resigning their employment. But we do hold that only a jury can make those determinations because the evidence is sufficient to raise genuine issues of material fact.

Because the evidence concerning the individual claims of harassment and constructive discharge overlaps the evidence of the pattern or practice claim, we discuss all three in this section. We find that the EEOC has presented sufficient evidence to raise a genuine issue of material fact that the work environment was hostile and abusive for the named complainants and to support its pattern or practice claim. As we discuss at subsection 6, we also find that there is sufficient evidence to support the claims of constructive discharge.

### 1. *The Law of Hostile Environment.*

The law of hostile environment has evolved more fully in the context of gender discrimination than in the other Title VII protected classifications and we are, of course, constrained to apply the law as it has evolved. But we are also mindful of the Supreme Court's and the Seventh Circuit's admonitions that Title VII's proof schemes are designed to be sufficiently flexible to change with respect to different factual circumstances. In other words, one size does not necessarily fit all. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973), *Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324, 1334–1335 (7th Cir.1995); *DeClue v. Central Illi-*

*nois Light Company,* 223 F.3d 434, 439–440 (7th Cir.2000) (Rovner, J., dissenting) ("Discrimination in the real world many times does not fit neatly into the legal models we have constructed."). We find these cautions particularly apt in the area of religion, where individuals' values, beliefs, and convictions run deep.

 Title VII prohibits employers from discriminating against employees on the basis of religion. Its prohibitions include creating, condoning, or tolerating a hostile work environment. Drawing from the law of sex harassment, a "hostile" work environment is one that is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Shanoff v. Illinois Dept. of Human Services,* 258 F.3d 696, 704 (7th Cir.2001) (internal citations omitted); *Adusumilli,* 164 F.3d at 361. The issue of whether the work environment is hostile "turns on whether the alleged harassment occurred because of the [religion] of the complainant." *Haugerud v. Amery School District,* 259 F.3d 678, 692 (7th Cir.2001). In other words, the question is whether the employee was "'exposed to disadvantageous terms or conditions of employment to which members of the [dominant religion were] not exposed.'" *Id.* quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

 Proof of hostile environment is two pronged. In order to prevail, the EEOC must present evidence sufficient to raise a reasonable inference that the complainants *subjectively* experienced the environment to be abusive; it must also show, *objectively,* that reasonable persons in their positions also would have perceived it to be hostile. *Haugerud,* 259 F.3d at 693; *Adusumilli,* 164 F.3d at 361. In order to determine whether the work environment is *objectively* hostile, we consider all of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Haugerud,* 259 F.3d at 693.

### 2. *Pattern or Practice*

 The evidence presented by the EEOC will support an inference that Preferred management—including its President and CEO Jackie Steuerwald—created and condoned a work environment in which their espousal of religious beliefs and practices was pervasive. Indeed, defendant's own recitation of the facts, set forth in some detail earlier in this entry, amply supports the conclusion that Jackie Steuerwald and other management personnel viewed it as their duty to share their religious beliefs with Preferred employees and even to encourage employees to convert to Ms. Steuerwald's brand of Christianity and that she lost few opportunities to do so.

 Title VII expressly prohibits employers from engaging in a "pattern or practice" of discrimination based on the statute's protected criteria. 42 U.S.C. § § 2000e–6(a). In order to establish a pattern or practice case, the EEOC must present evidence from which a trier of fact reasonably could infer that the offensive conduct alleged is the employer's "standard operating procedure," its "regular rather than the unusual practice." The parties here correctly acknowledge that it is not enough for a plaintiff to show that the employer engaged in "isolated" or "sporadic" acts of discrimination. Instead, the evidence must show that the conduct is "repeated, routine or of a generalized nature." *International Brotherhood of*

*Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396, (1977) (quoting Senator Humphrey); *King v. General Electric Company,* 960 F.2d 617, 620 (7th Cir.1992), *rehearing en banc denied.* As we have already discussed, "isolated" or "sporadic" acts of discrimination are, of course, unlawful and may be made the subject of a cause of action. Ordinarily, however, such conduct is actionable in individual (or collective) disparate treatment claims rather than in pattern or practice cases. *See, e.g., Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 878, 104 S.Ct. 2794, 2800, 81 L.Ed.2d 718 (1984).

Ms. Steuerwald's religious values, precepts, and practices were constituent elements of the very structure of the organization, beginning with Ms. Steuerwald's Mission and Values Statement and proceeding to her organizational wheel with Jesus Christ at its center. It also extended to her management personnel, all of whom shared a vision of religiosity consistent with her own, and who were usually selected to perform management responsibilities for that reason and on that basis. Ms. Steuerwald testified forthrightly that she could not separate her religion from the work place and that she made decisions on the basis of her religion.

A jury could reasonably infer from the evidence that:

● Ms. Steuerwald openly shares with her employees her belief that God directed her to establish her company and that Preferred is God's home care agency.

● Ms. Steuerwald believes that "The Great Commission" directs her to share her faith with her employees in the work place. Asked whether she believes that religion is appropriate in the workplace, Ms. Steuerwald responded: "If you're a person of faith, it can't be separated ... I don't leave my faith at the door when I go to work ... It permeates my thinking, my decisions."

● Ms. Steuerwald shares with her employees her narrative entitled "The Transfiguration of Preferred," which is distributed to employees, especially new hires, and discusses her belief that God was involved in Preferred's establishment and direction. Preferred's mission statement includes that its primary mission is "to be a Christian dedicated provider of quality health care."

● Preferred requires employees—as a condition of employment—to sign a statement that included the words: "I have examined myself and I agree that I have respected and actively supported Preferred's Mission and Values during this past year of employment and I agree to respect and actively support Preferred's Mission and Values for the coming year."

● A jury may reasonably infer from the evidence that management personnel are selected in significant part on the basis of their commitment to religious views and practices that are consistent with Ms. Steuerwald's. Thus, a jury may reasonably conclude from such evidence that Ms. Steuerwald is able to enforce her religious preferences, and actually did enforce them in the work place, by employing managers whose religious thinking is consistent with her own and who will implement her religious vision. The following management personnel, whose actions and statements are summarized below, held positions with various levels of decision-making authority:

● Human Resources Director Michael Pyatt, a policy-making member of the executive management team, with authority to hire and fire, describes himself as a born again Christian of fundamentalist persuasion. Mr. Pyatt conducted devotions on company time on company premises. He distributed to employees a publi-

cation entitled "Focus on Managing," which contained Biblical and religious references. He conducted a meeting at which he said that, because the employees "weren't reaching out to each other and being like Godly children should be," that was why their work wasn't flowing; he added that, if they centered their lives around Jesus, then everything would flow. When Mary Mulder told him she was uncomfortable with all the religion in the work place, he said to her that her kind was the hardest kind to break.

- Diane Christian, a member of the executive management team, served as director of training and development and later became the company's Northern Area Administrator. Although nominally a Catholic, she informed Chaplain Chuck Harrington about being born again, when, in the midst of a Mass, she lifted her hands and asked Jesus to come into her heart and she was transformed. She also told Chaplain Johnny Garrison that she had a one-on-one experience with Jesus at church where she felt like she had really opened her heart to him to become Lord of her life. Ms. Christian told Diana DeWester that, as far as religious views were concerned, "it was Jackie Steuerwald's way or the highway." She also told Ms. DeWester that Ms. Steuerwald did not think Ms. DeWester would fit in at Preferred because of Ms. DeWester's "nonbeliefs." Ms. Christian warned Ms. DeWester to be "very, very careful."

- Ann Parker was Preferred's Southern Area Administrator from 1990 through November 1995. As Southern Area Administrator, she supervised branch managers in the Vincennes, Jasper and Washing-ton offices. Ms. Parker testified that, as a manager she was required to be a "role model," which meant, among other things, that she and other managers were expected to attend devotions and that attendance at devotions was mandatory. Ms. Parker recommended that Sondra Sievers, who reported to her, read the book, "This Present Darkness," a book about spiritual warfare, which, she said, might help Ms. Sievers understand Jackie Steuerwald's and Darlene Wright's beliefs and the beliefs of the other people with whom she was working. Ms. Parker had been instructed in a management meeting to include "trust in the Lord" as part of the evaluation process. Accordingly, on an employee evaluation which included a section addressing Preferred's values, Ms. Parker wrote the words "in the Lord" next to the value of "trust." Ann Parker told Suzanne Elder that as a branch manager, Suzanne Elder would have to start having devotions in the Lawrenceville office.[20]

- Teresa Jennings (later Hedges) served as branch manager of the Lawrenceville facility, where she began the practice of devotions. She was promoted to Southern Area Administrator in December 1995. As the Southern Area Administrator, Ms. Jennings had the authority to hire and fire employees. Ms. Jennings told Sherry Stute that it was mandatory for her and her staff to attend an in-service on fasting that Chaplain Chuck Harrington was presenting. Ms. Jennings put together a self-improvement plan for Sherry Stute which included daily Bible readings and daily prayer. It also included a topic on how to heal a "wounded spirit," which is allegedly how Ms. Jen-

---

**20.** Notwithstanding this apparent consistency between Ms. Parker's and Ms. Steuerwald's religious beliefs, Ms. Parker resigned her position. Undisputed evidence shows that, at a breakfast meeting in Vincennes, Ms. Steuerwald stated that if her managers were not where they should be spiritually, they should resign, and that: "I have done this with my top management people, and your area director, Ann Parker, has resigned." Pl. Add. Facts ¶ 975.

nings described Ms. Stute. Ms. Jennings made numerous remarks, recounted earlier in this entry detail, disparaging of Catholicism.

• Nellie Foster was initially hired as a consultant for Preferred and in January 1996 became a member of the corporate team as a training and development manager. Ms. Foster's prior work experience included working as a minister of Christian education at the Southwest Church of God. She was responsible for teaching the Leader in the Making program, which was described to employees as a way to "understand Jesus modeled leadership." Preferred frankly acknowledges that Ms. Foster's leadership program was based on Biblical materials. Def. Facts ¶ 128.

Ms. Foster spoke about scriptures in her management training and referenced the Bible and religion in the handouts she distributed during those sessions. Corporate and branch managers were required to attend sessions of the Leader in the Making management program. In conjunction with the area administrators, Ms. Foster had authority to decide who met the qualifications for the Leader in the Making management program. Ms. Foster conducted a meeting entitled "Habits of Highly Successful People" at which she presented the "Lordship Ladder." She asked Sondra Sievers: "What was the last sin you committed?" and "What was the last thing you asked God forgiveness for?" She asked Ms. Sievers whether she could pray over her. Ms. Foster told Mary Mulder that religion was inseparable from the work place.

• Sue Klein succeeded Sondra Sievers as branch manager of the Vincennes branch. Ms. Klein was interviewed by a panel consisting of Darlene Wright, Terry Jennings and Chaplain Chuck Harrington. Her interviewees summarized their opinions about her qualifications, including the following: her strong faith in Jesus; faith is a priority with her; she has Godly values; Sue's faith is devoted and inspiring; honesty, integrity and a dependence on the Lord for guidance; God is her source of wisdom and strength; faith, honesty, and caring; and Trust in God. While serving as branch manager, Ms. Klein routinely prayed over employees and their work, and suggested prayer and devotions to employees.

• Wanda Wallace became acting branch manager for the Evansville branch in February 1996. Ms. Wallace asked Sherry Stute whether she had read her daily scriptures and told her that she needed to do so in order to progress. Ms. Wallace also brought in a Bible, laid it on Ms. Stute's desk, and told her that they would be studying this Bible. She referred to Ms. Stute as a "wounded spirit," told Jackie Steuerwald that Ms. Stute was a wounded spirit, and said that the Bible says wounded spirits need healing and nurturing. She told Ms. Stute that she needed to study the Bible and pray more. Ms. Wallace put her hands on Sherry Stute and prayed for Ms. Stute's headache to go away.

• Since 1990, Darlene Wright has been the personnel director for the southern district of Preferred. Ms. Wright's responsibilities included pre-screening of applications, preliminary interviewing of applicants, making recommendations to supervisors about applicants, making recommendations about corrective actions and discipline, and making the recommendation to fire an employee. Ms. Wright told Suzanne Elder to read the Bible and once attempted to conduct a laying of hands on her. Ms. Wright counseled Ms. Elder to show a constant verbal expression of her faith.

Ms. Wright told Sherry Stute at her interview that Preferred is a Christian organization. She asked Ms. Stute at her

interview whether she was a Christian, and shared with Ms. Stute the history of Preferred and some of her own strong commitment to religion. She told Ms. Stute that she and Jackie Steuerwald had prayed in a closet together at some point because they didn't know how the other people in the office would receive prayer in the work place. Ms. Wright referred to speaking in tongues at employee meetings.

- Preferred's management personnel use the company's missions and values definitions to evaluate and discipline employees. Preferred does not deny that employees were terminated for violating the values in the Mission and Values Statement, which included religious values and goals.

- Preferred gives copies of the company's mission statement, statement of values, values definitions, the organizational "wheel," and the "Transfiguration" to all applicants as they apply for employment. Applicants are informed that Preferred is a Christian organization and that prayers are recited at Preferred. Ms. Steuerwald told Sondra Sievers and others that a candidate for employment who said that there was no room in the work place for religion did not belong at Preferred.

- The company employs two chaplains. It employs an "evangelism and discipleship" subcommittee, whose members have prayed for the salvation of employees.

- Devotions are held weekly on company time and on company premises. Managers are expected to attend and Ms. Steuerwald keeps track of those who attend and those who don't.

- All management meetings are opened with prayer.

- The company routinely distributes literature on religious topics to employees through their mailboxes on company premises.

- Employees were asked in public meetings to share their religious experiences with the assembled employees.

- Employees were asked in public meetings about the sins they had committed.

- Employees with non-conforming religious views were routinely told that they were sinful, weak, not walking in God's path, broken or wounded, in need of spiritual guidance or development.

- Ms. Steuerwald referred to her employees as "sinners."

- Ms. Steuerwald stated that if her managers were not where they should be spiritually, they should resign.

- Employees with non-conforming religious views were told of Ms. Steuerwald's visions of the Antichrist and told that they were walking in the flesh.

- Employees with non-conforming religious views were assigned to Nellie Foster's Leader in the Making program, which is admittedly a program grounded in Biblical teachings. They were told that they had to be "broken."

- The Catholic church and its faith—with which complaining parties Sondra Sievers, Ellen Blice, Sherry Stute, Suzanne Elder, Dona DeWester, and Mary Mulder were affiliated—were roundly ridiculed by management in word and in deed. Ms. Steuerwald visibly froze when informed that an employee was a Catholic. Ms. Steuerwald asked Ms. Sievers, while giggling, whether it is "really true that you keep the Holy Spirit in a box at the front of your church?" When Sherry Stute said at a meeting that she had converted to Catholicism, Ms. Steuerwald allegedly had a devastated look on her face, her eyes got large, and she looked as if she had been knocked over. Ms. Steuerwald's demeanor toward Ms. Stute changed from a "smile" to a "blank stare" after learning

that Ms. Stute was Catholic. Ms. Steuerwald referred to Diana DeWester's Catholicism as non-beliefs.

Manager Becky Selm told Mary Mulder that she should not tell Jackie Steuerwald that she was involved with the Catholic church because, according to Ms. Selm, Ms. Steuerwald did not like Catholics. Ms. Selm said that she herself used to be involved with the Catholic Church, but that after she met Jackie, Jackie was able to bring religion into her life the way it should be. She said she was no longer involved with the Catholic Church, and she was heavily involved with another church. Becky Selm also referred to Catholics as "heathens" in Mary Mulder's presence.

Similarly, Terry Jennings said that Ms. Steuerwald had told her that Catholics didn't believe in the Holy Spirit. Ms. Jennings also said that Jackie Steuerwald told her that Catholics keep God in a box in the front of the church. Ms. Jennings told Ms. Stute that Jackie Steuerwald had told her that Catholics were pagans. Becky Selm, office manager of the Indianapolis office, told Diana DeWester that she need not attend a video on the Holy Spirit which Ms. Steuerwald had brought because, as a Catholic, she would not understand it.

• When Diana DeWester said at a meeting that just as there is more than one way to get to Beech Grove there is also more than one way to God, Ms. Steuerwald angrily observed that such beliefs were "new age thinking and it was not allowed at Preferred Home Health Care."

A jury could reasonably conclude from this evidence that religion was pervasive in the work place, that it was a routine or regular aspect of work life at Preferred, that it was often intimidating or humiliating for employees of non-conforming be-

liefs, and that it was used as a means of classifying, segregating, and limiting employees in violation of Title VII. 42 U.S.C. § 2000e–2(a).[21] It could conclude that employees with conforming religious views could expect to enjoy a satisfactory work experience while employees with non-conforming views were ostracized and subject to intimidation, hostility, and abuse based on their religious beliefs and preferences. A jury could reasonably find that such classification and segregation may, and here does, have a tendency to alter the terms and conditions of employment. A jury could reasonably conclude that the terms and conditions of employment for employees of a non-church-affiliated, for-profit health care company did not reasonably include the required participation in overt acts of religious devotion that were inconsistent with their own religious preferences.

Based on these examples—a representative sampling—we conclude that the EEOC has presented evidence sufficient to raise an inference that Preferred engaged in a pattern or practice of employment discrimination by creating, tolerating, or condoning an atmosphere suffused with religious practices that were unwelcome, abusive, insulting, and intimidating to its employees.

### 3. *Individual Harassment Claims*

All of the harassment claims that the EEOC has brought on behalf of the individual complainants arise against the backdrop of its pattern or practice evidence. This means, in the first place, that the complainants on whose behalf the EEOC has filed these claims shared the same work environment.

---

**21.** Section 2000e–2(a)(2) makes it unlawful for an employer to: "limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... religion...."

All worked in the chain of command headed by CEO Jackie Steuerwald and Director of Human Resources Mike Pyatt, who had ultimate authority for all employment decisions. At one time or another, all of them came under the jurisdiction of Darlene Wright and/or Terry Jennings—the former as personnel director for Preferred's southern district facilities, and the latter as area administrator for the southern district—and/or Diane Christian, a member of the executive management team, who served as director of training and development and later became the company's Northern Area Administrator, and/or Nellie Foster, who administered training and other personnel services in a corporate-wide capacity. In addition, complaining parties Sondra Sievers, Ellen Blice, and Sherry Stute all worked at the Vincennes facility—where Sue Klein became interim branch manager after Ms. Sievers was demoted and branch manager after Ms. Sievers was terminated—as did complaining party Suzanne Elder after transferring from Lawrenceville. In other words, the same management names tend to recur throughout these employees' work experiences.

We find that the evidence presented by the EEOC is sufficient to go forward on these individual claims of harassment in that they present sufficient evidence of "an intimidating and offensive environment which altered the conditions of [their] employment, and thus amounted to religious harassment under Title VII." *Venters*, 123 F.3d at 972. Since the pattern or practice evidence is set forth in considerable detail, we briefly summarize the evidence supporting the individual claims.

a. *Sondra Sievers.*

Sondra Sievers has been a practicing Catholic all of her life. She considers herself to be a Christian in that she is baptized and believes in Jesus Christ. She does not, however, believe in the idea of being saved or born again. Ms. Steuerwald knew that Ms. Sievers was a Catholic. Ms. Sievers was subject to a work environment in which, as a condition of her continued employment, she was expected to participate in religious practices that were unwelcome and inconsistent with her own. She and her beliefs were also subjected to ridicule and condemnation.

• Ms. Sievers was told: "You're not Christian, you're Catholic."

• Ms. Sievers was asked whether Catholics prayed to statues.

• During a luncheon with Ms. Sievers and others, Jackie Steuerwald asked Ms. Sievers, while giggling, whether it is "really true that you keep the Holy Spirit in a box at the front of your church?"

• Ms. Sievers was uncomfortable signing Preferred's Mission and Values Statement. She did so in order to keep her job.

• Ms. Sievers was obliged to watch religiously-oriented videos at work. As a Catholic, Ms. Sievers was offended by the content of the videos and also thought it inappropriate for Ms. Steuerwald to imply that Medicare should pay for her to evangelize.

• At the Vincennes branch, where Ms. Sievers worked, prayer was conducted at weekly devotions. After Sue Klein arrived as interim branch manager, prayers were conducted every morning. As a manager, Ms. Sievers was expected to participate in devotions as a condition of employment.

• Ann Parker told Ms. Sievers that Jackie Steuerwald knew which employees attended devotions and that Ms. Steuerwald expected employees to attend. She also told Ms. Sievers that Ms. Steuerwald wanted staff meetings opened with prayers.

• While still working at the Lawrenceville branch, Ms. Sievers told Ann Parker that she was uncomfortable with the way religion was "pushed" at Preferred. Ms.

Parker recommended that Ms. Sievers read the book, "This Present Darkness," a book about spiritual warfare, which, she said, might help Ms. Sievers understand the religious beliefs of Preferred's management personnel.

- Ms. Sievers received religious memos in her mailbox. As a branch manager, she also received from Mike Pyatt newsletters called "Focus on Managing," some of which contained Biblical and religious references.

- Religion was a topic of discussion at business meetings that Ms. Sievers attended. Jackie Steuerwald conducted meetings at which she talked about her religious beliefs.

- Marketing Director, Gregg Johnston, held a branch-manager meeting which Ms. Sievers attended in which he used the Bible and gave the attendees a book that related to the Bible. Human Resources Director Pyatt also conducted meetings at which he injected religious topics. And so did Johnny Garrison, one of Preferred's chaplains who also conducted devotions. As a branch manager, Ms. Sievers was expected to attend all branch meetings.

- Ms. Sievers' work performance was evaluated in part according to particular religious values. She was, for example, to "Trust in the Lord and not in [her] own understanding" as a measure of her work performance. Her work performance was measured in part by her "constant verbal expression of faith."

- Jackie Steuerwald told Ms. Sievers, among other managers, that if they were not where they should be spiritually, they should resign.

- Ms. Sievers was subjected to Nellie Foster's Leader in the Making program, which included religious practices. Among other things, Ms. Foster asked Ms. Sievers about the last time she committed a sin and about the last thing for which she asked God for forgiveness. When Ms. Sievers responded that she was a Catholic who discusses her sins with her priest, Ms. Foster took Ms. Sievers' hand and asked her whether she could prayer over her.

The record evidence indicates that Ms. Sievers was subjectively offended by being required to participate in these religious practices in the work place. She expressed her discomfort on several occasions, but her expressions of discomfort were construed as symptomatic of her religious deficiencies and the remedies that Preferred offered were the same practices that gave rise to the offense.

Ms. Sievers also expressed her feeling of marginalization, the sense that, because of the distance between her own religious values and Preferred's, she did not belong. This sense was confirmed by Jackie Steuerwald, who said that managers who did not conform spiritually should resign, and by Human Resources Director Pyatt who said that management was looking at all the managers and if they weren't where management thought should be, changes would be made.

We also find that a reasonable employee *not* in the majority group—and by "majority group" we mean the group whose religious values and preferences were consistent with Ms. Steuerwald and her management personnel, see *Venters*, 123 F.3d at 972 [22]—could also find the

---

**22.** Since Preferred has argued that the EEOC's claims are fatally deficient because the agency failed to show that the complainants were discriminated against because of *their* religious views, we quote that portion of *Venters* in which the Seventh Circuit rejected that argument:

"[P]roperly understood, Venters' claim is not that the city refused to accommodate her religious practices in some way, but that she was discharged because she did not measure up to Ives' religious expectations. What matters in this context is not so much what Venters' own religious beliefs

atmosphere hostile and abusive. Stated for purposes of summary judgment, we cannot say as a matter of law that no reasonable employee similarly-situated to Ms. Sievers could have found the work atmosphere pervaded with religious expressions and practices that were sufficiently frequent and demeaning as to be hostile, intimidating, humiliating, or abusive. Accordingly, there is a genuine issue of material fact as to the EEOC's claim of hostile environment on behalf of Ms. Sievers.

### b. *Ellen Blice*

Ellen Blice began working at Preferred's Vincennes facility in April 1994. She had received her RN and became a licensed nurse in 1993. As a field nurse, Ms. Blice was responsible for coordinating total client care, which included conducting the initial assessment, determining what other services are appropriate (*e.g.*, home health aids, therapists), and coordinating the client's eventual discharge.

● Ms. Blice was a life-long Catholic. When she began her employment with Preferred, she received a copy of Preferred's medical code of conduct, and its mission and values statement. Although nothing in the content of these documents offended her, she was uncomfortable with management's persistent use of prayer.

● Ms. Blice received religious materials in her office mailbox, including psalms, scriptures, prayers and religious writings about the kind of person she should be. She considered such practices inappropriate and found them offensive.

● Jackie Steuerwald conducted prayer at each meetings which Ms. Blice attended.

● During Home Care 101, Ms. Steuerwald asked a series of questions and gave prizes to the individual who was the first to answer correctly. The correct answers were usually "Jesus," "God," or "the Bible."

● Ms. Blice's branch manager, Sue Klein, told her that she had to be at devotions because she needed to learn to be more humble. Indeed, she had been told to attend devotions on the day she was fired. Ms. Blice did not attend devotions because they were contrary to her religious beliefs.

● Toward the end of her employment, Ms. Blice attended a meeting with Sue Klein, Donna Drew, Karen Lemons, and Terry Jennings. At the end of the meeting, Ms. Blice was encouraged to be more humble, to look to God for improvement and so that she wouldn't have as much chaos in her life.

● After receiving a verbal warning, Ms. Blice met with Ms. Steuerwald about the warning. Ms. Steuerwald handed Ms. Blice a song sheet for the song beginning "He is a mighty God" and said "You need to sing this." Ms. Blice did not sing the song. Ms. Steuerwald stared at Ms. Blice for the remainder of the devotions period.

Ms. Blice subjectively experienced these religious activities as unwelcome and offensive and she complained about them. She asked Sue Klein several times not to pray before giving her an answer to profession-

---

were, but Ives' asserted perception that she did not share his own. She need not put a label on her own religious beliefs, therefore, or demonstrate that she communicated her religious status and needs as she would if she were complaining that the city had failed to accommodate a particular religious practice. Venters need only show that her perceived religious shortcomings

(her unwillingness to strive for salvation as Ives understood it, for example) played a motivating role in her discharge." 42 U.S.C. § 2000e–2(m).
123 F.3d at 972. This analysis also provides the basis for rejecting Preferred's narrow definition of the plaintiff group as a group consisting of those who are not saved or born again.

al questions that Ms. Blice had posed. During the week preceding her termination on February 14, 1996, Ms. Blice told Sue Klein six times not to pray over her all the time. Similarly, although Ms. Blice routinely discarded the religious materials in her mailbox, she told Ms. Klein that she did not want to receive them. The materials continued unabated. Ms. Blice testified that she was uncomfortable at meetings at which prayer was introduced and in particular at the Home Care 101 meeting.

We also find that a reasonable employee not in the majority group could have found the work atmosphere to be pervaded with religious expressions and practices that were intimidating, hostile, abusive, or demeaning. That is, we cannot say as a matter of law that no reasonable employee similarly-situated to Ms. Blice could have found the work atmosphere hostile and abusive. Accordingly, there is a genuine issue of material fact as to the EEOC's claim of hostile environment on behalf of Ms. Blice.

### c. *Suzanne Elder.*

Ms. Elder, a Catholic, began work at Preferred's Lawrenceville, Illinois facility in February 1993.

- When Sondra Sievers was promoted to the Vincennes facility, Ann Parker offered Ms. Elder the branch manager position at Lawrenceville, but Ms. Elder declined because, among other reasons, branch managers had "to allow devotions in the office and to attend meetings at the corporate office that would be opened with prayer."

- Terry Jennings, who became branch manager, called in Darlene Wright to mediate certain problems that had grown up between Ms. Elder and Ms. Jennings. Ms. Wright described the process as Ms. Wright seeking "to mediate the problems and make me change." Ms. Elder did not believe that such mediation was necessary, because the problems had nothing to do with her work performance and were related only to her religious differences with Ms. Jennings.

- Ms. Wright's mediation consisted in part of reading the Bible, which Ms. Wright said would make Ms. Elder a better person. Ms. Wright once attempted to conduct a laying of hands over Ms. Elder and said it would make Ms. Elder feel better. Ms. Wright prayed at the start of each meeting.

- Ms. Wright gave Ms. Elder some books to read on personality profiles and told Ms. Elder to read the Bible. Ms. Wright counseled her to show a constant verbal expression of her faith.

- After transferring to Vincennes and after Ms. Sievers discharge, Ms. Elder attended mandatory quality assurance and nurses meetings that would be opened with prayer. She did not complain about prayer at meetings because she believed she had had enough harassment in the Lawrenceville office and did not want to attract additional scrutiny.

- Ms. Elder attended a mandatory values presentation led by Jackie Steuerwald. Ms. Elder objected to the value that required "subordination of self-interest to company interest," because her nursing training had taught her that her interests and the company's interests may not always be the same, especially if she were directed to carry out an improper order.

- Ms. Elder also objected to the part of the Mission and Values Statement in which there were specific references to places in the Bible and that these Biblical definitions were the company's characterization of what the value meant. Ms. Elder testified that she signed the Mission and Values Statement because she wanted to keep her job.

- Ms. Elder attended an introduction to home care at the corporate office at which passages of scripture were read. In addition, she too attended a Home Care 101 seminar at which Biblical Scripture was quoted throughout the seminar. A client care coordinator at the Home Care 101 seminar told the audience that everyone in the company had a faith in Christ.

- Ms. Elder did not attend devotions and was asked why she wasn't attending.

- Ms. Elder received unwanted religious materials in her work place mailbox. She threw them away.

- When Sue Klein was working in quality assurance, she often brought up religion to Ms. Elder. She told Ms. Elder that Ms. Elder's religion does not believe that one can pray for people after they die. She told Ms. Elder that Mary (the Mother of Jesus) is just a person in the Bible. And she talked about being saved. Ms. Elder told Ms. Klein that she did not want to hear about that.

- Ms. Elder was given a copy of the document, "Characteristics of Broken People Prepared for Revival." Various items on the bulletin board in the Vincennes office had religious references on them.

Ms. Elder subjectively experienced these activities as unwelcome, offensive, and abusive. She believed it was none of her employer's business whether she read the Bible, quoted scripture, or engaged in prayer. She was upset and offended by attempts to lay hands on her. She was offended by receiving religious materials in her mailbox and posted on bulletin boards in the work facility.

We also find that a reasonable employee not in the majority group could also find the atmosphere hostile and abusive. That is, we cannot say as a matter of law that no reasonable employee similarly-situated to Ms. Elder could have found the work atmosphere hostile and abusive. Accord-

ingly, there is a genuine issue of material fact as to the EEOC's claim of hostile environment on behalf of Ms. Elder.

d. *Sherry Stute.*

Sherry Stute was hired as Nursing Supervisor in July 1995. Shortly before, she had converted to Catholicism.

- Any time Ms. Stute interacted with her branch manager, Sue Klein, Ms. Klein made some reference to God and faith. Ms. Klein asked Ms. Stute whether she wanted to be her prayer partner.

- Ms. Stute was uncomfortable when Ms. Klein asked her whether she prayed and read the Bible regarding a drop in Preferred's Evansville clientele.

- When Sondra Sievers had to go to the hospital because of her blood pressure, Ms. Klein said to Ms. Stute: "If Sondra had been right with God she wouldn't be having physical problems." In response, Ms. Stute asked her whether that meant that all of Preferred's patients were not right with God. Ms. Klein replied: "Well, that's why we are there in their lives, so that we can bring them to the Lord before they die." Pl. Add. Facts ¶¶ 1196–1201; Def. Facts ¶ 391, 392.

- Ms. Stute attended Nellie Foster's presentation on "Big People see the Big Picture," which was a religious presentation. Although Ms. Stute did not find the content offensive, she found it offensive that such presentations were mandatory in the work place.

- One of the categories on the self-assessment forms used during the in-service presentations that Ms. Stute attended was on studying the Bible.

- During Ms. Stute's orientation, she had lunch with Jackie Steuerwald and Sondra Sievers, during which Ms. Steuerwald stated that Preferred was operated according to the fundamentals of her religious

beliefs. While Ms. Stute expressed no conflict with Preferred's mission statement and values, she testified that she thought it "unreasonable to expect us to base our day-to-day activities on the Bible verses that [Preferred management] chose for us."

• Ms. Stute signed the values statement because she felt that if she did not sign she would be terminated.

• During a values presentation, Ms. Steuerwald spoke of the history of Preferred, showed a religious video tape, shared her own religious testimony, and asked those in attendance to share how they became Christians. When it was her turn to speak, Ms. Stute told the group that she had joined the Catholic Church just prior to coming to Preferred and that she was still developing in her faith. After various individuals expressed their faith, Ms. Steuerwald would say "Amen" or "Praise God." When Ms. Stute said that she had converted to Catholicism, Ms. Steuerwald had a devastated look on her face, her eyes got large, and she looked as if she had been knocked over.

• After this meeting, Ms. Stute believed that Ms. Steuerwald's demeanor toward her changed, which she attributed to having revealed that she was Catholic. Thereafter, Ms. Steuerwald had less interaction with her and, when she did, the interaction lacked the "warm fuzzies" from before. Instead of a "smile," Ms. Stute perceived in Ms. Steuerwald's eyes a "blank stare."

• During Ms. Stute's orientation, Ms. Steuerwald said that it was a vision of hers that the conference room at Preferred would some day be a church and that people could come there and pray.

• Terry Jennings told Ms. Stute that it was mandatory for her and her staff to attend an in-service session on fasting that Chaplain Chuck Harrington was present-

ing. Ms. Stute also believed that devotions were mandatory.

• Terry Jennings' improvement plan for Ms. Stute included daily Bible readings, daily prayer and a checklist indicating how Ms. Stute was progressing on the various criteria. One of the topics of the improvement plan was "how to heal a wounded spirit."

• Every meeting between branch manager Wanda Wallace and Sherry Stute started with prayer.

• Wanda Wallace often asked Ms. Stute whether she had read her daily scripture.

• Ms. Wallace also brought in a Bible, laid it on Ms. Stute's desk, and told her that they would be studying this Bible.

• Ms. Wallace referred to Ms. Stute as a "wounded spirit" and stated that the Bible says wounded spirits need healing and nurturing. Ms. Wallace told Jackie Steuerwald that she thought Ms. Stute was a wounded spirit. She told Ms. Stute that Ms. Steuerwald agreed with that assessment.

• Ms. Wallace told Ms. Stute that she needed to study the Bible and pray more to overcome being a wounded spirit. She also asked Ms. Stute if she had confessed her sins. Ms. Stute was insulted by Ms. Wallace classifying her as a wounded spirit.

• Ms. Wallace also told Ms. Stute that Ms. Stute was a proud person.

• Ms. Wallace brought religious tapes into the office and asked Ms. Stute to listen to them.

• After she became area administrator, Ms. Jennings told Ms. Stute that being a Christian company, Preferred didn't do anything without including a prayer. She told Ms. Stute that she should go to church with Wanda Wallace. She told Ms. Stute

that Jackie Steuerwald was looking at her managers spiritually.

- Area Manager Terry Jennings made derogatory statements about Catholicism, including:

- Catholics don't believe in the Holy Spirit.

- Catholics have idols other than God.

- Catholics keep God in a box in the front of the church.

- Catholics are not considered Christians.

- Jackie Steuerwald told Ms. Jennings that Catholics didn't believe in the Holy Spirit.

- In making the sign of the cross, Catholics were making fun of God.

- Jackie Steuerwald told Ms. Jennings that Catholics were pagans.

These facts supported by admissible evidence raise a reasonable inference that the work environment in which Ms. Stute was employed was pervaded by religious expressions and practices that were intimidating, demeaning, hostile, or abusive. We cannot say as a matter of law that no reasonable juror could have found this environment hostile. Accordingly, there is a genuine issue of material fact as to the hostile environment claim brought by the EEOC on behalf of Ms. Stute.

### e. *Diana DeWester*

Diana DeWester began work for Preferred in 1991. Although she was hired as Director of Nursing in the Danville branch, she assisted with the Lafayette office for a few weeks and then became the branch manager and nursing supervisor for the newly opened Indianapolis office. Ms. DeWester grew up a Presbyterian, but converted to Catholicism in 1956 when she was 18 years old. She considers herself to be a Christian. Ms. DeWester perceived Jackie Steuerwald's religious views as "far-right fundamentalist" and relying on a literal interpretation of the Bible. Ms. DeWester believes that the teachings of the Catholic Church are consistent with a literal interpretation of the Bible. Def. Facts ¶¶ 455, 456. 457, 458 (and Pl. Resp.),

- Diane Christian told Ms. DeWester that Jackie Steuerwald did not think Ms. DeWester would fit in at Preferred because of Ms. DeWester's "nonbeliefs." Ms. Christian told Ms. DeWester to be very, very careful.

- Ms. DeWester said at a lunch attended by Ms. Steuerwald that Christians did not have a corner on the "God market," and that just as there is more than one way to get to Beech Grove, there is more than one way to get to God. Ms. Steuerwald appeared to be very angry after Ms. DeWester made this comment. Ms. Steuerwald observed that Ms. DeWester's comment "was new age thinking and it was not allowed at Preferred Home Health Care."

- Jackie Steuerwald and Diane Christian told Ms. DeWester that she needed to go to devotions to show support for Preferred's values.

- Ms. DeWester's took issue with Jackie Steuerwald's demands that Ms. DeWester abide by her interpretation of religion and direct her subordinates to abide by Ms. Steuerwald's religious beliefs.

- Ms. Christian told Ms. DeWester that, as far as religious views were concerned, "it was Jackie Steuerwald's way or the highway."

- Ms. DeWester was expected to present religious memos and posters in meetings. She did not support hanging religious posters in the workplace and she complained to Diane Christian about the religious bulletins and posters in the work place.

- Ms. Steuerwald told Ms. DeWester that she was "walking in the flesh," a common expression at Preferred. To-

wards the end of Diana DeWester's employment, Ms. Steuerwald discussed, in her presence, a vision she had of the Antichrist.

● Ms. DeWester also took exception to the Values Definitions attached to Preferred's Values Statement, because she did not think the Bible verses belonged in the workplace.

● Ms. DeWester was directed to support Ms. Steuerwald's religious beliefs on several occasions. She was directed to go to devotions. She was instructed that, when she hired employees, she was to make sure that they were Christians.

● Ms. DeWester was instructed to be present at an in-service values presentation to make the introduction and to show her support.

● At two meetings Ms. DeWester attended, Darlene Wright and Jackie Steuerwald talked about speaking in tongues.

● On more than one occasion, Diana DeWester heard Jackie Steuerwald say in a meeting that she was looking at her managers and thought that some of them were not where she thought they should be spiritually. On one such occasion, Ms. Steuerwald gave Diana DeWester books on religious topics.

● Occasionally, Pastor Johnny Garrison would come to Ms. DeWester's office to ask her if she was attending the Holy Spirit videos.

%● As a branch manager, Ms. DeWester was directed to tell applicants during the interview that Preferred is a Christian organization and to direct all applicants to talk with Pastor Johnny Garrison after she interviewed them.

● In a meeting that Ms. DeWester attended, Ms. Steuerwald explained that Jesus was the center of all of Preferred's operations and that all of the employees were spokes on the wheel.

● Every time Ms. DeWester had an extended conversation with Jackie Steuerwald (except for the last), Ms. Steuerwald would ask: "Have you been saved?" or "Have you found Jesus?" or words to that effect. On each occasion, Ms. DeWester would respond: "Jackie, I am a Christian."

● Ms. DeWester once said in a meeting at which Ms. Steuerwald was attending that Preferred was a business, not a church. Diane Christian phoned Ms. DeWester the next day and told her that she was in serious trouble with Ms. Steuerwald over the remark and that Ms. DeWester had to understand that Ms. Steuerwald considered Preferred to be a mission. Ms. DeWester testified that one did not disagree with Ms. Steuerwald about religion for fear of losing one's job.

Ms. DeWester subjectively experienced these religious activities as unwelcome, offensive and abusive. She always felt that her employment was threatened when she did not attend a religious function during work hours. She avoided religious observances during work by staying in her office and appearing to be very busy. She opposed giving "The Transfiguration of Preferred" to prospective employees because she did not believe that "God's real anxious to make Jackie Steuerwald a rich woman."

We also find that a reasonable employee similarly-situated to Ms. DeWester could have found the work atmosphere to be pervaded by religious expressions and practices that were demeaning, intimidating, hostile or abusive. We cannot say as a matter of law that no reasonable juror could find the atmosphere in which Ms. DeWester worked was hostile and abusive. Accordingly, there is a genuine issue of material fact as to the hostile environment claim brought by the EEOC on behalf of Ms. DeWester.

#### f. *Mary Mulder*

Mary Mulder has attended Catholic churches with her husband and children. She considers herself a Christian, which she understands to mean that she was to be kind to people and honest with them. She believes that being "saved" means that you believe in God and are kind to other people, you try to live an honest life and take care of your family.

• Jackie Steuerwald told Ms. Mulder that, to become "saved," Ms. Mulder needed to learn how to preach the word of God to other people, to openly talk about it and to give away her sinful way of life. These views do not square with Ms. Mulder's.

• Before her first day of work, Ms. Mulder met Chaplain Johnny Garrison, who told her that Preferred offered a devotional time, and that she was welcome to attend. At times, when Ms. Mulder did not attend devotions, her supervisor, Becky Selm would ask "Why didn't you go into devotions today?" She also observed: "Well, Jackie likes for everybody to attend."

• On one occasion, Ms. Mulder attended a meeting presented by Mike Pyatt where he discussed the need for the people in the branch to work together and told those in attendance that they were experiencing strife because they weren't reaching out to each other and being like Godly children should be and that if they centered their lives around Jesus, everything would flow.

• Mr. Pyatt also told those in attendance "If you're not walking in the right path of God, you need to look for a new job, this is not the place for you."

• Becky Selm told employees that employees were expected to be at Mr. Pyatt's meeting.

• Ms. Steuerwald brought a video entitled "The Holy Spirit" to the Indianapolis branch and employees were expected to attend. Ms. Selm told Ms. Mulder that she did not need to see the tape because she was Catholic and would not understand it. Ms. Mulder was shocked by Ms. Selm's comment.

• At the time of the showing, Ms. Steuerwald talked about how she had found the Holy Spirit and she also wanted her employees to experience the Holy Spirit because it would change their lives like it had changed hers.

• Ms. Selm cautioned Ms. Mulder not to tell Ms. Steuerwald that she was involved with the Catholic church because, according to Ms. Selm, Ms. Steuerwald did not like Catholics. Ms. Selm observed that she herself used to be involved with the Catholic Church, but that after she met Jackie, Jackie was able to bring religion into her life the way it should be. She said she was no longer involved with the Catholic Church, and she was heavily involved with another church.

• Ms. Steuerwald told Ms. Mulder that she was very open about her religion because she wanted others to have the glory of God in their lives too. Ms. Mulder responded that she was private about her religion and did not like preaching to other people. Ms. Steuerwald replied that, because she was not charismatic about religion, she could not be walking in the right path of God. She told Ms. Mulder that she could not be a saved Christian.

• In Ms. Mulder's presence, Becky Selm said, "Oh, you know those Catholics, they're just heathens."

• Ms. Selm told Ms. Mulder that Diana DeWester always fought corporate on religious issues, and they did not like that.

• Becky Selm often told Ms. Mulder what a good Christian she was because she participated in church all the time, believed in Jesus Christ and believed in the Bible.

- Ms. Selm would ask Ms. Mulder daily for her list of problems, and when Ms. Mulder would show them to her, Ms. Selm would say "Let's pray about them." Ms. Selm suggested that Ms. Mulder pray over her paperwork.

- After Ms. Selm and another employee took Ms. Mulder's paperwork into another room and prayed over it, Ms. Selm told Ms. Mulder that the only reason the work got done was because they had prayed over it. When Ms. Mulder asked Ms. Selm not to pray over her work, Ms. Selm told her that was a common practice for them and that they would continue to do it.

- During her comprehensive orientation, Mike Pyatt asked Ms. Mulder how she was enjoying working for Preferred. Ms. Mulder stated that she enjoyed the work but was uncomfortable with all of the religious aspects, such as praying over paper work. Mr. Pyatt responded, "You're the hardest kind to break." Def. Facts ¶ 619–621.

- At the comprehensive orientation attended by Ms. Mulder, each speaker explained his or her role in the company and also shared some personal information about their spiritual journey. After listening to all of the religious experiences, Ms. Mulder started to feel that, if she didn't believe the way they did, then she would be considered different or an outcast.

- Ms. Mulder also attended some of the presentations made by Nellie Foster. She found them offensive-not because the content was contrary to her religious beliefs, but because someone stood in front of her telling her that religion was necessary in the workplace. She also took offense on one occasion when she saw the Lordship Ladder posted for one day in the women's restroom.

- Once, one of Ms. Mulder's co-workers made a reference to the Masonic temple being a cult after Ms. Mulder mentioned that her father belonged to the Masons. Several employees said: "Didn't you know that the Masonic Temple is a cult?" And began snickering and laughing and whispering in each other's ears. Ms. Mulder was humiliated by this experience.

- Ms. Mulder attended a meeting at which Jackie Steuerwald called those in attendance sinners.

- After Rebecca Lambert left Preferred, Becky Selm came into Ms. Mulder's office and said "I think we need to pray in this office to get rid of the evil demons."

- After Diana DeWester left, Ms. Selm told Ms. Mulder that she and Ms. Steuerwald had prayed over Diana DeWester's office to rid it of evil demons. At some point in her employment, Ms. Mulder began to get sick to her stomach at the sight of religious memos. She became uncomfortable just seeing items with Bible verses on them in the reception area.

- When Ms. Steuerwald talked about religion in meetings in Indianapolis, she would say: "If you can't speak up and talk about God and talk his preachings and to walk his walk, you are not a good Christian and you need to get your life on the right path."

- When Ms. Mulder attempted to raise concerns about office matters, the response focused on religion rather than a practical solution to the problem. The religious response, in turn, increased her frustrations.

- Ms. Mulder perceived the morale in the Indianapolis office to be low. She believed that many employees were upset and anxious about losing their jobs if they didn't agree the corporate stance on religion.

- After Diana DeWester resigned and Preferred was in search of her successor in May 1996, Ms. Steuerwald held a meet-

ing with Ms. Mulder, Angie Weiskittel, Amy Butler, Cathy Robinson and Carol Fuzzell to address the reasons why some of the departments were not running smoothly. Ms. Steuerwald opened the meeting by reading from her Bible and said that the office was not running smoothly because the employees were not on the right path of God and were all sinners. She told the group: "You realize that you're all sinners, that you all play a part in this, of being a sinner. Each and every one of you is a sinner." Ms. Steuerwald asked Angie Weiskittel, "Do you believe that you're a sinner?" She replied: "Well, I guess I am." Ms. Steuerwald looked over at Amy Butler and asked "Do you believe that you're a sinner?" Ms. Butler hung her head and started to cry and said: "Yes, I'm a sinner." Ms. Steuerwald concluded: "That's right. Because each and every one of you is a sinner." She added: "Until you people release your vanity and quit becoming vain people, you're always going to come up with these problems."

Kathy Robinson asked Ms. Steuerwald "What do you mean by being vain?" Ms. Steuerwald replied: "When you cause problems, when you think that you're the only important person in this office, that everybody else is wrong, that means that you're a vain person." Ms. Robinson queried: "How can you tell us this is a vain act when we're just trying to make our jobs run more smoothly?" Ms. Steuerwald got up from her seat, put her hands on the table, leaned forward to about six inches from Ms. Robinson's face and said: "You are a vain sinner." Ms. Steuerwald told Ms. Robinson to repeat after her: "I will pray to God and ask him to keep me from thinking in vain ways." Ms. Robinson repeated the statement. Ms. Robinson and others began crying. Ms. Mulder was crying because it upset her to see her fellow workers so upset and because she felt that Ms. Steuerwald had reduced her to "slime," as if Ms. Mulder were a horrible person because she wasn't practicing Jackie Steuerwald's beliefs.

• Ms. Steuerwald gave the attendees at the May 1996 meeting examples of how they were sinners. She said that, instead of trying to deal with each other in a religious fashion, looking toward God for answers, they were going to supervisors. She told them that it was just a fact that they were being bad to each other, being sinners, and being vain people. When Ms. Steuerwald said things like "You're all sinners," she would look at each person in attendance. Some of the "You're all sinners" comments were directed at Mary Mulder.

• During the May meeting, Ms. Steuerwald asked Ms. Mulder whether she prayed over her work. Ms. Mulder responded that she was not raised to pray for material gain and that she thought it was selfish to do so. Ms. Steuerwald replied: "Your kind are the hardest to break."

• During the May 1996 meeting, Becky Selm started to argue with another employee. During the argument, Ms. Selm burst into tears and said: "I'm a sinner, I'm a sinner, oh, God, please forgive me, I'm a sinner." Ms. Steuerwald commented that "Becky is the only one in this room who is on the right path to being a good Christian." • On May 22, 1996, Ms. Steuerwald sent out a memo entitled "Your New Walk" to Ms. Mulder among others. Ms. Steuerwald intended the memo to teach the recipients that, instead of reasoning and coming up with wrong conclusions, it would be better to pray about those things. The substance of "Your New Walk" read:

I thank my God every time I remember you. In all my prayers for all of you, I always pray with joy because of your partnership with me in living out the gospel.

In my daily prayer journal this week, I had these 2 lessons and felt I should share them with you. *The Divine Reasonings of Faith* and the explanation of it will encourage you in your walk of laying down your carnal weapons. The admonition is to "Seek ye first the kingdom of God, and His righteousness, all these things shall be added unto you." Matthew 6:33

Please feel free to share with me your trials and victories. I'm believing for you and in you!

• Two weeks before Ms. Mulder resigned, Kristi Fenter, the acting branch manager, referred to those in attendance at a staff meeting as sinners because they had continued to argue over paperwork and other office matters. At that point, Ms. Mulder began crying, could not stop, and had to leave the room. Def. Facts ¶ 648, 649.

Ms. Mulder testified that she experienced these religious practices as subjectively offensive and abusive. She found herself growing depressed. She would go home in tears at night because of the constant emphasis on praying and religion at work. She testified that she resigned her employment because she could no longer bear the accumulated weight of the religious practices in the work place. In her resignation letter, Ms. Mulder wrote to Ms. Steuerwald that the burden she could no longer bear was not the stress of the job but Ms. Steuerwald's religious convictions.

We also find that a reasonable employee in Ms. Mulder's position could have experienced these religious practices as intimidating, demeaning, hostile or abusive. Accordingly, we cannot say as a matter of law

that no juror could reasonably conclude that the atmosphere was laden with religious expressions and practices that made work life unbearable. It follows that there is a genuine issue of material fact as to whether the work environment experienced by Ms. Mulder was hostile in violation of Title VII.

We note, once again, that we do not find that a jury *must* find that the work place was hostile for these employees. We merely hold that we cannot conclude as a matter of law that it *wasn't* and that only a jury can make that factual determination.

### 4. *A Note On Coercion.*

Preferred argues throughout its brief on summary judgment that employees were informed before they joined Preferred that it was a Christian business, that attendance at devotions, other prayers, religious videos, and the like were not mandatory, and that employees were free to throw away the religious materials they received in their mailboxes instead of reading them. In other words, Preferred argues that employees participated in religious practices (if at all) voluntarily.

Preferred thus seeks to distinguish this case from *EEOC v. Townley Engineering & Manufacturing Co.*, 859 F.2d 610 (9th Cir.1988), *cert. denied*, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989), a religious discrimination case (cited by both parties) whose facts are very similar to those here. *Townley*, however, was a failure-to-accommodate case and not a disparate treatment case; the cases thus involve different legal theories and are governed by different analyses. For those and other reasons, its application here is very limited.[23] For our purposes, a decisive

---

**23.** The legal analyses differ under Title VII's religion provision just as failure-to-accommodate analysis differs from disparate treatment analysis under the Americans with Disabilities Act. *Venters,* 123 F.3d at 972 (religion); *Bul-*

*temeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1283 (7th Cir.1996) (ADA). The *Townley* decision turned on the question of whether the employer could accommodate

fact in the Ninth Circuit's decision was that the employer's devotional services were mandatory. Indeed, the company handbook expressly announced that the services were mandatory and the complaining party, an avowed atheist, signed an agreement adopting that policy as a condition of employment. *Id.* at 611–612.

We are not called upon to determine whether a hostile environment claim may survive summary judgment where the atmosphere of religiosity is truly "voluntary." [24] To the extent that Preferred seeks to distinguish this case from *Townley* by arguing that its religious practices were voluntary rather than mandatory, however, we find that a jury could reasonably conclude from the evidence that religion at Preferred was not a voluntary practice. While there was no written policy expressly requiring employees to attend devotions or other prayers or to attend religious videos or the anointing of buildings or offices, the EEOC has presented sufficient evidence to raise a reasonable inference that Ms. Steuerwald's "expectation" of attendance and her "expectation" of other behaviors amounted to a form of coercion—more subtle, perhaps, than an express policy on pain of discharge, but no less coercive.

To cite a few examples among many, employees were required to sign the values statement as a condition of employment. The handwritten document "Expectations of Branch Manager" included that devotions are held weekly at a scheduled time. Pl. Add. Facts ¶ 1474. Ann Parker testified that, as a manager she was required to be a "role model," which meant,

among other things, that she was "expected" to attend devotions. Sondra Sievers testified that she believed she was expected to attend devotions and to watch religious videos. Ellen Blice testified that she was offended that Ms. Steuerwald expected employees to conduct their lives in accordance with Biblical quotations selected by Ms. Steuerwald. Employees were expected to have a "prayer partner" and Ms. Stute was subjected to Ms. Jennings' exasperation at not having selected one. Such "expectations" rise to the level of "requirements" when employees are exposed to consequences as a result of not meeting them.

Traditional labor law has long held that even subtle forms of coerced behavior and intimidation are as effective as mandatory controls in enforcing an employer's will. *E.g., N.L.R.B. v. Regional Home Care Services, Inc.,* 237 F.3d 62, 68 69 (1st Cir. 2001) (addressing "subtle question of whether the conduct and speech of the supervisor amounted to implicit threats or coercion."). *Also see Motley v. Tractor Supply Co.,* 32 F.Supp.2d 1026, 1054–1055 (S.D.Ind.1998), a race discrimination case, in which Judge Tinder held that a supervisor's driving to the plaintiff's workplace and watching him, without saying anything, until the plaintiff noticed him, "constitutes a subtle form of supervisory intimidation." Such holdings square with common sense.

Here, in addition, the penalties for not conforming may have included legally cognizable adverse employment actions such as demotion and discharge (which we ad-

Ms. Pelvas's atheism (by excusing him from the services) without "undue hardship" and the question of whether Townley Engineering was a "religious organization" within the meaning of Title VII's exemption.

**24.** The *Townley* court hinted that even where a religious practice was overwhelmingly ap-

proved by the employees, Title VII might well be implicated: "The goal of Title VII is served by protecting only those who have religious objections to the services. To protect those who do not have such objections is not necessary." 859 F.2d at 621.

dress below). Additionally, "expectation" tends to metamorphose into "requirement" when Ms. Steuerwald or other management personnel keep track of who attends devotions and who doesn't and inquires into why an employee did not attend. Moreover, the EEOC has presented employee testimony to the effect that, by not conforming their behavior to the "expected" standard, they experienced ostracism or marginalization, the sense of having been cast out or excluded from the group on the basis of their non-conforming religious beliefs. They also testified to intimidation in the form of Ms. Steuerwald's wrath expressed as accusations of employees' sinfulness or walking in the flesh, or being a wounded spirit, or being proud or vain, assertions of the employee's need for atonement or redemption, ridicule of the employee's religious views, subjection to unwanted religious literature and videos, and subjection to Ms. Foster's Leader in the Making program. All of this may have been highly beneficial to the employees, as Ms. Steuerwald contends, but *voluntary* it was not. Or so a jury could reasonably conclude.

In sum, as the Ninth Circuit observed in *Townley,* "Protecting an employee's right to be free from forced observance of the religion of his employer is at the heart of Title VII's prohibition against religious discrimination." 859 F.2d at 620–621.

### 5. *Vicarious Liability versus Negligence.*

■ Since the Supreme Court's clarifying decisions in 1998, analysis of employer liability for hostile environment harassment has depended upon whether the harassment was committed by a supervisor or by a co-worker and whether or not the harassment culminated in a tangible employment action. *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Under certain circumstances—including where the harassment occurs at the hands of a co-employee—the employer is subject to a negligence standard. Under that standard, the employer is liable where it knows or reasonably should know of co-worker harassment and, despite knowing, fails to take prompt remedial action. *Berry v. Delta Airlines,* 260 F.3d 803, 811 (7th Cir. 2001); *Savino v. C.P. Hall Co.,* 199 F.3d 925, 933–934 (7th Cir.1999).

■ An employer is *vicariously* liable for harassment under two circumstances. First, where the harasser is a supervisor (or a successively higher manager in the victim's chain of command) and the harassment results in a tangible job detriment. In this circumstance, the employer is not entitled to an affirmative defense. Or, second, where the harasser is a supervisor (or successively higher employee) and *no* tangible job detriment occurs. In this event, however, the employer is entitled to an affirmative defense consisting of two showings: that the employer exercised reasonable care to prevent or correct the harassment *and* that the employee failed to take reasonable steps to avail herself of opportunities to remedy the harassment. The Supreme Court explained the standard in *Ellerth:*

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any

sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. *Gawley v. Indiana University*, 276 F.3d 301 (7th Cir.2001), *quoting, Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257.

■ This case involves instances of *both* tangible job detriment (alleged discharge, constructive discharge, failure to promote, and demotion) and 'instances where job detriment is absent. But even assuming that *no* adverse employment actions occurred and that Preferred is thus entitled to assert the affirmative defense, it may prevail on that defense only by showing by a preponderance of the evidence *both* that it "exercised reasonable care to prevent and correct promptly any ... harassing behavior, *and* that the plaintiff employee[s] unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *See, e.g., Savino v. C.P. Hall Co.*, 199 F.3d 925, 932 (7th Cir.1999);

Thus, even assuming that Preferred is entitled to the affirmative defense, it has not sustained its burden. It has not shown that it took care to prevent religious harassment or correct it promptly upon discovery; and it has not shown that any of the complaining parties unreasonably failed to take advantage of any opportunity Preferred provided or otherwise to avoid harm.

In numerous recent harassment cases, employers have successfully argued that they complied with the requirements of the affirmative defense by providing employees with an anti-harassment policy containing a mechanism for complaining about harassment and by showing that the plaintiff failed to avail herself of that complaint mechanism. *Haugerud*, 259 F.3d at 698; *Savino*, 199 F.3d at 932; *Johnson v. West*, 218 F.3d 725, 731 (7th Cir.2000); *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812–813 (7th Cir.1999), *cert denied*, 528 U.S. 1076, 120 S.Ct. 790, 145 L.Ed.2d 666 (2000).

Here, however, Preferred admits that no such policy and no such mechanism existed.[25] Moreover, the EEOC has presented evidence to show that when management personnel were advised that various religious practices were offensive to various employees, Preferred management sought to "resolve" the complaints through the very religious means that gave rise to the complaints—for example, by requiring the employee to engage in Leadership in the Making training, which contained a significant religious component.

Preferred's Director of Human Resources, Mike Pyatt, was responsible for all training on personnel subjects. From 1993 through 1998, Mr. Pyatt was a member of the executive management team. Pl. Add. Facts ¶¶ 681–682. Mr. Pyatt acknowledges that he had no training on religious harassment. Pl. Add. Fact, ¶ 847. Nor did Mr. Pyatt conduct any training on religious harassment or reli-

---

**25.** Preferred had a *sexual* harassment policy. It has pointed to no procedure (formal or informal) pursuant to which an employee could complain meaningfully about harassment based on religion. As we discuss in the context of the constructive discharge claims, moreover, the EEOC's evidence indicates that any such complaint would have proven futile both because Preferred was incapable of viewing its religious principles and practices as a form of "harassment" and because those who engaged in the harassment included Jackie Steuerwald at the apex of her organization. In sum, any such complaint would have been futile.

gious discrimination for Preferred employees. Nor did the manual that the directors of personnel used to train branch managers contain anything on religious harassment. Pl. Add. Fact, ¶¶ 845, 846. Terry Jennings, branch manager of the Lawrenceville branch and then Southern Area Administrator, received no training on religious harassment or religious discrimination other than reading an article about religious accommodation. Neither did Ann Parker, former Southern Area Administrator. Neither did Sue Klein, branch manager of the Vincennes branch. Wanda Wallace, acting branch manager of the Evansville branch and then branch manager of the Evansville branch, acknowledged that she could not recall receiving any training on a specific policy to be used if employees had a complaint of religious discrimination or religious harassment. Neither did Carol Smith, HHA Supervisor of the Vincennes branch. Pl. Add. Facts ¶¶ 848–851, 855. Nellie Foster, trainer and developer for Preferred, had no training on religious discrimination or religious harassment. Neither did Kathy Robinson, HHA Supervisor of the Indianapolis branch, have any training on how to deal with a complaint of religious discrimination or religious harassment. Neither did Becky Selm. Nor did Karen Lemons, RN Supervisor of the Vincennes branch, receive training on religious discrimination. Pl. Add. Facts ¶¶ 852–856.[26]

In sum, there is more than enough evidence to raise a reasonable inference that Preferred provided no complaint procedure for employees to register concerns about religious harassment or discrimination. Nor did it take other reasonable steps to investigate and prevent discrimi-

nation. To the contrary, the EEOC has presented evidence showing that Preferred management—all the way to Jackie Steuerwald at the top of the corporate hierarchy—employed religious practices to remedy the complaints of excessive religious practices.

For one example, on January 31, 1996, attorney L. Edward Cummings, representing Sondra Sievers, wrote a letter to Ms. Steuerwald in which he conveyed Ms. Sievers' discomfort with Preferred's religious practices. He wrote, in part:

> There was no secret ... that [Ms. Sievers] was a practicing Catholic and was not comfortable with some or even much of the religious materials and indoctrination which was provided to your employees. When you had a discussion with her critical of her performance, the materials provided her were clearly religious telling her to confess and repent. Subsequently, she was placed in a program, Leader in the Making, in which she sincerely attempted to perform to your and your company's expectations so that she could return to her position as manager. As you know, the entire focus of the "Leader in the Making" was religious and her success or lack of success in the program related to how she characterized her relationship with Jesus Christ. She and Ms. Foster had a particular discussion involving something called the Lordship Ladder which was not to Ms. Foster's satisfaction and the following day Ms. Sievers learned that she was no longer going to be returned to her position as branch manager.

Pl. Add. Facts ¶ 863.

Ms. Steuerwald and Mr. Pyatt received copies of Mr. Cummings' letter. Pl. Add.

---

**26.** Preferred objected to each of these statements involving the lack of training on religious discrimination and harassment on the ground that they are "immaterial" to "the matters raised and not raised on Preferred's motion for summary judgment." In view of the case law just cited concerning vicarious liability, Preferred's objections are overruled.

Facts ¶ 865. Ms. Steuerwald testified that she did not perceive the letter as a complaint of religious discrimination. Pl. Add. Facts ¶ 868. Mr. Pyatt did not confer about the letter with anyone other than Ms. Steuerwald, Nellie Foster, and Preferred's counsel. In other words, faced with what would reasonably be viewed as a complaint of religious discrimination or harassment, Preferred management ignored it. Pl. Add. Facts ¶ 867.

In view of Preferred's handling of such complaints, we cannot find as a matter of law that Preferred has satisfied its burden under its affirmative defense to "exercise reasonable care to prevent and correct promptly any ... harassing behavior." *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. It follows that Preferred is vicariously liable for that harassment.

Notwithstanding our finding that Preferred is vicariously liable, we note that it would not be entitled to summary judgment even if we applied the lower negligence standard. An employer is liable for hostile environment harassment under the negligence standard when it knows or should know of harassment and fails to take prompt remedial action—action that is reasonably calculated to remedy the harassment and prevent its recurrence. *Berry v.Delta Airlines*, 260 F.3d 803, 811 (7th Cir.2001); *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir.1996).

A jury could reasonably infer from the evidence we have already addressed that Preferred disregarded complaints of religious discrimination and harassment and took no remedial measures. It follows that a jury could reasonably conclude that Preferred was negligent with respect to harassment.

6. *Constructive Discharge.*

▌ The same evidence that supports the EEOC's claims of harassment is also sufficient to raise a reasonable inference

that employees Sherry Stute, Suzanne Elder, Diana DeWester, and Mary Mulder were constructively discharged from employment. In other words, for purposes of summary judgment we cannot say as a matter of law that it would have been unreasonable for them, or for similarly-situated employees of ordinary religious sensibility, to have felt compelled to resign under the terms and conditions of employment that prevailed at Preferred.

■ To establish a claim of constructive discharge, a plaintiff must present evidence sufficient to raise an inference that her working conditions became so intolerable that a reasonable person under similar circumstances would have felt compelled to resign. The reason for the resignation must, of course, be that the employer's misconduct was in violation of a Title VII protected criterion, here religion. *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 727 (7th Cir.2001). *Tutman v. WBBM–TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1050 (7th Cir.2000); *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998).

■ Where, as here, the constructive discharge arises from an alleged hostile environment, the Seventh Circuit requires a showing of "aggravated" circumstances, factors that go beyond the underlying harassment. *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 661–62 (7th Cir.2001); *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 677 (7th Cir. 1993). Additionally, absent extraordinary conditions, "a complaining employee is expected to remain on the job while seeking redress." *Grube*, 257 F.3d at 728. The Seventh Circuit agreed with the proposition that "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Id., quoting Yearous v. Niobrara County*

*Mem'l Hosp.,* 128 F.3d 1351, 1356 (10th Cir.1997).

The evidence here supports these higher standards of "aggravated" circumstances and "extraordinary conditions." We focus on only two points in particular from the detailed description of hostile working conditions already recited. First, in addition to the pervasive, unrelenting atmosphere of religiosity in the work place, the named employees were exposed to ridicule and condemnation because their beliefs did not accord with the prevailing orthodoxy. A jury could reasonably conclude that Ms. Steuerwald's and Ms. Jennings' denigrating references to Catholicism—the religion shared by all four of the parties claiming constructive discharge—created conditions that aggravated the already offensive atmosphere of religiosity.

Second, Preferred management was oblivious to the very idea that their religious practices in the work place could be construed as discriminatory, offensive, hostile, intimidating, abusive, or even unwelcome. As a result, Preferred management tended to view a complaint of discrimination or harassment as symptomatic of an underlying deficiency in the employee's spirituality. As Preferred management saw it, the "remedy" for complaints of too much religion was more religion. An employee complaining of religious harassment was thus subjected to improvement programs which were substantially religious in nature, or videos on the Holy Spirit, or literature on healing a broken spirit, or devotions and prayer.

The whole point of requiring an employee to remain employed and try to work out problems before resigning is—like the exhaustion of administrative remedies—a *proximate* means to solve a problem before the employee resorts to the *ultimate* means, resignation and a lawsuit. *See,*

*e.g., Ulichny v. Merton Comm. Sch. Dist.,* 249 F.3d 686, 704 n. 16 (7th Cir.2001); *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1015 (7th Cir.1997). Here, proximate resolution was futile. As noted earlier, there was no formal mechanism at Preferred for complaints of religious discrimination or harassment and Preferred management was apparently incapable of recognizing that some employees found the religious practices offensive, intimidating, and abusive. When the CEO of a corporation receives a letter from a lawyer which says that his client, a practicing Catholic, has been subjected to religious "indoctrination," and the CEO says that she did not interpret the letter as a complaint of religious discrimination, meaningful communication on the topic would appear to be impossible. See Pl. Add. Facts ¶¶ 863, 865.

For these reasons, a jury could reasonably conclude from the evidence that employees Stute, Elder, Mulder and DeWester were constructively discharged.

### D. *Individual Disparate Treatment Claims.*

#### 1. *Legal Analysis.*

■ The EEOC alleges individual disparate treatment claims on behalf of four employees. It alleges that Preferred demoted Sondra Sievers on the basis of religion and then unlawfully discharged her on the basis of religion or in retaliation for having complained about religious discrimination. It alleges that Preferred disciplined and then discharged Ellen Blice on the basis of religion. It alleges that Preferred refused to promote Sherry Stute on the basis of religion. And it alleges that Preferred refused to hire Teresa Raloff on the basis of religion.[27] We find the evidence sufficient to support all of these

---

**27.** We have already addressed the claim on behalf of Teresa Raloff. See subsection B–2.

claims, except for Ellen Blice's claim of discriminatory discipline, so that a grant of summary judgment would be inappropriate as to all but that claim.

All of the individual disparate treatment claims allege that Preferred took adverse employment actions against individual employees on the basis of religion. These claims are governed by the same disparate treatment proof schemes that govern other forms of employment discrimination. The EEOC may employ the traditional burden-shifting analysis as modified by the Seventh Circuit for purposes of religious discrimination in *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1169–1170 (7th Cir.1998). Or it may seek to create a "convincing mosaic" of discrimination as outlined in *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994); *Sattar*, 138 F.3d at 1170 (7th Cir.1998); *Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1088–1089 (7th Cir. 2000).

In *Sattar*, the Seventh Circuit adopted the Tenth Circuit's method of showing religious discrimination as follows:

> [I]n order to establish a prima facie case in actions where the plaintiff claims that he was discriminated against because he did not share certain religious beliefs held by his supervisors, we hold that the plaintiff must show (1) that he was subjected to some adverse employment action; (2) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (3) some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs.

138 F.3d at 1169–1170, *quoting Shapolia v. Los Alamos Nat'l Laboratory*, 992 F.2d 1033, 1038 (10th Cir.1993). The question, in sum, "is whether the plaintiff has established a logical reason to believe that the

decision [to terminate her] rests on a legally forbidden ground." *Venters*, 123 F.3d at 972, quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158–59 (7th Cir.1996) (*per curiam*). *See Maldonado v. U.S. Bank*, 186 F.3d 759, 763–764 (7th Cir. 1999).

Before embarking on our analysis of the individual claims, we note a breathtaking inconsistency at the heart of Preferred's motion for summary judgment. Jackie Steuerwald, Preferred's CEO, guiding force, and principal decision maker, identifies herself as a born again Christian whose mission it is to bring her religious message to the world, including to her employees in the workplace. In pursuit of that mission, she created a work environment that is, as we have described it at considerable length, frankly and pervasively religious. Her aim is nowhere clearer than in her deposition testimony. In answer to the question whether religion is appropriate in the work place, she said: "If you're a person of faith, it can't be separated." She added: "Well, in Him I live and breathe and have my being, and I don't leave my faith at the door when I go to work. It's who I am." *"It permeates my thinking, my decisions."* Steuerwald Dep., p. 69 (emphasis added).

Now, on summary judgment, she asks us to find *as a matter of law* that *none* of the employment decisions at issue here was based on religion. In other words, Ms. Steuerwald wants it both ways: she wants to operate her for-profit enterprise openly according to her religious precepts; at the same time, she tells this court that there is no evidence from which reasonable jurors might infer that her decisions were based on the very religious values and practices that she esteems and seeks to institutionalize.

We cannot simply ignore Ms. Steuerwald's principled acknowledgment that she

makes employment decisions on the same basis that she makes all other significant decisions: pursuant to her overriding religious mission. We view her acknowledgment as direct evidence—"evidence which in and of itself suggests" that someone with managerial authority was "animated by an illegal employment criterion." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1045 (7th Cir.1999), *quoting Venters*, 123 F.3d at 972. As the Seventh Circuit noted in *Sheehan*:

> Even isolated comments may constitute direct evidence of discrimination if they are "contemporaneous with the discharge or causally related to the discharge decision making process." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir.1998) (internal citations omitted). Direct evidence typically "relate[s] to the motivation of the decisionmaker responsible for the contested decision." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir.1997).

*Id.* at 1045. Ms. Steuerwald's acknowledgment manifestly relates to her motivation as the decision maker. Nor, in view of the evidence already discussed, can we dismiss her statement as "stray remarks" unrelated to employment decisions. Instead, "remarks and other evidence that reflect a propensity by the decisionmaker [sic] to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination, even short of an admission of illegal motivation." *Id.* at 1045, *quoting Venters*, 123 F.3d at 973. *Also see, Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.1999); *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1164–65 & nn. 2–3 (7th Cir. 1994); *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir.1990).

In the following analyses of the individual disparate treatment claims, we cut to the chase. If we apply the burden-shifting analysis as set forth in *Sattar*, we find that: (1) all three named complainants were subjected to some adverse employment action; (2) at the time the employment action was taken, all three employees' job performances were satisfactory; and (3) the EEOC has presented some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs.

It follows that the only issue in each case is whether the EEOC has produced legally sufficient evidence that Preferred's explanation of the adverse actions was pretextual. We arrive at the same issue if we apply the "convincing mosaic" analysis: whether, through "a combination of direct and circumstantial evidence"—employer remarks revealing a propensity to act, comments by supervisors, suspicious timing, inconsistent explanations or behavior, ambiguous statements oral or written, "bits and pieces from which an inference of discriminatory intent might be drawn"—a convincing picture of discrimination emerges. While none of the evidence may be conclusive in itself, if, taken together, it composes "a convincing mosaic of discrimination," the plaintiff may survive summary judgment. *Hasham v. California Board of Equalization*, 200 F.3d 1035 (7th Cir. 2000), *quoting Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994); *AFSCME v. Doherty*, 169 F.3d 1068, 1072–1073 (7th Cir.1999); *Robin*, 200 F.3d at 1089; *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir.1997).

The evidence here creates such a convincing mosaic of discrimination. In addition to Ms. Steuerwald's straightforward acknowledgement that she makes employment decisions on the basis of religious criteria, our analysis also embraces the following undisputed facts, which constitute tiles in the mosaic of discrimination.

First, Preferred requires its employees, as a condition of employment, to sign a statement that includes the words: "I have examined myself and I agree that I have respected and actively supported Preferred's Mission and Values during this past year of employment and I agree to respect and actively support Preferred's Mission and Values for the coming year." Def. Facts, ¶ 37; Pl. Add. Facts, ¶ 824. Second, Preferred's managers and supervisors are instructed to use the company's values in disciplining employees because values are considered a standard of performance. Def. Facts, ¶ 41. Third, Preferred actually evaluates employees' work performance according to its Mission and Values Statement. Pl. Add. Facts, ¶ 841. Fourth, Preferred has terminated employees for violating the values in the Mission and Values Statement. Pl. Add. Facts, ¶ 844. Fifth, Ms. Steuerwald said that certain religious ideas that were inconsistent with her own were "new age" thinking and would not be tolerated at Preferred. Def. Facts ¶ 468; Pl. Add. Facts ¶ 1345. In the context of the employment decisions at issue here, these facts—along with Ms. Steuerwald's admission that she makes employment decisions on the basis of her religious values—are enough to make it impossible for us to rule as a matter of law that religion did not play a role in the company's adverse employment decisions against employees Sievers, Blice, and Stute. They are enough to raise a doubt as to the honesty of any explanation that omits religion as a factor in these adverse employment decisions.

### 2. Sondra Sievers: Demotion, Discharge, Retaliation.

The EEOC alleges that Sondra Sievers was the victim of religious discrimination in that she was demoted from her position as branch manager at Vincennes and subsequently discharged because she failed to subscribe to Jackie Steuerwald's religious preferences or that she was discharged in retaliation for having complained about religious discrimination. Preferred argues that the demotion and discharge were justified by Ms. Sievers' inadequate work performance.

#### a. Ms. Sievers' Demotion

Ms. Steuerwald says that she demoted Ms. Sievers because of the results of the employee survey—"Your Opinion Counts"—conducted by Mike Pyatt in October 1995. The details of the survey are recounted in our statement of facts. Suffice to say here that the survey included the question: "Are the Company's Values actively promoted and modeled by supervisors and managers?" And the request: "Please make any other comments or suggestions that you believe would help Preferred be more effective and be a better place to work and serve the Lord and our customers," providing space for comments. Def. Facts ¶ 108, 109; Pl. Add. Facts ¶¶ 962, 963.

As Mr. Pyatt distributed the survey to the Vincennes employees, he said in response to an employee's question that management was looking at all the managers and "if they weren't where they thought they should be, there would be changes made." Pl. Add. Facts ¶¶ 965, 966.

Mr. Pyatt distributed fifty-nine surveys; thirty-four employees responded. Def. Facts ¶ 123. Three of the employee responses included the following negative comments about Ms. Sievers: (1) "We have lost a lot of very good, kind, caring office and field staff because of the branch manager and it sure is a shame;" (2) "Sondra does not respect our opinion. If we voice our opinion she will usually disagree and then she will be angry"; (3) "Sondra has us all very unhappy with her lack of responsibility, caring or understanding";

(4) "Sondra does not like others, is either [sic] revengeful with field staff, clients and families"; and (5) "If a person isn't liked or if a person does a job well, branch manager will do anything to create problems for the person." Def. Facts ¶ 124, 125.

After receiving the results of the survey, on November 14, 1995, Ms. Steuerwald and Mr. Pyatt went to Vincennes to inform Ms. Sievers of her demotion. Def. Facts ¶ 127. Ms. Sievers met with Mr. Pyatt who addressed the survey results and told Ms. Sievers that she would be removed from her position, placed in the Leader in the Making program with Nellie Foster, and re-evaluated by December 31, 1995. He also gave Ms. Sievers three documents. The first outlined the "qualifications" of a Leader in the Making as (1) having a teachable spirit, (2) having love for one another, (3) honoring others above self; (4) being approachable; (5) willing to ask others other for help and advice; and (6) willing to invest in others. The second, entitled "Confess—Repent—Turn," outlined what Ms. Sievers needed to accomplish by December 31, including (1) restoring broken relationships with Cherie Deem, referral sources, patients and staff; (2) submitting to authority; (3) regaining trust and respect of the staff and community; and (4) consistently walking in a blameless way to be above reproach. The third document was called "Characteristics of Broken People Prepared for Revival." Def. Facts ¶¶ 133–136. After the meeting, Mr. Pyatt told Ms. Sievers to take three days off and pray and think about things. Def. Facts ¶ 138 and Pl. Resp.

Preferred argues that Ms. Steuerwald based her decision to demote Ms. Sievers on the results of the survey. It argues that Ms. Steuerwald "honestly believed" that, based on the survey, Ms. Sievers' work performance was deficient and that we have no authority to second-guess hon-estly held business decisions. But we do second-guess employment decisions in virtually every employment discrimination case. We test employers' decisions to determine whether they are, indeed, "honestly held" or whether a jury might determine that they are pretextual. *See, e.g., Stalter v. Wal–Mart Stores, Inc.,* 195 F.3d 285, 289–290 (7th Cir.1999); *Dey v. Colt Construction & Development Co.,* 28 F.3d 1446, 1460–61 (7th Cir.1994). Preferred's argument may well be true and we would expect Preferred to present it to the jury. But a jury would not be *compelled* to believe it. *Venters,* 123 F.3d at 973. Accordingly, we cannot conclusively determine its truth and grant summary judgment on Ms. Sievers' demotion claim.

In addition to the reasons we outlined earlier explaining why Preferred's employment practices and Ms. Steuerwald's comments raise genuine issues of material fact with respect to her motivation in making employment decisions, we also note the following. First, assuming that Ms. Steuerwald based her decision on the results of the survey—or, more precisely, on the negative comments of three employees about Ms. Sievers—the decision was "performance related" only in the sense that religious beliefs and practices are part and parcel of Preferred's understanding of "performance." In other words, Preferred used an unlawful determinant of "performance."

Second, Ann Parker, Ms. Sievers' supervisor at the time, testified that she thought the survey had been designed to obtained negative results about Ms. Sievers. Pl. Add. Facts, ¶ 964. This is strong testimony from a management employee, especially one who was in favor with upper management for a considerable period. Third, Ms. Steuerwald replaced Ms. Sievers with Sue Klein. Where Ms. Sievers had several years of managerial experience with satis-

factory (and more than satisfactory) performance evaluations, Ms. Klein had no management experience whatever. Third, as we described in considerable detail earlier, Ms. Klein's religious views and practices were demonstrably consistent with Ms. Steuerwald's.

In view of these facts, as well as those recited earlier, there is a genuine issue of material fact as to whether Ms. Steuerwald demoted Ms. Sievers on the basis of religion. Accordingly, we cannot say as a matter of law that Preferred's demotion of Ms. Sievers was not motivated by religion.

### b. *Ms. Sievers' Discharge.*

After Ms. Sievers' demotion, she was assigned to Nellie Foster's Leader in the Making program for training to remedy her alleged performance deficiencies. Ms. Foster was going to customize a training program for Ms. Sievers' circumstances. Def. Facts ¶¶ 127, 128. The customized training involved meetings between Ms. Sievers and Ms. Foster on December 5 and 6, 1995. Both were religiously-oriented. Pl. Add. Facts ¶¶ 1018, 1019. At the December 6 meeting, Ms. Foster presented the "Lordship Ladder" to Ms. Sievers and asked such questions as: "What was the last sin you committed?" and "What was the last thing you asked God forgiveness for?" Ms. Sievers responded, "I am a Catholic, and I discuss my sins with my priest," and began crying. Def. Facts ¶¶ 166–169.

Ms. Foster concluded from these meetings that Ms. Sievers was not a candidate for leadership training and that she should not be returned to her branch manager position. She conveyed these conclusions to Ms. Steuerwald, who decided to offer Ms. Sievers a position in quality assurance instead. Def. Facts ¶¶ 174, 175, 178–180. On March 8, 1996, three months later, Ms. Steuerwald fired her. Def. Facts ¶ 186.

Preferred argues that the decision to terminate Ms. Sievers was, like the decision to demote her, based on Ms. Sievers' performance. It argues that, during Ms. Steuerwald's investigation of Ellen Blice's role in the catheter patient episode, she learned that Ms. Blice had discharged a patient under questionable circumstances and that Ms. Sievers did not intervene to correct the matter. Indeed, according to Ms. Steuerwald's "sources," Ms. Sievers "actually hung-up on the client when the client called." According to Preferred, Ms. Steuerwald also believed that Ms. Sievers was directly responsible for the loss of business as a result of separate incidents involving two clients and a referral source. In addition, Darlene Wright told Ms. Steuerwald that Ms. Sievers had approved the hiring of Ms. Blice even though Ms. Blice did not meet the company's minimum experience requirements for a field nurse. Def. Facts ¶¶ 188–191. Finally, "Ms. Steuerwald believed that Ms. Sievers' conduct while she was the branch manager was inimical to PHHC's values of treating people with respect and dignity and honoring others." Def. Facts ¶ 194.

While these explanations of an employment decision might ordinarily carry considerable weight on summary judgment, here they are counterbalanced by all of the evidence that supports the EEOC's argument that Ms. Steuerwald had a powerful propensity to make employment decisions on the basis of religion.

We note in addition that Darlene Wright, who apparently criticized Ms. Sievers for hiring Ms. Blice even though Ms. Blice did not have the proper qualifications, was the same Ms. Wright who *recommended* Ms. Blice for the job for which she was hired. Ms. Blice interviewed first with Ms. Wright, who told Ms. Blice to go immediately to Preferred's office on Washington Avenue and see Bar-

bara Burke. Ms. Wright told Ms. Blice: "You would be a wonderful person for the Preferred agency. We need the nurse. You just need to talk to Barb." Pl. Add. Facts ¶ 1059. Ms. Burke told Ms. Blice that Darlene Wright wanted Ms. Blice hired on the spot. Pl. Add. Facts ¶ 1060. Ms. Burke also recommended Ms. Blice's hire because of her technical skills. Pl. Add. Facts ¶ 1061.

Besides, by the time Ms. Steuerwald fired Ms. Sievers, Ms. Blice had been employed for two years. She had received favorable employment evaluations prepared by Barbara Burke. Def. Facts ¶ 206. The decision to terminate Ms. Sievers because of a decision she participated in two years earlier raises an eyebrow as to suspicious timing.

We also note that Ms. Sievers' alleged loss of a referral source is questionable. At first Ms. Steuerwald could not identify which referral source Ms. Sievers allegedly lost. Then, she identified the referral source as the Vincennes Housing Authority. It turned out, however, that the Vincennes Housing Authority was not a source of referrals. Pl. Add. Facts ¶¶ 1055–1056.

Additionally, one of Ms. Steuerwald's express reasons for discharging Ms. Sievers was that Ms. Sievers' performance as branch manager was "inimical" to Preferred's values. Coupled with Ms. Stueurwald's earlier findings that Ms. Sievers was irredeemable as a leader and that Ms. Sievers did not exemplify such characteristics as "a teachable spirit," we cannot separate religious reasons from the secular reasons, or subjective reasons from objective reasons in a sufficiently conclusive manner so as to grant summary judgment.

Both the decision to demote Ms. Sievers and the decision to discharge Ms. Sievers were made, at least in part, on the basis of subjective factors: "attitude," "caring," "management style," and the like. Feder-al courts, including the Seventh Circuit, have routinely held that an employer may base adverse employment actions on subjective factors. *Giacoletto v. Amax Zinc Co., Inc.,* 954 F.2d 424, 427–428 (7th Cir. 1992); *Chapman v. AI Transport,* 229 F.3d 1012,1033 (11th Cir.2000), *en banc.* They have also held, however, that subjective explanations are more susceptible of abuse and may mask discrimination more effectively than objective, testable explanations. In *Giacoletto,* for example, the Seventh Circuit noted that: "Although relying on subjective factors is not per se illegal, the jury may, under some circumstances, reasonably consider subjective reasons as pretexts for discrimination." *Id.* And in *Perfetti v. First Nat. Bank of Chicago,* 950 F.2d 449, 457 (7th Cir.1991) the court observed: "we recognize the ease with which employers may use subjective factors to 'camouflage discrimination.'" To prevent employers from masking discrimination behind an incantation of subjective factors, we have held that, "under many circumstances, subjective factors may be insufficient to justify the employer's hiring decision." [Citation omitted.]

The EEOC's evidence is sufficient to raise a reasonable inference that Ms. Sievers' demotion and termination were based on religion and that they were, therefore, in violation of Title VII.

c. *Retaliatory Discharge.*

■ The EEOC alleges, alternatively, that Ms. Sievers was terminated in retaliation for having complained about religious discrimination. In addition to protecting employees from discrimination based on race, Title VII prohibits an employer from retaliating against an individual who "participates" in statutorily-protected conduct or who "opposes" conduct made unlawful by the statute. 42 U.S.C. § 2000e–3(a).

*See, McDonnell v. Cisneros,* 84 F.3d 256, 262 (7th Cir.1996).

In order to prevail on the retaliation claim, the EEOC must show that Ms. Sievers (1) engaged in statutorily protected expression; (2) suffered an adverse employment action; and (3) there is a causal relationship between the protected expression and the adverse action. *Maarouf v. Walker Manufacturing Co.,* 210 F.3d 750, 755 (7th Cir.2000); *Alexander v. Gerhardt Enterprises Inc.,* 40 F.3d 187, 195 (7th Cir.1994).

By engaging a lawyer who wrote on her behalf a letter which focuses on alleged employment discrimination, Ms. Sievers clearly engaged in statutorily protected conduct. She subsequently experienced a materially adverse employment action in that she was discharged. As is usually the case, this retaliation claim boils down to the sufficiency of the evidence to support the causal connection between engaging in the protected conduct and the adverse employment action. While the call is a close one, we believe the evidence is sufficient to raise an inference of causation.

First, the evidence supports an inference of "suspicious timing" or a "telling temporal sequence." *E.g., Horwitz v. Board of Educ. of Avoca School Dist. No. 37,* 260 F.3d 602, 612–613 (7th Cir.2001); *Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1034 (7th Cir.1999); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998).

Ms. Sievers' lawyer, Mr. Cummings, wrote to Preferred on January 31, 1996, shortly after Ms. Sievers was demoted. The gist of his letter was that Ms. Sievers felt she had been the victim of religious discrimination. The letter sets forth in some detail what Mr. Cummings called the religious "indoctrination" to which Ms. Sievers had been subjected. This included some of Ms. Steuerwald's favorite practices, including the dissemination of religious materials in the work place, Ms. Steuerwald's focus on employees' confession of sin and repentance, and Nellie Foster's Leader in the Making program, including its "Lordship Ladder." Ms. Sievers was terminated on March 8, a mere five weeks later. There is support in the case law for the proposition that timing alone may, under the proper circumstances, create a reasonable inference of retaliation. *Horwitz,* 260 F.3d at 612–613; *Silk v. City of Chicago,* 194 F.3d 788, 800–801 (7th Cir.1999).

Second, the EEOC has presented considerable evidence indicating that Ms. Steuerwald did not respond warmly to those who disagreed with her religious views. She stared at employees who refused to sing hymns during devotions. She almost literally got in Kathy Robinson's face and called her a "vain sinner" when Ms. Robinson asked her a why it was vanity for employees to make their jobs run more smoothly. She got a "devastated" look on her face, her eyes got large, and she looked as if she had been knocked over when Sherry Stute said that she had converted to Catholicism. These examples (and there are others) suggest a propensity on Ms. Steuerwald's part to react against those who challenge her religious views, which is what Sondra Sievers appeared to be doing through her lawyer's letter. Indeed, coming from a lawyer, Mr. Cummings' letter conveyed the kind of threat that no employee's work place challenge could match. This is the kind of propensity evidence that we discussed earlier: "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria [that] will suffice as direct evidence of discrimination." *Sheehan,* 173 F.3d at 1045; *Venters,* 123 F.3d at 973.

Third, Ms. Steuerwald mentioned Mr. Cummings' letter when she met with Ms.

Sievers on the day she terminated her. She opened the meeting with words to the effect that: "I understand that you have some questions about your demotion and that you feel it has to do with religious discrimination." Pl. Add. Facts ¶ 1052.

Finally, Ms. Steuerwald asked Mr. Pyatt—who accompanied Ms. Steuerwald when she fired Ms. Sievers—whether she should terminate Ms. Sievers. Mr. Pyatt opposed terminating her on the ground that "the paper trail" was not strong enough. Def., Facts ¶ 187; Pl. Add. Facts ¶ 1054 and Def. Resp. Whatever Mr. Pyatt meant—and at least one interpretation is unfavorable to Preferred—he clearly did not think there were sufficient grounds to support her termination at the time.

The EEOC's evidence of retaliation is sufficient to raise a reasonable inference that Ms. Sievers was fired for having complained about religious discrimination. Accordingly, we DENY Preferred's motion for summary judgment with respect to Ms. Sievers' retaliation claim.

### 3. *Ellen Blice*

The EEOC alleges that Ellen Blice was subjected to discriminatory discipline and then discharged on the basis of religion.

#### a. *Discriminatory Discipline.*

■ The basis for Ms. Blice's discriminatory discipline claim is that she received a verbal warning for having committed an infraction that was substantially identical to an infraction which co-employee Donna Drew also committed, but about which Ms. Drew was neither disciplined nor warned. Since there is evidence to suggest that Ms. Drew shared the dominant groups's reli-

gious values, the EEOC argues that there is an issue of fact as to whether religion explains the difference in treatment.

Perhaps it does. But well-settled case law in our circuit compels us to conclude that the claim is not actionable because warnings, by themselves, do not rise to the level of a materially adverse employment action. *Kersting v. Wal–Mart Stores, Inc.,* 250 F.3d 1109, 1118–1119 (7th Cir.2001); *Smart v. Ball State University,* 89 F.3d 437, 441 (7th Cir.1996); *Harbison v. Prestige Group, Inc.,* 2001 WL 395786, at \*28–\*29 (S.D.Ind., 2001). Accordingly, we find that Ms. Blice's unlawful discipline claim is not legally cognizable and GRANT Preferred's motion for summary judgment with respect to it.

#### b. *Discriminatory Discharge.*

##### i. *The Decision Maker.*

■ As a preliminary matter, Preferred argues that Ms. Steuerwald did not know Ms. Blice's religion so that religion could not have been a basis for terminating her.[28] *Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir.1996). Preferred's argument presupposes that Ms. Steuerwald made the decision to terminate Ms. Blice. *See,* Def. Facts ¶ 302. The EEOC states, without challenge, however, that "Jackie Steuerwald was not involved in the decision to terminate Ellen Blice." And that: "Sue Klein made the decision to terminate Ellen Blice prior to the meeting with Jackie Steuerwald on February 14, 1996." Pl. Add. Facts ¶¶ 1080, 1081. The EEOC's position is supported by Sue Klein's testimony that she, Karen Lemons, and Terry Jennings made the decision and that she

---

**28.** We find Preferred's statement somewhat disingenuous. Unrebutted testimony establishes a reasonable inference that, on February 14, 1996, the day Ms. Steuerwald went to Vincennes to discuss Ms. Blice's warning with her, Ms. Steuerwald handed Ms. Blice a song sheet for the song beginning "He is a mighty God" and said "You need to sing this." Ms. Blice did not sing the song. Ms. Steuerwald stared at Ms. Blice for the remainder of the devotions period. Def. Facts ¶¶ 269–272; Pl. Add. Facts ¶¶ 1111–1116.

couldn't say that Ms. Steuerwald played any role in it. Klein Dep. Vol. II, 144–45. It is also supported by Ms. Jennings' testimony, in which she denied that Ms. Steuerwald was involved in the decision and said that the decision was made on the branch level by Ms. Klein. Hedges (Jennings) Dep., p. 176, 257–258. There is at least an issue of fact as to who made the decision to terminate Ms. Blice. Since a jury could find that Ms. Klein made the decision and that Ms. Steuerwald concurred in it, this preliminary matter must be resolved in favor of the EEOC.

### ii. *Ms. Blice's Discharge.*

Preferred claims that Ms. Blice was fired because of the catheter incident of November 1995,[29] which we previously described in detail. In brief, Ms. Blice received orders on a Friday from Dr. Shelton to remove a patient's catheter and to reinsert it some time over the weekend. Donna Drew was the on-call nurse for the weekend. Ms. Blice paged her. When Ms. Drew did not respond, Ms. Blice informed Karen Lemons, her supervisor, that she needed to see Ms. Drew and that the patient's condition had changed. Ms. Lemons said she would inform Ms. Drew of the change. Ms. Drew did not make contact with Ms. Blice until around noon on Saturday. She told Ms. Blice that she was with her daughter at a sporting event and could not leave to take care of the patient right then. Ms. Drew did not go to the patient's house to replace the catheter until 1:30 p.m. Sue Klein, the Acting Branch Manager, believed that the optimal response would have been for Ms. Drew to replace the catheter immediately. Pl. Add. Facts, ¶¶ 1084–1099; Def. Facts ¶¶ 238–252.

The following Monday morning, Ms. Blice met with Ms. Klein and Ms. Lemons. Ms. Klein and Ms. Lemons instructed Ms. Blice to make direct contact with the on-call nurse in the future whenever a patient's condition changed. Although Ms. Blice denied responsibility for the catheter incident because she felt she had acted appropriately by informing Nursing Supervisor Lemons, she apologized and indicated that she would give proper notification in the future.

In early February 1996, a surveyor from the State audited some of Preferred's client charts based on a complaint received from the catheter patient. As a result of the survey, Preferred received a deficiency for lack of communication in the area of "coordinating client care." The state surveyor had found two charts where the primary nurse had failed to coordinate with the on-call nurse; one chart involved the catheter incident in which Ms. Blice was the primary nurse, while the other chart, on which Ms. Drew was the primary nurse, involved a failure to communicate a medication change. As a result of the audit, Ms. Blice received a formal verbal warning on February 8. Ms. Drew, who also disavowed responsibility, never received a warning and was not even counseled over the deficiency for more than a

---

**29.** Since we must assume for purposes of summary judgment that Ms. Klein was the decision maker and that Ms. Steuerwald had nothing to do with the decision, we must discount Ms. Steuerwald's testimony that she was also outraged by Ms. Blice's role in the lasix incident that had occurred in July 1995, which Ms. Steuerwald says she discovered on February 14, 1996, and for which she said she would have terminated Ms. Blice in any event. Def. Facts ¶¶ 280–301. Since Ms. Steuerwald did not participate in the termination decision, and since there is no evidence that Ms. Klein considered the lasix incident in her decision to fire Ms. Blice, then the lasix incident could not have figured in the decision. Nevertheless, even if we credited this testimony, to determine which factor(s) played a role in which decision maker's decision would require too much speculation to support a grant of summary judgment. Only a jury is empowered to make such decisions.

week. Pl. Add. Facts ¶¶ 1100–1105; Def. Facts ¶¶ 255, 256.

A jury could reasonably conclude from the evidence that Ms. Klein decided to terminate Ms. Blice because of the catheter incident. But a jury also could reasonably conclude from the evidence that religion played a role in the decision. Where the evidence is sufficient to support an inference that an unlawful criterion played a role in an adverse employment action, a grant of summary judgment would be improper. That is the case here.

First, it appears from the evidence that Ms. Blice and Ms. Drew were similarly-situated. Each had made an error in communications that involved patient care and both incidents showed up in a state audit that led to a deficiency for the company. Indeed, Ms. Drew had been involved in *both* incidents. Pl. Add. Facts ¶¶ 1106–1110. Yet Ms. Blice was given a formal warning and shortly thereafter terminated, while Ms. Drew was merely counseled. The difference between Ms. Klein's treatment of Ms. Blice and her treatment of Ms. Drew calls for a non-discriminatory explanation. None is apparent from the record.

Second, even if Ms. Steuerwald may have been unfamiliar with Ms. Blice's religion, Sue Klein was quite familiar with Ms. Blice's objections to religion in the work place, including her numerous requests to Ms. Klein not to prayer over her. The record indicates that Ms. Blice asked Ms. Klein not to pray over her six times during the week before her termination. On February 9, 1996, five days before Ms. Blice's termination, Ms. Klein saw a Communication Note signed by Nurse Carol Smith stating that Ms. Blice has said that things have changed since Ms. Klein took over and that: "Sue K. always tells her, 'I'll pray for you,' and Ellen [Blice] said, 'she can take her prayers somewhere else. I

don't need them.'" Klein Dep. Vol. II, 225–26, Ex. 70.

Additionally, toward the end of Ms. Blice's employment, she attended a meeting with Ms. Klein, Ms. Drew, Ms. Lemons, and Terry Jennings. At the outset, Ms. Klein conducted a prayer for Ms. Blice to understand the meeting that they were going to have and to ask God for his acceptance. Pl. Add. Facts ¶ 1102. At the end of the meeting, Ms. Blice was encouraged to be more humble, to look to God so that things would be better and she wouldn't have as much chaos in her life. Pl. Add. Facts ¶ 1103.

Third, among the reasons Preferred has offered for its action against Ms. Blice is that she rejected responsibility for the catheter incident and was not sufficiently apologetic about it. It expressly asserts that Ms. Blice was discharged because of Ms. Klein's and Ms. Steuerwald's assessment of her "performance" and "attitude." Def. Facts ¶ 301, n. 4. As we noted earlier, religion and work performance were so thoroughly intertwined at Preferred that we cannot determine as a matter of law that any particular instance of "performance" was not also an instance of religious beliefs or values. Whether "performance" involved Ms. Blice's duties as a nurse or her subscription to the company's religious values is a question for a jury. Similarly, while an employer may consider an employee's "attitude" in evaluating her work performance, the term is so subject to the kind of abuse we discussed earlier as to make it suspect when it is used to justify a discharge.

The evidence presented by the EEOC is sufficient to raise a genuine issue of material fact as to Preferred's motive in discharging Ellen Blice. Accordingly, Preferred's motion for summary judgment as to Ms. Blice's discharge claim is DENIED.

4. *Sherry Stute: Failure to Promote.*

 The EEOC alleges that Preferred refused to promote Sherry Stute to branch manager of the Evansville branch on the basis of religion. Preferred argues that Ms. Stute was unqualified for the position, never applied for it, and was never rejected for it. The parties have offered little evidence to support their respective claims. However, that evidence is, in light of all the other evidence we have discussed, enough to raise a jury question.

The evidence shows that Ms. Stute was hired as RN Supervisor at Preferred's Evansville facility. She had been told when she was hired that Preferred was hiring her as RN Supervisor to get the Evansville office operational, but that once it became financially stable, the RN supervisor would move into the branch manager position and a new RN Supervisor would be hired. Pl. Add. Facts ¶ 1221. On February 21, 1996, Preferred hired Wanda Wallace, a retired former administrator for PMCI, to be the acting branch manager of the Evansville branch. Among her duties, Ms. Wallace was to train Ms. Stute to become the branch manager. Ms. Stute was informed that Ms. Wallace would be training her for that job. Preferred does not dispute the EEOC's statement that Ms. Stute was never given the opportunity to apply for the branch manager position at Evansville. Pl. Add. Facts ¶ 1223.

Preferred asserts that Ms. Stute was not qualified for the branch manager's position, because she did not have any previous home health experience, and one year of experience was required for the position. The EEOC points out that one year was "preferred," but not "required." Def. Facts ¶¶ 404 (and Pl. Resp.), 405. The evidence shows that Darlene Wright knew that Ms. Stute had no prior home health care when she recommended her for the job. And so did branch manager Sondra Sievers and nursing supervisor Cherie Deem. Ms. Wright thought, however, that Ms. Stute's financial experience "sounds perfect for what the job we want done in Evansville, because we want someone who is working with finances and understands the bottom line." Pl. Ad. Facts 1181, 1188, 1191. The EEOC also points out that by the time Ms. Stute would have become branch manager, she would have had the requisite two to three years of managerial experience.

Preferred also asserts that Ms. Stute never applied for the job. While that may be precisely true, there is no evidence to support the proposition that promotion to this position (or for any position at Preferred, for that matter) was based on employee applications. *See, e.g., Loyd v. Phillips Bros., Inc.,* 25 F.3d 518, 523–524 (7th Cir.1994); *Box v. A & P Tea Co.,* 772 F.2d 1372, 1377 (7th Cir.1985), *cert denied,* 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 724 (1986). Instead, the EEOC alleges that Ms. Stute had a reasonable expectation of promotion at the outset of her employment, and presents evidence to support that allegation.

Once again, in view of all of the evidence a jury could reasonably conclude that Preferred did not promote Ms. Stute because she was unqualified (or under-qualified); or it could reasonably conclude that religion was a determining factor in not promoting her to branch manager.

Without recounting all of the evidence in detail, we simply note the following facts. After Sondra Sievers was discharged in November 1995, Terry Jennings served as Ms. Stute's supervisor and Sue Klein was interim branch manager. We have described in detail Ms. Jennings' numerous denigrating references to Ms. Stute's Catholicism. She told Ms. Stute that it was mandatory for her and her staff to attend an in-service session on fasting that Chaplain Chuck Harrington was presenting.

Ms. Jennings placed Ms. Stute on an improvement plan which included daily Bible readings, daily prayer and a checklist indicating how Ms. Stute was progressing on the various criteria. One of the topics of the improvement plan was how to heal a wounded spirit.

Every meeting between branch manager Wanda Wallace and Sherry Stute started with prayer. Ms. Wanda Wallace often asked Ms. Stute whether she had read her daily scripture. Ms. Wallace referred to Ms. Stute as a "wounded spirit" and stated that the Bible says wounded spirits need healing and nurturing. Ms. Wallace told Jackie Steuerwald that she thought Ms. Stute was a wounded spirit and told Ms. Stute that Ms. Steuerwald had agreed with that assessment. Ms. Wallace told Ms. Stute that she needed to study the Bible and pray more to overcome being a wounded spirit. She also asked Ms. Stute if she had confessed her sins. Ms. Stute was insulted by Ms. Wallace classifying her as a wounded spirit. Ms. Wallace called Ms. Stute "proud."

We also have discussed the fact that Ms. Klein noted on Ms. Stute's three-month evaluation, among other things, that Ms. Stute needed to grow in her faith. Ms. Klein asked Ms. Stute whether she wanted her to be her prayer partner. Ms. Stute was uncomfortable when Ms. Klein asked her whether she prayed and read the Bible regarding a drop in the Preferred's Evansville clientele.

In view of all of the evidence indicating that the key decision makers-Jackie Steuerwald, Terry Jennings, Sue Klein, and, to a lesser degree, Wanda Wallace-perceived Ms. Stute's religion as non-conforming, we cannot find as a matter of law that religion was not a determining factor in Preferred's decision not to promote Ms. Stute to branch manager.

### 5. Pattern or Practice of Religious Discrimination.

In addition to its claim that Preferred engaged in a pattern or practice of religious *harassment*, the EEOC also alleges that Preferred engaged in a "pattern or practice" of *discrimination* based on religion. In other words, it alleges that the adverse employment actions which Preferred took against employees Sievers, Blice, Stute, and Raloff were not merely isolated acts of religious discrimination against four individuals, but were indications of systemic discrimination—Preferred's routine method of making employment decisions.

We have already noted that Title VII expressly prohibits employers from engaging in a "pattern or practice" of discrimination based on the statute's protected criteria. 42 U.S.C. § § 2000e–6(a). We have also noted that it is not enough for a plaintiff to show that the employer engaged in "isolated" or "sporadic" acts of discrimination. Instead, the evidence must show that the conduct is "repeated, routine or of a generalized nature." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396, (1977) (quoting Senator Humphrey); *King v. General Electric Company,* 960 F.2d 617, 620 (7th Cir.1992), *rehearing en banc denied.*

Preferred argues that the EEOC has not presented any statistical evidence giving rise to a reasonable inference of systemic discrimination, whereas the Seventh Circuit has stated that: "In a pattern or practice disparate treatment case, statistical evidence constitutes the core of a plaintiff's prima facie case." *Bell v. Environmental Protection Agency,* 232 F.3d 546, 553 (7th Cir.2000). Preferred points out, moreover, that it employed some four hundred employees and that the EEOC

has made allegations on behalf of only seven.

■ The courts do not, however, require any particular kind of evidence to prove a pattern or practice case. The Supreme Court cautioned in *Teamsters* that "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." 431 U.S. at 339–340, 97 S.Ct. at 1857. The Seventh Circuit said much the same thing in *King v. General Electric Company,* 960 F.2d 617, 626 (7th Cir.1992), a pattern or practice age discrimination case: "Although statistics are useful, they are not magical. The finder of fact must always consider the extent to which the statistical evidence reasonably supports an inference of discrimination." Nor would the Court limit the kind of evidence that employers might use in defense. *Teamsters,* 431 U.S. at 360 n. 46, 97 S.Ct. at 1867 n. 46. An employer may attempt to show that the plaintiffs' proof is "either inaccurate or insignificant," *id.* at 360, 97 S.Ct. at 1867, or the defendant may provide a "nondiscriminatory explanation for the apparently discriminatory result." *Id.* at 361 n. 46, 97 S.Ct. at 1867 n. 46.

Here, while statistics might have enhanced the EEOC's pattern or practice case, it has presented sufficient non-statistical evidence that Preferred systematically made religious values and practices a routine part of its employment operations. The EEOC also has introduced evidence that seven employees, and one would-be employee, suffered a variety of adverse employment actions based on religion. The range of adverse actions is also significant. They include demotion, discharge, constructive discharge, failure to hire and failure to promote. This evidence complies with the Seventh Circuit's requirement that, in addition to showing that the

company had a discriminatory *policy,* it produce "some victims" or "some valid direct or circumstantial evidence to show that [the company] actually followed the polic[y] in its treatment of employees." *EEOC v. Sears Roebuck & Co.,* 839 F.2d 302, 354–355 (7th Cir.1988). We find that the EEOC's evidence amply supports a reasonable inference that Preferred engaged in a pattern or practice of discrimination in the form of disparate treatment, at least for purposes of Preferred's motion for summary judgment.

### IV. *Conclusion.*

For all of the aforestated reasons, we summarize our holdings as follows. We DENY Preferred's motion for summary judgment except with respect to the EEOC's claim that Ellen Blice was the victim of discriminatory discipline. We construe Preferred's "Establishment Objections" as a motion to strike and DENY that motion. We GRANT the EEOC's motion for partial summary judgment in all particulars, *except* for its request that we find as a matter of law that PMC is a proper defendant and *except* for its request that we find admissible all evidence of Preferred's conduct before June 18, 1995 and after July 26, 1996, which portions we DENY. To the extent that Preferred's arguments concerning statute of limitations may be viewed as a motion separate from its motion for summary judgment, we DENY that motion and conclude that none of the EEOC's claims is barred by any statute of limitations.